UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

DAVID PIRK *et al.*,

           Defendants.

No. 15-CR-142-W

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT THOMAS SCANLON'S OPPOSITION TO DETENTION AND IN SUPPORT OF RELEASE ON CONDITIONS

**HODGSON RUSS LLP**
*Attorneys for Defendant Thomas Scanlon*
Daniel C. Oliverio, Esq.
Timothy W. Hoover, Esq.
Reetuparna Dutta, Esq.
Patrick E. Fitzsimmons, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY 14202-4040
716.856.4000

**INTRODUCTION**

The government's motion to detain Thomas Scanlon should be denied. Scanlon, a model citizen, poses no danger to any person or the community. The evidence shows that Scanlon is a family man, with long-standing ties to the community, and a stable employment history who worked for the same employer since 1987 and has no prior criminal or traffic record. He is also a decorated military veteran who was awarded the Purple Heart for his valor, and who sustained serious medical injuries as a result of putting his life at risk for others. In fact, other than the Indictment in this case, there are no blemishes on Scanlon's otherwise exemplary background.

But the government claims that Scanlon was also a member of a motorcycle club, the Kingsmen, which was a criminal organization, and that Scanlon committed a variety of offenses as part of that organization – RICO conspiracy, possessing firearms in furtherance of a crime of violence and drug trafficking offenses, obstruction of justice, false statements before a grand jury, and using and maintaining premises for drug dealing. But the government never alleges that Scanlon participated in, or directed, any acts of violence, or that he participated in any homicides, and the government concedes that Scanlon poses no risk of flight, given his extraordinary behavior in driving from North Carolina to Buffalo to turn himself in – a voluntary surrender that the government and the case agents specifically permitted.

And the government's reliance on a few phone calls that supposedly occurred – in much fewer number than the government originally claimed – and with the single one that occurred on September 6, 2014 not occurring "immediately" after the homicides, is insufficient to prove any danger. The ***one call*** on the early morning of September 6 by Scanlon that the

government cites is the exact opposite of proving any danger. Rather, Scanlon, who was called by someone telling him about the murders, was immediately shocked, saddened, and worried about the safety of his friends. This, of course, makes sense, since the Second Superseding Indictment does not allege that Scanlon had anything to do with the homicides and, in fact, he was home sleeping at the time. Indeed, in the overt acts leading up the homicide, Scanlon is nowhere mentioned, and is not alleged to have ever been present with Andre Jenkins, and is not alleged to have been present at the Olean clubhouse for a meeting between Robert Osborne, Jr., Pirk and Jenkins.[1] Scanlon was not part of any conspiracy to commit homicide, did not destroy any evidence, and had no knowledge of the homicide plot before or after it occurred. Appending a single or handful of coincidental calls, without specificity, to the charges seeks to tie them to violent acts to which Scanlon had no part, and is alleged to have no part.

      The government's generic claims of some risk of violence by a non-violent man charged with no violent acts should not carry the day. Those claims do not carry the government's heightened burden of clear and convincing evidence. And even if the Court is concerned with some potential risk of danger, the government has offered nothing in response to our strong proposed bail package, including the posting of property, money, pretrial services reporting, GPS monitoring, and associational restrictions and other conditions.

      In these circumstances, Scanlon should be released to his family and his community, pending trial. He has rebutted the presumptions that the government has invoked

---

[1] Second Superseding Indictment (Docket #33) ("Indictment") ¶ 30, Overt Acts 41-63.

(one of which the government concedes is rebutted), and our proposed conditions of release will more than ensure the safety of the community.

Scanlon should be released on the following conditions, with any other conditions that the Court sees fit to impose:

- Post cash or property to include all of the equity in his residence and rental property, for a total monetary bond of $100,000$^2$;

- Pretrial Services supervision, including phone and in-person reporting as frequently as directed;

- Wear an electronic monitor under home detention (or whatever level of monitoring, including home incarceration, that the Court deems appropriate);$^3$

- Seek and maintain gainful employment;

- Appropriate travel-restriction/reporting as the Court deems appropriate;

---

2   The two personal properties have mortgages, but there is equity in both. We envision posting both of those, plus cash. As well, Scanlon's parents are aware of this case, and are supportive, and are willing to post their home, which they own free and clear, if additional assets are required by the Court to secure release.

3   We received copy of a letter today, dated March 24, 2016, from Cytec to Mr. Scanlon indicating that it had terminated Scanlon's employment because of the return of the indictment. This occurrence, while unfortunate, does not change our position on release and, if anything, strengthens it, for Scanlon can be supervised on electronic monitoring or home detention, as he will no longer be traveling out-of-state.

- Surrender his passport to Pretrial Services;

- Refrain from any use of alcohol or non-prescription drugs;[4]

- Provide access to requested financial information;

- Provide access to requested medical/mental health information, and engage in any additional treatment as directed by Pretrial Services;

- Do not communicate (in person, or by telephone, or by any other means) with any member of the Kingsmen[5];

- Stay away from any Kingsmen clubhouse location or place where Kingsmen associate; and

- Any other required condition.

## ARGUMENT

A defendant should be detained prior to trial only if there is "no condition or combination of conditions [that] will reasonably assure the appearance of the person as required and the safety of any other person and the community."[6] And a finding that no conditions will

---

[4] We do not believe alcohol and drug testing is necessary because Scanlon does not abuse alcohol or use drugs, but we have no objection to such testing.

[5] We are advised that Scanlon has not been a member of the Kingsmen since late summer/fall 2015, and is no longer a member.

[6] 18 U.S.C. § 3142(e)(1).

assure the safety of others must be supported by clear and convincing evidence.[7] While there is a rebuttable presumption in favor of detention if the court finds probable cause to believe that the defendant committed certain offenses under the Controlled Substances Act, or an offense under 18 U.S.C. § 924(c), the presumption is rebuttable.[8] But the Court must take into account the nature and circumstances of the offense, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.[9] The defendant continues to be presumed innocent.[10]

      Here, there is no basis for Scanlon's detention. He is a model citizen and, as the government conceded, not a flight risk. Thus, the only basis for detention is the presumption in favor of detention given the charges against Scanlon, and the government's allegation that he communicated immediately before and after certain alleged homicides with co-Defendant David Pirk.[11] But the mere fact of the charges in the Indictment – which include no allegations that Scanlon engaged in or directed any violent acts[12] – and a few phone calls with a co-Defendant during a certain time frame, should not be sufficient to rebut Scanlon's lifelong record of

---

[7]     *Id*. at § 3142(f).

[8]     *Id*. at § 3142(e)(3)(A), (B).

[9]     *Id*. at § 3142(g).

[10]     *Id*. at § 3142(j).

[11]     *See* Indictment, Overt Acts, ¶¶ 57-65.

[12]     By contrast, the Indictment alleges that Defendant Pirk told Defendant Jenkins to kill Paul Maue and Daniel Szymanski. Indictment, Overt Act 57.

responsibility, good character, and respect for authority, particularly when a substantial set of bail/release conditions can be imposed and are appropriate.

### POINT I.   SCANLON HAS REBUTTED THE PRESUMPTION AGAINST DETENTION.

Where a defendant is subject to a presumption in favor of detention, the defendant "bears a limited burden of production – not a burden of persuasion – to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight."[13]  Once a defendant has met his burden, the presumption becomes simply a factor to be considered by the court.[14]  And, even in a case in which the presumption applies, "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community."[15]

Here, Scanlon has rebutted the presumption in favor of detention:

- Scanlon has long-standing ties to the community.  He has been married for 25 years, has three children, and is a life-long resident of the Olean community.  His children and extended family all reside in and around the Olean area.[16]

---

[13]   *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (citations omitted).

[14]   *Id*. (citation omitted).

[15]   *Id*. (citations omitted).

[16]   *See* Exh. J (family photographs); Pre-Trial Services Report for Thomas Cornelius Scanlon, dated March 25, 2016 ("Pre-Trial Services Report"), at 2 (Scanlon was born in Olean, both parents reside in Olean, and he resides with his wife and daughter in Olean).

- Scanlon has an exemplary character.  He is a ***decorated*** military veteran who was deployed to Iraq (among other locations) and honorably retired due to injuries he sustained in Iraq.[17]  Scanlon suffers from PTSD and Traumatic Brain Injury (among other ailments).[18]

- Scanlon has ***no criminal history whatsoever***.[19]

- Scanlon held long-standing and stable employment – he worked for Cytec Industry, Inc. since 1987 and moved up the ranks to achieve the position of Regional Sales Manager.[20]

Moreover, the government concedes that Scanlon does not pose a flight risk, given that he voluntarily drove to Buffalo from North Carolina to turn himself into law enforcement, immediately upon learning that an arrest warrant had been issued for him.  And, while he is charged with serious and violent crimes, ***there is no single allegation in the 72-page***

---

Scanlon offered, and the Court admitted, Exhibits A-J at the March 25, 2016 detention hearing.

[17]  *See* Exh. B, C, D, E, F, G (military honors), H (trauma record), I (army release because of physical disability).

[18]  Pre-Trial Services Report, at 4 (noting and verifying allegation that Scanlon was diagnosed with PTSD, depression, and anxiety and has been attending treatment at the VA since 2006); *see also* Exh. K (VA's Disability Evaluation System Rating Decision, discussing Scanlon's PTSD, traumatic brain injury, and other medical issues).  Exhibit K will be offered in Court at the resumption of the hearing on March 28, 2016 at 2 p.m.

[19]  Pre-Trial Services Report, at 4.

[20]  Exh. A (announcement of Scanlon's promotion to Regional Sales Manager).

***Indictment that Scanlon engaged in any violence himself***.  Thus, Scanlon has rebutted any presumption in favor of detention.[21]

> POINT II.   DETENTION SHOULD NOT BE BASED ON EVIDENCE OF TELEPHONE CALLS BETWEEN SCANLON AND PIRK, THE DETAILS OF WHICH HAVE NOT BEEN ACCURATELY DESCRIBED TO THE COURT.

The government has suggested that evidence of phone calls between Scanlon and co-Defendant David Pirk are sufficient to establish his danger to the community.  Specifically, according to the government during its argument on March 25, 2016, there were a series of 11 phone calls between Scanlon and Pirk immediately before and after the alleged homicides of Paul Maue and Daniel Syzmanski.

Preliminary, we believe that the phone call records have not been accurately described to the Court by the government in its argument on March 25, 2016.  Contrary to the government's argument, the phone records that we received from the government[22] indicate that

---

[21]  *See United States v. Morales*, 1997 U.S. Dist. LEXIS 13430, at *2-*3 (S.D.N.Y. Sept. 4, 1997) (defendant rebutted presumption where prior arrests were either old or did not result in conviction and, in recent years, defendant and wife were gainfully employed and government's allegations that defendant attempted to hide evidence at time of arrest did not evidence danger to community).  *Cf. Mercedes*, 254 F.3d at 436-37 (reversing grant of pre-trial release based on danger where defendants were charged with conspiracy to commit armed robbery and were found in a car containing loaded guns, fake police badges, and handcuffs; one defendant had two convictions of weapons possession and other defendant had history of domestic violence).

[22]  The phone records were provided to us by the government on March 28, 2016 at 8:53 a.m.  We received only call records from September 5, 2010 to September 26, 2010 that the government believes were between Scanlon and Pirk.  We did not receive any other call records for Pirk, or Scanlon.  In other words, the call records are devoid of the context of what other calls occurred.  That is, they do not show the multiple other calls

only one call was made between Scanlon and Pirk on September 6, 2014 at 4:29 a.m., not two (the circumstances of which are described below). The call records indicate that the (716) 378-8922 number (associated with the Scanlons) called (716) 572-0774 at 4:29 a.m., and it appears that the call was somehow forwarded to (352) 516-2119, a Florida cell phone associated with Patti Wyland (that apparently the government believes was used by Pirk). So while the records, at first glance, make it look like there were two calls, it appears there was just one, as the two listings include the same start time (09/06/14, 04:29:00 EDT) and same initiating number. While the government may have made an innocent interpretation mistake, that error significantly undermines the probative force of its claims which are, in any event, entirely based on unstated speculation and assumptions, and no evidence about the content of the call.

And, the day before, we discern only two calls, ***not three calls***, between Pirk and Scanlon, one occurring at approximately 4:40 pm (lasting 39 seconds) and the other occurring at 4:44 pm (lasting 7 minutes and 23 seconds).

Similarly, there were four calls on September 7, 2016, not six.

Moreover, the one phone call that occurred on September 6, 2014 was not "immediately" after the homicides. Rather, after someone called Scanlon to tell him what

---

Scanlon made. And, while we have no way of knowing what other calls Pirk made or received, we would expect that he called dozens of other people.

As well, we requested copies of Scanlon's grand jury testimony on Friday March 25, 2016. Copies were provided to us at approximately 12:01 p.m. on Monday March 28, 2016, two hours before the resumed hearing.

occurred, Scanlon called Pirk (assuming Pirk was using Ms. Wyland's phone) approximately ***two hours after*** the homicides.

And the reason for the calls was not sinister at all. Scanlon was home, sleeping, with his wife, on the evening of September 5 into the morning of September 6. He was awoken by a call from Roger Albright, telling him about the murders. Scanlon was shocked and upset by this information and saddened to hear of the deaths. The short call to Pirk – among others – is consistent with the actions of an individual frightened and reaching out to others to discuss the shocking occurrence, and to make sure that others were ok. There were no other calls between Scanlon and Pirk that day.

There is no information to support any supposition that the phone calls somehow involved Scanlon in the homicides, because they do not. And to be clear, the government does not claim as much.

Set in proper context, the phone call toll record evidence is still insufficient to detain an otherwise model citizen defendant, who is not alleged to have participated in, or directed, any violence.

*United States v. Arena*[23] is illustrative. There, defendants were charged with conspiracy to distribute and possess with the intent to distribute cocaine, and both defendants were faced with the presumption in favor of detention.[24] But the court found that detention was

---

[23]    878 F. Supp. 439 (N.D.N.Y. 1995).

[24]    *Id*. at 439-40.

inappropriate for Defendant Panzera, given his "lesser role" in the conspiracy, his lack of any criminal history, the lack of any evidence to show that he would continue his narcotics activity, as well as his advanced age and medical issues.[25]  By contrast, the court found that the nature of the charges against Defendant Sciglitano merited detention.  Sciglitano's involvement "far exceed[ed]" Panzera's, and the government's evidence showed that he "was deeply and actively involved in th[e] alleged large-scale conspiracy and possess[ed] knowledge of and contacts with intentional sources of supply."[26]  Simply, Panzera's "role [was] more properly characterized as a 'facilitator' or 'go between,'" while his alleged co-conspirators were the "primary movers in the alleged transactions."[27]

       Here, Scanlon is – at most – a facilitator as to alleged non-homicidal crimes, with no role or knowledge of the alleged homicide (before or after the fact) whatsoever.  Assuming that Scanlon communicated once with Pirk after the homicides occurred, there is no evidence that he directed them or otherwise participated in them or knew about them until he was told (by someone other than Pirk) that the deaths occurred.  Indeed, there is no evidence that the phone calls with Pirk concerned any illegal activity.[28]  Scanlon is not charged with being privy to, or part of, any of the meetings with Pirk or Jenkins or anyone else before the homicides occurred.

---

[25] The government presented evidence of wiretapped phone calls where Panzera acted as a facilitator for two separate drug transactions.  *Id*. at 441.

[26] *Id*. at 442.

[27] *Id*. at 441.

[28] *See United States v. Perez*, 2005 U.S. Dist. LEXIS 23481, at *15 (N.D. Tex. Oct. 13, 2005) (government did not show that intercepted phone conversations between co-defendants concerned illegal activity).

Scanlon was home, sleeping, when they occurred. And simply associating with Pirk cannot sustain the government's burden to show – by clear and convincing evidence – that Scanlon poses a danger to the community.[29] Nor is Scanlon's alleged leadership position in the Kingsmen Motorcycle Club enough to sustain the government's burden, as there is no allegation that he controlled or directed the unlawful activities alleged in the Indictment.[30]

Simply, nothing in the Indictment, the record of the smaller amount of phone calls, or Scanlon's personal history suggests that he would pose a danger to the safety of any person or the community. Detention is not appropriate here.

---

[29] *United States v. Jackson*, 845 F.2d 1262, 1265-66 (5th Cir. 1988) (detention inappropriate where government rested on presumption and defendant's association with motorcycle club to support pre-trial detention; "[a]lthough the government introduced a lengthy affidavit suggesting that the [motorcycle club members] are committed to lawlessness and violence, the affidavit was based on generalizations that related only indirectly to the acts alleged in the indictment and mentioned no act performed by this defendant."); *see also Morales*, 1997 U.S. Dist. LEXIS 13430, at *2-*3 (detention inappropriate where government's allegations that defendant attempted to hide evidence at the time of arrest did not evidence a danger to the community).

[30] *See United States v. Ciccone*, 312 F.3d 535, 538, 543 (2d Cir. 2002) (declining to embrace *per se* rule that pre-trial detention is appropriate based on defendant being leader of organized crime family; defendant was appropriately detained based on evidence that defendant was leader of crime family, represented family at meetings with other crime families and, under his leadership, members of family used threats of force and violence to place an associate on union's executive council to ensure that union contract was awarded to company partly owned by crime family associate, and secret payments from extortionate activities were made to defendant).

> POINT III. SCANLON IS WILLING TO COMPLY WITH ANY REASONABLE CONDITIONS IMPOSED BY THIS COURT, AND HIS PROPOSED CONDITIONS ARE SUFFICIENT TO ENSURE HIS APPEARANCE AND MITIGATE THE RISK OF ANY SUPPOSED DANGER.

As outlined above in the Introduction, Scanlon will comply with any reasonable conditions that this Court imposes. He will pledge any of his assets, will refrain from communicating or associating with other members of the Kingsmen Motorcycle Club, and will agree to GPS tracking of his movements or other electronic monitoring. His parents are willing to post their home, which they own free and clear. In light of Scanlon's exemplary background and the government's sparse evidence, it cannot be the case that there are no conditions that would reasonably assure the safety of others and alleviate any concerns with respect to Scanlon's pre-trial release.[31]

---

[31] 18 U.S.C. § 3142(c), (e).

**CONCLUSION**

Thomas Scanlon, a family man with substantial ties to the community and a decorated military veteran with no criminal history, should be allowed to continue living his life, while defending himself against these serious accusations. For these reasons, detention is inappropriate, and this Court should impose reasonable conditions to assure itself the safety to the community.

Dated:  Buffalo New York
        March 28, 2016

                              **HODGSON RUSS** LLP
                              *Attorneys for Defendant Thomas Scanlon*

                              By:  s/Timothy W. Hoover
                                    Daniel C. Oliverio
                                    Timothy W. Hoover
                                    Reetuparna E. Dutta
                                    Patrick E. Fitzsimmons
                              The Guaranty Building
                              140 Pearl Street, Suite 100
                              Buffalo, New York 14202
                              (716) 856-4000
                              *doliveri@hodgsonruss.com*
                              *thoover@hodgsonruss.com*
                              *rdutta@hodgsonruss.com*
                              *pfitzsimmons@hodgsonruss.com*