67

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA     )     15CR142
                             )
vs.
                                   Rochester, New York
TIMOTHY ENIX,                )     July 1, 2016
          Defendant.               9:30 a.m.
- - - - - - - - - - - - - - X
**CONTINUATION OF DETENTION HEARING**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ELIZABETH A. WOLFORD
UNITED STATES DISTRICT JUDGE

WILLIAM J. HOCHUL, JR., ESQ.
United States Attorney
BY: JOSEPH TRIPI, ESQ.
    BRANDON CULLINARE, ESQ.
Assistant United States Attorneys
6200 Federal Building
Rochester, New York 14614

TERRENCE M. CONNORS, ESQ.
1000 Liberty Building,
Buffalo, New York 14202
Appearing on behalf of the Defendant

COURT REPORTER:   Karen J. Bush, Official Court Reporter
                  (585) 613-4312
                  100 State Street
                  Rochester, New York 14614

68

USA VS. T. ENIX

P R O C E E D I N G S

\*          \*          \*

THE CLERK:  United States of America versus Timothy Enix, 15CR142EAW.

THE COURT:  All right.  Good morning, everyone.

MR. TRIPI:  Good morning, your Honor.

MR. CONNORS:  Good morning, your Honor.

THE COURT:  Welcome to Rochester.

MR. TRIPI:  Thank you.

MR. CONNORS:  Thank you.

THE COURT:  So we have Mr. Tripi.  And how do you pronounce the last name, Cullinare?

MR. CULLINARE:  Correct, thank you.

THE COURT:  Here on behalf of the U.S. Attorney's Office; Mr. Connors is here on behalf of the defendant.  I received Mr. Connors' letter yesterday indicating that your client was waiving his right to appear here; is that correct?

MR. CONNORS:  That's correct.

THE COURT:  Is the government ready to proceed?

MR. TRIPI:  Yes, your Honor.  I believe when we left off, it was Mr. Connors' time to proceed.

THE COURT:  Yes, I agree.  Is the defense ready to

USA VS. T. ENIX

proceed?

MR. CONNORS:  We are.  May it please the Court. This is the application for the release of a 57-year-old man who, until this case began, had never seen the inside of a jail before.  He has absolutely no criminal record whatsoever.  The cases that the government cites asking you to detain stand for the proposition that that fact alone weighs in favor of release, that is the *Colombo* case.  It's right there.  It says something you should consider.  So while he has no record, he has an enviable record, solid and deep community roots in Toledo, where he grew up, and Tavares, Florida where he resides now.  Roots of stable employment from the time he was 18 years old.  I think yesterday your Honor asked --

THE COURT:  Two days ago.

MR. CONNORS:  They run together -- if the government had any cases that stood for the proposition that Mr. Enix must have roots in the community of Western New York -- and there is a case, there is a case in the Ninth Circuit Court of Appeals, not the Second Circuit, they haven't ruled on it, but the case is clear and logical.  Essentially what it says --

THE COURT:  Do you have the name and cite first?

MR. CONNORS:  *United States vs. Townsend*, it's in the United States Court of Appeals for the Ninth Circuit,

70

USA VS. T. ENIX

decided in 1989, 897 F. 2d 989.  There's actually a Buffalo connection.

THE COURT:  Oh, is there?

MR. CONNORS:  There is.  But the case law has decided in the Ninth Circuit.

THE COURT:  You're not going to tell me the Buffalo connection?

MR. CONNORS:  There was in 1989 the government obtained an indictment superseding the complaint that was superceded in Buffalo, and ultimately the complaint found its way out to the Ninth Circuit.

THE COURT:  Okay.

MR. CONNORS:  Among additional characteristics that must be considered:  Are there ties to the community.  What community is meant?  If it were only the community in which the indictment was brought, a defendant who had deep roots in Boston, for example, might be denied bail if indicted in New Haven.  If the defendant is a United States resident, the community to be considered would be at least as broad as in the United States.  Accordingly, we hold that community in this section of the statute embraces both the community in which the charges are brought and also a community in the United States to which the defendant has ties.  And that's at page 994, and then cites cases, including a Supreme Court case.  So while I

71

USA VS. T. ENIX

recognize it's not our circuit, your Honor, it's instructive with respect to that issue and it's logical and makes sense.

THE COURT:  Do you know if that case has been cited in the Second Circuit?

MR. CONNORS:  It has not, according to our research, but it has some history in the Third Circuit.  And as I say that, it cites back to the Supreme Court case.

So let's talk a little bit about one of the 3142 (g) factors; that is his roots in the community, his stability, the way in which he has constantly, wherever he has lived, put deep roots in the community and contributed in a very positive way in his community.  He graduated from Wade High School in Toledo, Ohio.  And at an early age, he went to work.  He left high school and worked at Chrysler.  He worked there for 30 years as his dad started before him.  He worked on the assembly line and worked his way up gradually for a position in management before he retired in 1997.  Along the way, he managed two years at the University of Toledo as he began his family with his first wife and they raised three boys.  So straight out of high school, very shortly thereafter, he married, went right to work at Chrysler and stayed there.  No complaints, obviously no criminal record, but no complaints about his work record, and it shows a steady assent from the assembly line to a management position.  While there in Ohio,

USA VS. T. ENIX

he showed further roots in the community by becoming a volunteer fireman and a medic.  Those positions are, volunteer firemen, from my experience and knowledge, about those type of people, it's generally people who have a deep commitment in the community.  They want to protect their community and they do that as a way of service, and that is what Tim did when he was in Ohio.  He retired in 2007 after 30 years on the line, and in management as well.  He retired because he wanted to pursue what, for him, was a lifelong dream.  His mom had sold real estate before him.  And his mother and father had moved to Florida, not too far from Tavares where he lives, it is roughly a 15-minute drive.  And Tim wanted to do that.  He wanted to move to Florida and sell real estate.  So when he retired in 2007, that is exactly what he did.  His divorce was finalized and he met Mindy and they were married for about three years when they moved, and they moved to Florida in 2007 with his second wife.  He is roughly characterized as a short drive from his dad.  Mindy had two boys and Tim had three boys and they have five boys that they maintained close ties and essentially brought up and stayed in contact with.  In fact, now they have a separate bedroom in the home in Florida because one of the sons, Matthew, has a daughter who is Tim's granddaughter, who has some serious mental challenges and suffers from post-traumatic stress disorder, and Tim is a help and influence

USA VS. T. ENIX

in a positive way.  So after arriving in Florida, he immediately went to work.  Really no gap.  He started to work for several well qualified and well-known real estate companies:  ERA was one of them, Four Star was, I think, another one.  He worked for a couple doing something he liked to do.  He obtained his Florida real estate license and, of course, while not as rigorous a vetting as required for our jobs, nevertheless to get the license by the state, you have to have a background search.  And so he worked for a while for a number of years with these prominent real estate firms, but real estate took a turn for the bad in Florida.  We all know what happened.  During the time period with Mindy there and some of the boys visiting in and out, life was good.  He renewed his active participation in the Masons.  He actually started a chapter in the Masons.  And if you read their website, it's designed for a lot of good virtues.  He started a chapter in the Tavares, Florida region as well.  He visited with his dad, he supported his family.  Essentially lived a quite life in Florida.  Basically, according to the affidavit of Mindy, he is in bed by 8 p.m. and up at 4:30 to 5 to work.  So life was good for him.  But it wasn't perfect.  Before he left for Florida, Tim was diagnosed with Type II Diabetes Mellitus.  It was something new for a big strong guy to have a disease, which is a progressive disease that causes him

USA VS. T. ENIX

problems.  His diseased progressed until 2008 where he had to take daily insulin injections.  He has always been on 1000 milligrams of Metformin, but his disease didn't get better. Complications set in, Tim developed neuropathy, a severe type of nerve disorder that manifested itself with pain in his feet. 2009, his wife Mindy was diagnosed with systemic Lupus. Essentially a condition that causes a great deal of issues throughout your body, basically attacking your system that reacts to infection.  I know, my wife has it, so I know quite a bit about it.  And she developed fibromyalgia, which is a widespread muscle weakness consisting of quite a bit of pain. And she suffers with that right up to the present day.  Long about that time, Tim's brother, David, stepped in.  David is in the courtroom.  He is the gentleman sitting next to Mr. Easton.

THE COURT:  Good morning, sir.

MR. CONNORS:  And he has come up here from Florida to be with his brother and support him.  David stepped in. David runs a very successful accounting business in Florida and it's named Enix & Associates.  And what they do, essentially, is they contact a lot of different companies and run the Intuit books system.  He is one of the leading prevailers of that particular system in central Florida.  He offered Tim a job. He saw that Tim was not well and that Mindy was worse, so he needed some flexible hours.  So Tim left the real estate

USA VS. T. ENIX

market, which, frankly, at that time, was not doing well because of the crash.  And he was able to work for his brother because his brother put him on a flexible hour schedule.  He could go home and take care of Melinda when necessary and take care of his father, which he does five days a week, and help out at Enix & Associates.  This job was a Godsend and he was able --

THE COURT:  He started there about five months ago or longer?

MR. CONNORS:  Little bit longer than that, your Honor, but when he started there.

THE COURT:  Within the last year.

MR. CONNORS:  It is.  Within the last year.  I don't think David realized what a contribution his brother was going to make, and it's contained in his affidavit.  We have a sworn statement with respect to that.  And Tim stepped in and did like he did at Chrysler, moved up to the point where he interacts on a regular basis with all of their customers.  He, in fact, has the title "chief operating officer" and that requires him --

THE COURT:  How many employees does the firm have, do you know?

MR. CONNORS:  How many employees?

DAVID ENIX:  Two companies, roughly 10.

76

USA VS. T. ENIX

THE COURT:  Combined?

DAVID ENIX:  Yes.

THE COURT:  Thank you.

MR. CONNORS:  So he stepped in and assumed that position, and his brother David has said has become really indispensable, not that the business couldn't go on without him, but he has been a solid substantial contribution.  And that is relevant under the 3142(g) characteristics.  But even more relevant is this.  Do you think that someone that runs an accounting company that requires interaction with the clients and the general public would hire someone who's temperament is violent, whose history and background represents violence?  He didn't hire him because he has the kind of personality that engages with other people.  And I'll show you later as we go through this how that is the same personality he brings to the Kingsmen motorcycle club.  Because many times it was Tim who de-escalated violence.  It was Tim that proposed violence was not the way for the Kingsmen club.  And that is in a number of posts that the government didn't show you yesterday that we found because we've been going through 100,000 documents that were dumped on us about a week or so ago.

So now he is in Florida and solidly employed with his brother.  There is a small radius, fifteen miles, his father, his wife is there, one of his sons is there, and his

USA VS. T. ENIX

brother.  I can't conceive of a more closer-knit unit with deep roots in the community than the information we proffered under oath from affidavits.  These people know him the best.  They know him, as they told you, as a non-violent man, as a family man and as a hard worker.  But they didn't just file affidavits and step back from him.  David came here to show you that he is willing to support his brother, not just by words, he is willing to put up his home.  He is willing to put up the equity it the home.  Mindy, you know, can't be here because it's very difficult.  She can't travel, essentially, as her affidavit says in her supplemental affidavit, she is homebound right now, and very difficult for her to cope.  She is willing to put up their home in Florida and the equity that is left in that home.  They bought it, I think, for $275,000.  The value has dropped over the years, but there is still substantial equity.  And his 81-year-old dad is willing to put up the equity in the home.  They're willing to invest and put their faith in him and willing to tell this Court that they will put their property up to guarantee he shows up.  In addition, David is willing to serve as a designated supervisor under the statute that provides for that.  Under one of the subsections, I think it's (H) or (G), you can designate someone who will be responsible for him, who will report to the Court if there is any violations, and who will stay in touch in addition as an other

USA VS. T. ENIX

source with the Probation Department.  And they know him better than anyone else.  They love him, without question, your Honor.  They're partialis, no question about that, but they're willing to put their money, literally, where their mouth is.  As it turns out, you know, Tim and Mindy, when they moved to Florida, had another common interest, besides their love for each other, they both loved to ride motorcycles.  And moving to Florida enabled them to do that year-around.  That is one of the reasons that they moved to Florida.  That is some of the background.

Let me turn to the indictment.  And the indictment has some claims and has allegations, not evidence, but something obviously you can consider because it's been returned by a grand jury.  They claim that this conspiracy started in no later than 2006, no later than 2006.  Tim is in Toledo, Ohio in 2006.  He is not a member of the Kingsmen motorcycle club, probably never even heard of the Kingsmen motorcycle club.  And supposedly in 2006, this conspiracy is raging full steam, this drug and gun conspiracy is at its heat of momentum while he is working on the assembly line for Chrysler.

He moves to Florida in 2007.  He is not a member of the Kingsmen motorcycle club as that alleged conspiracy is starting to continue in 2007 and 2008.  He is selling real estate.  2009, he is ill, his wife is ill.  And then worse than

USA VS. T. ENIX

that, in 2010, he suffers a life-altering medical condition. He suffers a strokes and he almost dies.  He is air lifted to a hospital to get immediate treatment and he has, even to this day, repercussions, physical repercussions for the stroke that he has monitored by his attending physician, Dr. Boggus.  I wish he had a different name.

THE COURT:  You handed up that letter two days ago and Dr. Boggus said he was in treatment with him until November of 2015.  Is there a reason that the treatment stopped in 2015?

MR. CONNORS:  In November of 2015, he was scheduled to see a consultation for some foot surgery because of the neuropathy to his feet, and Dr. Boggus had referred him to the foot surgeon and he was focused on that as well.  In addition, he was referred to an internal gastroenterologist, an internist and gastroenterologist because he has to have a colonoscopy, even though he is 57, his mom died from that and he had them scheduled, and he had surgery for his feet, both of them were cancelled because of his incarceration.  He was arrested, as you know, in March.

THE COURT:  I'm reading Dr. Boggus's letter as saying he was active until 2015.  Is that because he was referred to other medical professionals?

MR. CONNORS:  Yes.  His primary medical conditions at that time with the neuropathy in his feet and monitoring and

USA VS. T. ENIX

screening for colon cancer, he was still a patient of Dr. Boggus and David Enix is a patient of Dr. Boggus. He is the primary care, I guess, would be the best way to say it.

THE COURT: Okay, thank you.

MR. CONNORS: After his recovery, slow recovery from the stroke in 2010, on September 22nd, 2012, he was in a massive car accident. He was riding his motorcycle, a car cut in front of him. He went down with the bike and he broke virtually every bone on the right side of his body and he broke his clavicle and had a serious traumatic brain injury and he had a problem with hearing loss as well afterwards. It took him months to recover, long hospitalization and longer recuperation. He wasn't out and about until March or April of the next year.

THE COURT: How do you reconcile that claim with at least one Facebook posting that I saw during this time period where Mr. Enix is purportedly stating that he wants to use his unbroken hand to beat up other motorcycle gang or club members.

MR. CONNORS: Yeah. He is flat on his back at that time and feeling quite frustrated about his lack of recovery, not fast enough, and he may -- he put something on as a post. You know, those posts are interesting, and I'll get into them in a little bit. If every stupid thing or hyperbole

USA VS. T. ENIX

in a Facebook post were to be counted against an individual, we would have half of the college students detained in this day and age.  These are things taken out of context.  And as that post says, he is not out and about.  He is frustrated and like to get out and about.

THE COURT:  At least from a reading of the post dated November 17th, 2012, which would have been less than two months after this significant accident, he is clearly not only indicating frustration and a purported desire to engage in some kind of physical violence, but he is also fully aware of what is happening at one of the clubhouses because he says, "we had a couple of F'ing drunks show up at the clubhouse last night and started giving our striker a hard time."  And he knew that Muddy and Grumpy put them out the front door.

MR. CONNORS:  Yes.

THE COURT:  So this at least suggests to me that even if he is bed ridden, he is fully aware of what's going on in the Kingsmen clubhouses during this time period.

MR. CONNORS:  He is still in contact with them. There is support from the members of the Kingsmen club that know he is injured and they report to him and talk to him about things and events.  And he writes a statement.  But what is significant about that post, like a lot of other posts that were quoted to you on Wednesday, is there is no evidence of

USA VS. T. ENIX

violence that comes out of that.  There is no evidence brought forward that he in fact ever used his other hand to hurt someone, that he was ever involved in that.  It's a series of allegations about nothing coming to fruition.  That is not what we keep people in jail for pending their trial to determine their guilt or innocence.  But essentially what is uncontroverted in this case, your Honor, is that Tim joined the Kingsmen motorcycle club six years after the latest date that the conspiracy began, six years after he allegedly maintained a drug house in Buffalo.  And it's interesting what was spoken at the -- in the transcript of the detention hearing by the special agent about that and I'll get to that.

THE COURT:  You mean the detention hearing in Florida?

MR. CONNORS:  In Florida.  Exactly, yeah.  Did I say Buffalo?

THE COURT:  No, you didn't, I was clarifying.

MR. CONNORS:  Six years after he allegedly possessed guns, which they make quite a big point about.  He has a legal license in Florida to possess weapons and to carry weapons.

THE COURT:  Would he be able, with that license, to carry those weapons to New York State?

MR. CONNORS:  He would not have and he did not.

83

USA VS. T. ENIX

When he came to New York, he came to New York -- and I'm going to go through what Mr. Tripi says, he doesn't know if he came two times, one time, he says one or two.  And you pin him down on the dates, and basically you have dates of three times when he came to New York.  He flew on an airplane.  He never took his motorcycle for that length of a distance, never traveled by any other carrier except by an airplane.  And God knows you can't bring a gun on an airplane.  So it's just whoever made that up, whatever unsourced hearsay or third party that was quoted to you, it's absolutely false.  He traveled by airplane to come here for the meetings.

So let's take a look at the indictment.  You know, I don't mean for a moment to depreciate the fact that these are serious charges.  I recognize that.  I acknowledge that.  Your Honor, they are not only serious, they're terrifying for a man like Tim Enix who has never been in any trouble before.  But the presumption that attaches because of those charges is a rebuttable presumption, and it's rebuttable for a good reason.  A reason like the ones we're going to talk about those today.  You don't get a presumption that arises from the unsourced hearsay that we were treated to on Friday.  That doesn't provide you the presumption.  It comes only from what is charged in the indictment, the rest is a proffer, as the cases say, have to be reviewed scrupulously by the reviewing court or

USA VS. T. ENIX

the magistrate.  They don't get a benefit from saying things without sourcing them or without putting testimony on or without affidavits, that doesn't provide the presumption.  It's what's in the indictment.  And I find it very interesting when I studied this indictment.  When this Bail Reform Act was passed in the early 1980s --

THE COURT:  1984.

MR. CONNORS:  Exactly.  And there was quite a bit of discussion about that on the floor of Congress.  One of the co-sponsors, in fact, was Senator Kennedy.  And he said some interesting things that are relevant for this particular determination today.  We went back and looked at the legislative history because that Bail Reform Act has the potential for being abused more than any other statute, suppose other than the RICO statute, in history.  Here is what he said and warned us and people that were going to be implementing the statute.  First of all, he thought the definition of "violent crime" might be too broad itself.  And he says because of that, we have to have safeguards in place.  And he is worried about the bill doesn't give sufficient weight to the past criminal record of a criminal defendant in determining who is likely to commit a crime while out on bail.  He referenced the District of Columbia Preventative Detention Statute.  Because our Bail Reform Act was modelled after that statute.  And what he said

USA VS. T. ENIX

was that that statute from which we drew to create this bill requires that a court find a prior pattern of criminal conduct before he or she can impose preventative detention.  We should ensure that the legislation is carefully tailored to cover only those defendants most likely to be a danger to the community. That is one of the co-sponsors.  And his words are echoed in the Second Circuit's case of *Shakur*, S-h-a-k-u-r.  It is cited in my papers, but I can find the cite for you.

THE COURT:  That's okay, I'm familiar with it.

MR. CONNORS:  They said this is only to be applied for a limited few offenders.  That is what the Second Circuit said in interpreting the bail statute and that same debate about the Bail Reform statute, Senator Ervin stood up and said there is a concern here about that type of legislation because there is a potential to result in a frontal assault on the presumption of innocence.  You probably can tell, I'm not a biker lawyer.  I'm a little out of the comfort zone here, your Honor.  But when I saw the way the RICO statute was being applied, and I know a little bit about the RICO statute and I know about the Bail Reform Act, I gladly got involved in this particular case.  Because this is something that really threatens what we do and how we administer justice.  And I share Senator Kennedy's concern and Senator Ervin's as well. And if I can, I'll show you why he is not in this limited group

86

USA VS. T. ENIX

of offenders that *Shakur*, 817 2nd says.

Wednesday, Mr. Tripi barely even mentioned the criteria in 3142(g), didn't discuss it.  And that is really important because that is the safeguard that was imposed.  That is the plan that is put in place so that you can find any combination of factors that might assure the safety of the community and the return and prevent the risk of flight.  This prosecution has sought detention of every single individual charged in the indictment.  Every single one.  That is not the way you administer justice.  There is no one size fits all.  You have to distinguish between the two.  They have to make those judgments.  You can't just come in and blanketly say, it's a RICO, everyone gets detained.  I understand why they want to do it and I understand their reasons and I'm not faulting them for it, but it's an abuse of the statute.  But the charges against Mr. Enix, I said on several occasions, he is barely mentioned in the indictment.  And Mr. Tripi disagreed with me because he thought I was minimizing it.  But the reality is, he is only in four counts:  First, second, 45 and 46, like the book ends of the indictment.  He is only in two overt acts.  He has the least amount of charges against him and the least amount of overt acts.  We've put a chart together for you, I know you have taken a look at it.  It may not be current because there has been some activity.

USA VS. T. ENIX

THE COURT:  This is the chart of who has been released and who has not been released.

MR. CONNORS:  We know Jason Williams with six counts and seven overt acts has been released.  We know that Jack Wood with six counts and five overt acts has been released.  And that Tom Scanlon with eight counts and four overt acts has been released.  And Glen Stacharczyck with six counts and four overt acts has been released as well.  I think that is significant when we're trying to administer this Act fairly.  I think it makes some sense to review what has been done so far.  And as far as I know, I don't think the government has appealed.

THE COURT:  No, the only other appeal -- it's not really an appeal in front of me because it's a separate motion in front of me.  And the only other separate motion has been on the part of Mr. Myrtle, that was just filed.

MR. CONNORS:  For revocation.

THE COURT:  His attorney has filed a motion with me to set aside Judge Roemer's decision.

MR. CONNORS:  Right.  So the indictment itself sets forth a scenario that was discussed at great length yesterday by Mr. Tripi.  The indictment has an introduction as well.  And at one point on the transcript yesterday, you mentioned, "don't tell me as much about how the organization

88

USA VS. T. ENIX

works, tell me about Mr. Enix." And I'm going to tell you today that even what was proffered to you about how the organization works isn't holding up by the words of their own witnesses. In the introduction they say at page six of the indictment, paragraph 23: In 2013, certain KMC members sought to establish the KMC as a one percent club. The one percent notoriety referenced a view once articulated by a representative of the American Motorcycle Association that 99 percent of motorcyclists were law abiding, where the remaining one percent were engaged in drug activity, firearm activity and acts of violence. That comment by the American Motorcycle Association has been adopted by him in his introduction to this. We start off with the proposition that 99 percent of the motorcyclists are law-abiding members. And this conspiracy has to stand, because otherwise you're faced with, and he is faced with, discrete acts, discrete criminal acts of violence that should be prosecuted individually, several which are outside of the statute of limitations and several of which have already been prosecuted. And here is why the introduction fails. At the detention hearing in Florida, on page 21 --

THE COURT: Let me just get there, hold on.

MR. CONNORS: It starts at page 20, line 16.

THE COURT: Yeah, I'm there.

MR. CONNORS: I'm down a little lower, line 24.

USA VS. T. ENIX

Now, this is the issue about the one percent club which is essential to his allegation. Question: "Okay. Do you know whether there was any discussion or any type of process undertaken by the Kingsmen to become a one percent club." And the person testifying there is Special Agent David Brown. He is the agent in Florida who was assigned to do numerous interviews, to speak to as many Kingsmen as possible and conduct the investigation and interviews by the Buffalo division of the FBI. And he says in response to the question: I believe that Buffalo division shared with me that there were some meetings within the Kingsmen as to whether they were going to be a true one percent club, and their indication, the Buffalo division, to me was they, the Kingsmen, decided not to.

That is Special Agent Brown. But it's even more emphatic than that. Whenever an issue is brought up to a motorcycle clubs, I am told, one person brings it up, it has to be voted upon. That issue about becoming a one percent club was brought up by some individuals. There is some rogues in the Kingsmen motorcycle club, no question. It was brought up for vote before the board, the national board, which consists of five people. That vote to become a one percent club was voted down unanimously. And I know the government knows that, and I know that the FBI knows that. That is why I made an application for Brady material. Tell us this. You have an

USA VS. T. ENIX

obligation.  It is relevant to a detention hearing.  Their own lead agent, may even be the case agent, certainly it is the Florida lead investigator says, I know there was a vote brought up and the vote was decided not to unanimously.  Who is on that board?  Tim Enix is on that board.  And he voted unanimously and may have been the loudest voice in opposition to becoming a one percent club.  That is the major premise of their indictment and their own witness decides there is evidence that exists that the Kingsmen didn't want to be a one percent club.

THE COURT:  Do you know when this vote was that you're referring to?

MR. CONNORS:  I don't know the exact date, but I know it was before the homicides that occurred in Niagara County.  They also take the position, rather unabashedly, there is an unwritten rule that you can't speak to law enforcement, and if you do, you'll be expelled and there will be consequences is the language used in the indictment, as well as they'll be expelled.  All right.  If that is the situation and Mr. Enix is such a rabid Kingsmen motorcycle club violent person, why does he sit down on December 11th, 2014 with Special Agent Brown?  And he said, well, Mr. Connors will probably tell you it was cooperative, but it wasn't cooperative.  Read the FBI 302.  He says in there that these two are comfortable, and that I asked them, "could I call you

USA VS. T. ENIX

back later if I need more information."  They said, "sure, call us back if you need more information."  And I think he called Pirk back later on.  Why would these -- I'll deal with my client, Tim Enix, someone that supposedly holds the hierarchy.  Why would he violate the basic principles and tenets of the Kingsmen motorcycle club?  Because the reality is he is a good person and is willing to talk and cooperate with the FBI.  Just as Malinda did when they showed up in the house and allowed them to search, gave consent to search, that is in 2014.

There are a couple of cases we found that said, you know, government, how can you come forward now and say how dangerous they are and there are problems with safety to the community when you don't indict them for two or three years later; and second, they certainly knew about the fact that there was an investigation.  Did they run or hide or threaten witnesses?  Can he point to one single fact that suggests that Tim Enix was violent during that period?  And I think it's clear the answer to that question.

So, that is really the indictment with the exception of the overt acts, the overt acts, two overt acts.  One is basically addressed to everybody saying -- I think it's the one about the drug house.

THE COURT:  Paragraph 87.

MR. CONNORS:  87.  Maybe I will start with that

92

USA VS. T. ENIX

one, your Honor.  They say he ran a drug house on Eagle Street. They can't even tell you how many times he has been to Buffalo. But Special Agent David Brown says, under oath at the transcript, and I'll find it for you in a second, that Tim Enix had no authority in the State of New York.  That is the lead investigator from Florida.  The one that is supposed to know the most about this case.  And what does he say?  He says -- I'll find the page and number for you as we go forward, but I'm certain it's there, I read it last night.  And almost was an ah-ha moment.  He testifies under oath that Tim Enix has no authority in Buffalo.  So how does 87 overt act hold any water at all?  It doesn't.

But the one about 33 that we spent a lot of time on Wednesday, overt act 33, that says basically:  In January of 2014, Flip Caruso and Andre Jenkins, the two of them, while armed with firearms, traveled to a KMC clubhouse in Leesburg, Florida and met with Pirk and Enix and others.  So, first of all, they don't even allege it in the indictment that Tim was armed.  But I will tell you this, there is a likelihood he was. He has a concealed carry permit and carries a weapon with him in Florida.  Nothing illegal about that at all.  But here is what's important about that.  They say this, they agreed they would get their colors back from the Pagans by any means necessary, including murdering Pagans and kidnapping "old

USA VS. T. ENIX

ladies."  So I pushed on that in my application to your Honor because I knew that nothing ever came of it.  So I pushed on that and I asked for the Brady material.  And I didn't get Brady material.  And but what I got was this, and you received it as well, essentially they say that the violence discussed never came to fruition, nothing happened.  And Wednesday they told you, well, the Pagans blew them off.  Seriously?  A group of violent people who have a trunk full of guns, they are supposed to go to this meeting where they're going to threaten the Pagans.  The Pagans call and say, "sorry, we can't make the meeting."  "Okay, we'll reschedule."  It doesn't hold water.  It doesn't make sense.  But here is what happened that does make sense.  That meeting did take place.  There was a meeting between the Pagans and Tim Enix and a couple of members of Kingsmen motorcycle club because they had their five patches.  They went there and sat down with them and they did what Tim Enix does very well, they negotiated in a friendly, non-violent manner.  And at that point, the Pagan leadership said, you know, you're right, we have your colors, we know that they are valuable to you.  Ours are valuable to us.  They went to the side, picked them up, they were neatly folded in a package and they gave them to Tim Enix and he walked out the door.  No violence, no argument, no gun toting.  And if it's different, come forward and tell us it's different.  They can't.  All they

USA VS. T. ENIX

can say is they talked about something that never came to fruition.  That's it, your Honor.  That is the indictment that they want to keep a man like Tim Enix for four years until he gets his day in court.

THE COURT:  Assuming, the case law is very clear. First of all, we don't know that it's going to be four years. And second of all, that is not a proper consideration for me at this point as to how long it may take to get the case to trial. I know Judge Roemer and I are going to make every effort to make sure that it's not four years and it's much less time.

MR. CONNORS:  You do make a good point.  But the case law also says this, your Honor.  If you're going to make this argument, the argument can't be speculative.  And that is why, in our papers, we gave you the history of the cases that have been prosecuted as RICO gang cases and how long it took for them to get to trial.

THE COURT:  But even so, I'm not aware of any law, in fact, I think the law says the exact opposite that I could even consider that at this point.  I think the Second Circuit has said it's inappropriate for a court, at this stage of the proceedings, to consider the potential for a lengthy incarceration when deciding on whether or not to detain a defendant.

MR. CONNORS:  I do get your point, your Honor, but

USA VS. T. ENIX

I do think what the Circuit does say is this, they say that you can't speculate about it, but when you have factors and criteria that make it likely that it's going to be a long period of detention, then it comes into play as well.  Here what we have, we have an overcrowded docket.  No doubt about it.  Judge Skretny tells me about it every time how crowded the docket is.  We have a history of cases like this taking time.

THE COURT:  Not in front of me.

MR. CONNORS:  Glad to hear that, your Honor.  But in addition, you have a series of complicated motions that have to be made.  You have a number of hearings that are likely to be requested.  Even now, we're bogged down over protective orders in discovery.  Our pretrial motions aren't due until September.  You're looking at a substantial period of time.  And what the cases say, you're correct, when they say come to us later if you're alleging a due process violation, but some of them said 19 months are getting very close to the outer limit for keeping somebody in jail without a trial.  There is no question we'll be in jail that long.  I think it's relevant, I agree with your point and I get it, but I do think --

THE COURT:  Do you have any responses to the proffer that Mr. Tripi made two days ago about the trunk load of firearms that your client allegedly showed up with in connection with these overt acts, 31 through 33?

USA VS. T. ENIX

MR. CONNORS:  I do.  First of all, as you pointed out yesterday, nothing like that has ever been alleged in the indictment, not contained in the indictment, and there is no evidence with respect to that occurring.  Nothing really for you to consider except what he says.  And, you know, I understand that he is a prosecutor.  But what the cases say is that the obligation of the Court is to test unsourced hearsay and to see what is the reliability of that.  And so when the cases where they have held people in custody, there has been live testimony, there has been affidavits, there has been photographs, and there has been surveillance, and that is the two cases he cites, that is *Colombo* and *Mercedes*, the ones he is trying to keep in.  And so what I say to that, your Honor, with all due respect to Mr. Tripi, you can't stand up here and say when you've never alleged it, never proved it, never had it in the grand jury, well, they showed up with a trunk load of weapons.  But the important part about that is it never went anywhere anyway, Judge.  Even if there were weapons in a trunk, and I strongly believe there were not, even in there were, he claims the meeting was blown off, they never went anywhere.  He never said were those licensed weapons?  Were they illegal weapons?  There is nothing illegal about them, even if it occurred.

THE COURT:  It's illegal to be contemplating using

USA VS. T. ENIX

firearms to go to a negotiation with a rival motorcycle club with the plan being that if it goes south is you're going to potentially murder Pagans and kidnap Pagan "old ladies," that is part of the allegation of the indictment.  That is illegal, even if all of the firearms are obtained legally.

MR. CONNORS:  You're talking conspiracy?  We don't punish people for a guilty mind.

THE COURT:  Your client is charged with two 924(c) counts:  One is possessing firearms in furtherance of violence.  There, a grand jury determined that there is probable cause to believe that Mr. Enix in fact engaged in that activity.

MR. CONNORS:  Well, there is, as I pointed out, those are blanket charges that are against virtually every defendant in the case, but what we need to do is we need to distinguish, okay, what is the evidence.  Do you have any evidence, Mr. Prosecutor, that Mr. Enix brandished the gun or threatened anybody.  They have that evidence against other people.  Do you have anything that anything came to fruition, any violence that was allegedly thought about that anything that suggests that Tim is a danger to the community.  That is a rebuttable presumption under 924.  It's not enough to hold him just on that with nothing other than that when we proffer all of his other characteristics and qualities that make him eligible for a combination of conditions that will assure his

USA VS. T. ENIX

return and safety to the community.  And look at that community.  He has been living in Florida since 2007.  Is there any allegation that he ever did anything that was violent in that community, anything that happens?  Is there anything real that we have to put our hands on?  There isn't.  There is some claim that they had a meeting and talked about doing something that never came to fruition.  If we were to hold people in custody for a substantial period of time on the basis of that, I think that alone would be a violation of the Bail Reform Act.  It's not enough, your Honor.  It's not enough evidence.

THE COURT:  Just so I understand your argument.  Your argument is, if in fact this is true and Mr. Enix, in contemplation of a meeting with the Pagans where the goal was to get the colors back by using any means necessary, and if negotiation failed, they would resort to violence, and that is the plan, and Mr. Enix is involved in providing or potentially providing a trunk load of firearms to further that plan, your argument is even with the presumption, even with the charges in this case, that that would not be sufficient for me to find that he presents a danger to the community?

MR. CONNORS:  My argument with respect to that is look at what the proffer was on Wednesday of that overt act.  Look at what they offered to you to support that claim.  That there was a meeting that never took place.  I've now offered to

USA VS. T. ENIX

you there was a meeting and it was perfectly hospitable, no one ever pulled a gun.  Why didn't they say in the overt act, they actually did something violent, they threatened someone, they were actually there with the guns?  I have no idea who said there was a trunk full of guns and neither do you.

THE COURT:  I think Mr. Tripi said it was a co-defendant and proffered that.

MR. CONNORS:  Well, that's interesting because the only likely candidate would be Fil Caruso.  And I know he is reluctant to identify that.  It is his choice.  He can refuse to identify witnesses if he wishes, but it's held against him for the bail hearing determination.  It diminishes the quality of proof that he submitted.  He is perfectly free to have no witnesses.  He is perfectly free to rely on the presumption, as some prosecutors do.  But Caruso -- didn't tell you much about Caruso.  He filed on February 8, 2015 a motion to revoke the bail of this guy.  Sounds like --

THE COURT:  You mean Mr. Tripi filed this?

MR. CONNORS:  He did, he did.

THE COURT:  In connection with Mr. Caruso's other charges that I think were pending in front of Judge Arcara?

MR. CONNORS:  He did.  But they were using him as a confidential informant as well.  Caruso got jammed up, they let him go without bail on a gun charge, pretrial release, no

USA VS. T. ENIX

opposition.

THE COURT:  He was let go after he pled even.

MR. CONNORS:  Yeah.  Because what happened is their discussions were broken down, according to Mr. Tripi.  So he is a three-time convicted felon.  They can't -- they are trying to interview him and they can't find where he is and don't know what he is doing.  And they have additional information that he is involved in cocaine, firearms and criminal activity.  And he continues to violate the law.  And I think he failed 12 drug tests before Magistrate Judge McCarthy.  And he needs a mental health evaluation.  And he basically is the worst of the worst.  He is one of those limited group of offenders that should be detained.  So they filed a motion saying, basically, this guy not living up to his obligations and defaulting on all those.

THE COURT:  Are you referring to a particular docket number in a case?

MR. CONNORS:  The case is 1:14CR00203 RJA, HKS, and this is document 25 that was filed on February 28th, 2015.  I think I have a clean copy of it for you.  I have a clean unmarked copy for you.

THE COURT:  Sure.  If you want to hand it up to my courtroom deputy there.  Thank you.  This never came to fruition, though, did it?  In other words, his bail was not

USA VS. T. ENIX

revoked?

MR. CONNORS:  Well, I don't think they had to.  I think he was arrested on the other indictment after that.

THE COURT:  But that wasn't until 2016.  In other words --

MR. TRIPI:  Judge, if you like me to clarify.

THE COURT:  Maybe you could, Mr. Tripi.

MR. TRIPI:  Just on that point, as I recall it, and the docket should bear this out, I filed the motion.  Basically he had been using drugs while on release or things of that nature, filed the motion to revoke his pretrial release.  I believe that was denied by Judge Schroeder.

THE COURT:  But you filed this before he pled guilty, correct?

MR. TRIPI:  I filed it before he pled guilty and I filed it before we indicted him in this case as well.

THE COURT:  And it was denied?

MR. TRIPI:  Correct.

THE COURT:  And after he pled in this other case, in other words, after Caruso pled in the other case, Judge Arcara allowed him to remain released, correct?

MR. TRIPI:  That is -- I wasn't the prosecutor, Caleb Petzoldt was.  But as I understand, Judge Arcara allowed him to remain at liberty and he was arrested at his residence

102

USA VS. T. ENIX

when we arrested everybody else in this case.

THE COURT:  And he has been detained in this case?

MR. TRIPI:  Since then, correct.

MR. CONNORS:  I think he is being held in Monroe County, which is why Mr. Enix did not want to come here to be housed there at all.

THE COURT:  I think the Marshals were going to put Mr. Enix in Steuben County.

MR. CONNORS:  Worse.

THE COURT:  I was in discussions with them about where they were going to be transporting him.

MR. CONNORS:  After this appearance?

THE COURT:  Yes.  And then we got your call that he was waiving his personal appearance, so we never had to sort out those issues.

MR. CONNORS:  But it's likely that this unreliable, drug using, gun toting individual may be the one who said these statements.  We don't know because we haven't been told about it.  But it would be virtually impossible to count on him in any way as a reliable witness if he is the one that makes the statement.  And secondly, there is nothing that comes to fruition.  And our proffer is they went there peacefully, non-violent manner, negotiated the return of the colors and that happened.  Even in the response given by Mr.

USA VS. T. ENIX

Tripi, he said none of it ever came to fruition and there was, at one point he said the meeting got blown off. It's to me incomprehensible that we could hold a man who has no criminal record and no demonstrated violence on the basis of that overt act that really doesn't stand for anything on the overt act itself. And the other counts and the drug count, every person who has swore an affidavit to you says that Tim is anti drug. That he is about as anti drug as any person who you can imagine. First of all, because of his medical condition he doesn't take drugs. He may have, according to Colleen Beuler, smoked marijuana when he was a youngster. His medical conditions preclude the use of drugs. And you see from the interaction that he has expelled people from the club because of drug use, and that is what the proof will be from that standpoint. That allegation itself, without additional evidence, they could proffer evidence that said it's, you're wrong, we have him using drugs, we have him selling drugs, we have him participating in drug transactions. But running a drug house, really, in Buffalo on Eagle Street where he has almost never been there and their own special agent says he has no authority, no jurisdiction in New York, it just doesn't -- it doesn't hold up to this heavy burden that needs to be established of clear and convincing evidence. And our rebuttal consists of this, as we demonstrate in our motion, it's

USA VS. T. ENIX

actually solid uncontroverted evidence.  They haven't really come back and said anything we proffered to you is wrong in any way.  It shows Tim is not a flight risk.  I don't think they could argue he is a flight risk now.  Presumption is you're not going to just leave your ailing wife and your father, who is really on the last stages, lose all their homes and leave them in Florida to flee.  And on roots in Florida, they are very deep.  And on the issue of danger to the community, there is no demonstrated history of violence.  They have nothing they established to -- there is no evidence in the charge of the overt acts that supports that.  And even more importantly, we have a series of conditions that I'll propose to you in a minute that we're going to account for that, exactly what the Bail Reform Act says this is what you can do and prevent it. He doesn't have a passport, we know that, your Honor, and we've told you that as well.  But, we proffered more than just my affidavit, Malinda's two affidavits and David's affidavit.  We provided you with two probation officer, Senior United States Probation officers.  One is in Florida --

THE COURT:  I'm assuming the one that you have attached to your papers is a woman who used to work for this district's probation office?  I'm not familiar with who it is.

MR. TRIPI:  Yes.  Here name is Colleen Rahill-Beuler.

USA VS. T. ENIX

THE COURT:  Is she now in the private practice of doing pretrial services reports?

MR. CONNORS:  She does some reports privately. For 35 years --

THE COURT:  She is being paid by your firm or Mr. Enix.

MR. CONNORS:  $750 she received.  So, but still, your Honor, the 35 years, everyone relied upon her.  She went from Curtain to Arcara to Skretny and check with them.

THE COURT:  But she was working for the Court then.  I mean, now she is working for the defendant in a case. I mean, her role is entirely different now.

MR. CONNORS:  True.  Two points on that.  It's inconceivable that someone with her history and credibility would sacrifice her reputation for $750.  It's inconceivable. But even more importantly than that, they haven't shown you one single solitary statement of fact that she made in the report, which is the basis for her conclusions, is wrong, not one. Haven't challenged it at all.  All they say is now she is working for the defense on occasion, so you can't believe her. It's disregarded.  You know how that works from private practice?  You engage experts, and the other side engages experts, and you attack their credibility.  Okay, you lied under oath.  You said this another time.  You contradicted.

USA VS. T. ENIX

Her reputation is impeccable.  You can check with anyone within the Court system, which is why we went to her because she had that kind of reputation.  But irrespective of her, what happened in Florida?  The pretrial services officer, once again, a senior, which designates he has a lot of experience, he prepared a pretrial services report.  He did interview Mr. Enix, he did interview Mindy, he did do background checks and he found history of residence, family ties were examined, employment history and financial resources, did a run down on the finances, checked into his health to find out what his condition was, found out, as we have provided to you, that Tim suffers from a serious case of sleep apnea where he uses a CPAP machine.

THE COURT:  I don't mean to interrupt you, but is there any medical treatment that you're alleging that he is not receiving in jail that he should be receiving?

MR. CONNORS:  Yes.  Well, first of all, he has no access to his CPAP machine.  He can't use that and so his sleep is interrupted.

THE COURT:  Has there been a request made to either the Marshals Service or the jail for him to be able to use that or is that a policy that they won't allow that?

MR. CONNORS:  My understanding is that it's not available.  In a situation in a local -- he is in a local

USA VS. T. ENIX

county jail in Niagara.  He is not in a federal facility where they have access to things of that nature, but he is not.

THE COURT:  Yeah.  But I've dealt with defendants in other cases where, who, quite frankly, have had much more significant medical issues than Mr. Enix has, and, typically, when requests have been made to the Marshals Service to try and accommodate these requests, they have found a way to do that, even if it requires transporting the defendant to another facility that would be able to accommodate the request.  I take it no such requests have been made in this case?

MR. CONNORS:  It hasn't, but there was a request for him to use his orthotics.  He has, as I mentioned earlier, severe neuropathy in his feet.  And it's relieved by the use of orthotics.  They haven't allowed him while in custody in the Niagara County jail.  So he has a situation where the sleep apnea aggravates the underlying conditions of diabetes.  It's not good for his other conditions that he has.  And the reality is he suffers from depression.  He was able to manage it while he was outside and he had the ability to have consults and to be on medication.  Here we did make some efforts to try and have him evaluated and try and have him treated because of those issues that were of concern.  And he had a short meeting with someone and all they did was double the dosage of his Effexor, and double the medication, which certainly is not, and

USA VS. T. ENIX

I'm not faulting them, they're not designed to treat these issues, but it's certainly not really addressing the underlying problems that he has.

But the conclusions of the senior probation officer is that he has significant family residential and family ties to the community.

THE COURT:  How does that rebut, though, the presumption of danger?  I mean, I understand the arguments with respect to flight, and I understand the arguments with respect to flight, with respect to the assets that are proposed to be posted and so forth.  The community ties, I mean, there is an awful lot of focus in your papers on his history and characteristics.  But what would you say or what you would rely on in support of the notion that this presumption of danger has been rebutted here?

MR. CONNORS:  Well, this report specifically says to assure the defendant's appearance and the safety of the community.  Now, I would assume that you don't make the rank of senior probation officer without having some experience and some knowledge of what it takes with respect to those rebuttals.  In any event, it's reviewed by another person as well in the office, a supervisor, and they say to assure safety of the community, pretrial services respectfully recommends he be released on a secure bond, report to pretrial services,

USA VS. T. ENIX

participate or continue in mental health treatment counseling, evaluations, medication, no possession of weapons or firearms. We can offer you additional conditions as well that should allay that concern. No contact with any Kingsmen. Put him on a GPS monitor, Judge. We've come a long way with respect to the ability to be able to monitor someone's activities. Restrict the phone calls. And keep him on house arrest. That will eliminate the possibility that anybody would be in danger. You have all of the tools at your disposal. And I think this case calls for the implementation of those tools.

And I can't really leave without talking just a little bit about Colleen Beuler. I know you pointed out that we did hire her. I did that for a reason. I went to her because of her reputation and abilities. And she, of course, says he is not a risk of flight or danger to the community. What she says is this --

THE COURT: What page are you referring to?

MR. CONNORS: Nine, the last page. It's blotted out. He doesn't drink alcohol nor use a control substance, so there is little likelihood that he is going to get drunk and do something wrong or get high and alter his behavior, which has never demonstrated any evidence of violence. He lives a quite simple pro social lifestyle, and has been described by family members as being a home body. He has never engaged in an act

USA VS. T. ENIX

of violence.  There is nothing to indicate that he is a danger to the community.  If anything, he appears to be an asset to the community.  Well, we share that opinion that he is an asset to the community.  But it's not just us, he has demonstrated by his work at Enix company and work as a volunteer fireman and his involvement in the Masons.  And if you wish, you can curtail any other activity.  What could he possibly do if he is on GPS or committed to house, go to work, come home, medical and usually they give them some hours for taking care of other activities that they have.  But all of that can be monitored by pretrial services.  We have the ability to do something.  And where it becomes even more important and some of the policy reasons that I articulated and supported with citation to show that right now, pretrial detention accounts for about 500,000 people incarcerated, it's just an overuse and abuse of that system.  We're overcrowded and straining at the seams with those particular problems.  Why would you keep this man like this when we have other reasons that we are able to do that pending his trial.  Sometimes we talk about this, we hear a proffer about this act or that act, and we recognize that something has been established or proven.  We know the gang cases or RICO cases haven't been all together successful in the Western District of New York.  We're willing to work on that score with you to establish any type of conditions that will

USA VS. T. ENIX

make you comfortable and make the community comfortable as well.

I talked to you about David's affidavit. He is here. You know, I've spent some time with him. He is a quality person. He just wants to take his brother home. He is -- its a little brother taking care of the big brother right now. And he has some ability to do that credibly by placing his property on the line for him and by continuing to promise to give him the kind of employment that will keep him secure, and keep the community secure as well.

We gave you a lot of information about Mindy's background. And I'm well aware of the decision that Magistrate Roemer wrote in the Emmett Green case, I believe, where he said "I feel very sorry for the fact that someone has MS, but I can't consider that on this particular defendant." Well, not going to debate whether he is right or wrong. We never offered to you the fact that Mindy has Lupus and fibromyalgia, and that is unrelented pain to keep her homebound. We didn't do that. We offered it to show the stable community he'll be back in. He is not going to leave his wife, he is not going to do anything that would be violent or would do anything that would jeopardize his ability to take care of the woman that he loves or to be around when his dad passes away at age 81. That is why we offered it to you. And that is relevant specifically

USA VS. T. ENIX

because family ties is a 3142(g) characteristic as well.

We talked a little bit about weight of the evidence.  I went through the issue of the colors.  And, but, you know, as a lawyer, it's a little bit alarming to me when I make a request in a motion for Brady material, and it's not that I get snubbed by it, there is no response at all.  He doesn't even say there is no Brady material with respect to the risk factors of flight.  And we know there is a series of questions that say Brady can apply in the pretrial detention posture as well.

The history and characteristics deal with several different areas.  They are, I think, well developed in the motion paper that we provided to you.  But physical and mental condition is one.  And I've been through the problems with you that he has.  I mean, it's concerning to me that he missed his foot surgery and missed the colonoscopy screening procedure that he has to have.  It's concerning to me that his condition, while you say that you've had prior situations where people's medical issues were being addressed, his isn't being addressed.  And I don't think the answer is to say that the jail will address those conditions.  We know from what Dr. Boggus has said that he is likely to suffer some short-term problems with respect to the care that he is required to have.  I mean, the thought that someone says double the medication for depression,

USA VS. T. ENIX

that is no kind of therapy at all.  Especially when he has been making some progress.  He lost, before incarceration, 45 pounds with diet and a strict regiment himself.  And he was able to cut down the insulin injections almost to the point where he doesn't have to do them to a regular basis and he can rely on the medications as well.  Now he is back up and gaining weight.  He has been in jail, eight, nine weeks.  I'm there every other Sunday, I spend at least an hour, two hours with him.  He is not doing well, there is no question he has problems exacerbated by the incarceration.  But for me as a lawyer, how do I interact with him?  I have to show him 100,000 documents and videos and other things to help this man defend himself against, what he has said and you have said, is very serious charges with terms of imprisonment that are staggering.  And I can't do that in a sitting in a little room up in Niagara county jail.  And he has a right to defend himself and we gave you the statistics that Gene Pigott put in a decision a couple of months ago.  We all know somebody that is incarcerated has a percentage of trial chance of prevailing when he is out on bail.  I need him to discuss things on a regular basis without worrying about every time I talk to him on the phone is the subject of recording.  How do I do that?

            THE COURT:  Well, I mean the attorney communications on the phone are not.  Mr. Tripi, correct me if

USA VS. T. ENIX

I'm wrong, but the government doesn't --

MR. TRIPI:  I believe in the facilities, Judge, depending on which facility he is in, either there are secure lines for attorney calls and the inmate usually just has to request a secure line to make an attorney call.  I believe that opportunity is afforded.

MR. CONNORS:  Maybe, maybe.  I mean certainly not the opportunity not meeting with him face to face and going over everything.

THE COURT:  I appreciate your argument.  And I'm not suggesting I'm unsympathetic to it, because I am, but the fact of the matter is whether or not it's easier for the defense when you're incarcerated or not incarcerated is not really the issue for me to decide.  My issue that I'm faced with is is he is a flight risk, is he a danger and are there conditions that can be put in place to protect against any of those risks.

MR. CONNORS:  Well, you know the literature on this topic as well as I do, and whether Judge Rakoff in the Southern District or Law Review articles that we quoted to you, it all says the same thing, it says that long-term incarceration has a tendency to induce pleas, has a tendency to force someone to make a decision that is a very difficult decision to make, instead of having the ability of being

USA VS. T. ENIX

outside and preparing for a defense and challenging it in Court.  We all know that someone incarcerated for lengthy periods of time, are they starting to think, am I ever going to get out of here.  What keeps me awake at night, what happens if the pattern followed in the past and we don't go to trial for three and a half, four years, what happens if I walk him out of that courtroom that day with a finding of not guilty on those four counts and he goes back to a life in shambles in Florida to a wife that is very sick, to a dad that likely passed away, to a job that he has been away from for four years, what kind of reentry is he going to have into society for an innocent man?  What is he going to do?  Where, in the meantime, with a set of conditions, we can keep that in tact, keep that family in tact.  So if he is acquitted, and right now he is presumed innocent, that is what I think about when I think about this case, and I think of this all of the time.

We talked to you also on a 3142(g) about the family ties, strong as can be.  His employment, we've talked to you about that as well.  His financial resources.  Well, you know things are tough right now.  You have the report from the probation officer.  There is a mortgage on the property.  Mindy, obviously, can't work as well.  And they are trying to cope with keeping that afloat as well, but they are people of modest means.  It's not they have unlimited resources.  This

USA VS. T. ENIX

isn't one of the cases when you see where you're researching the Bail Reform Act, you see the considerations of a judge of a very, very well-off defendant that they might, because they can do so, by posting large amounts of bail and do those things. This is not that type of family, but they're willing to do everything they can. They are willing to post all of the property as well, and to supervise him, so that applies to the issue of danger as well. They're willing to do that. His past conduct, when I think of the words in the D.C. statute that require the Court to have a finding of criminal conduct, a pattern of that in existence, and when I hear the words of Senator Kennedy, maybe we don't articulate that enough here. If you could find a pattern of criminal conduct with respect to him, I wouldn't be standing in front of you asking for the relief. I wouldn't do that. But a man with a clean slate and no scrapes against his record, I mean, he deserves this, deserves to be released and given a chance to defend himself. So we've talked a little bit about the overburdening system as well. And the overcrowding. I mentioned to you the equity that is available and we put that it's a total equity of about $600,000, and they're willing to stake that as well as any other conditions.

We do make a due process argument here as well, your Honor. When *Salerno* was decided on the Bail Reform Act,

USA VS. T. ENIX

it swatted away a facial challenge to the constitutionality of the statute.  But what it did say is that is the toughest type of challenge you can make is to overturn it on the basis of unconstitutional legislation.  But it did say that we have not decided on the as applied doctrine here as well.  Under these circumstance, we've made the argument, and there has been no response by the government.  Not a case law cited or not an argument.  We said in this situation, the Eighth Amendment prohibits excessive bail and cruel and inhuman punishment without due process of law.

THE COURT:  Isn't your argument based on the assumption that there isn't a risk of danger or flight?  If a court determines that your client presents, for instance, a risk of danger and that there is no reasonable conditions that can be put in place to protect against that, are you arguing that nonetheless there is a due process violation?

MR. CONNORS:  If the statute is unconstitutional, as applied to Mr. Enix, it doesn't matter what he is charged with, doesn't matter.

THE COURT:  In that instance, how would it be unconstitutional in regards to him?

MR. CONNORS:  The analysis we put in the papers, you have a situation where if he is held on excessive bail for a lengthy period of time and he has --

USA VS. T. ENIX

THE COURT:  But I guess I'm going to stop you right there.  We're not at that lengthy period of time yet.

MR. CONNORS:  That is not a prerequisite.  It's one of the things to consider, but no one can possibly claim that he is not going to be held more than 19 months.  And that has kicked in on one of the cases, it was not good in the length of delay, but the other case said you ought to consider it.

THE COURT:  Do you have any case where the Court has endorsed the notion that you can release a defendant because of the anticipated length of time that the defendant is going to be serving?

MR. CONNORS:  The only language I have -- and the answer to your question is no.  But the only language I do have is where the Court says, if it's non-speculative, then we will consider it.  And here I maintain that in this situation, as applied to Tim Enix is dangerous for due process violations.  And the case that we do have, and I think we cited in our papers or certainly in the brief, deals with the issue of the fact that this is getting parously close for the fact that he is not going to be up for trial certainly for 19 months, probably much longer than that.  And more importantly, all of the conditions or combination of conditions that we proffered on the issue of flight and danger, with all of those taken

USA VS. T. ENIX

together you have and you run the risk here of a due process violation.

But I read every word of the cases that they cited, you probably did, too.  But *Colombo* and *Mercedes*, interesting, this is how they want to keep Tim in jail on the basis of *Colombo* and *Mercedes,* okay?  In *Colombo*, the government proffered clear and convincing evidence that the defendant had in fact been involved in violence.  They had a government witness, Anthony Ferraro, who testified from personal knowledge and presence at meetings that the defendant himself directed the conspiracy members to rob, to engage in assault, rival drug dealers, robbing victims.  They also proffered evidence that corroborate his testimony.  Wasn't enough that they had live testimony, they provided corroboration by tapes of telephone calls in which the defendant permitted.  There is nothing like that that has been offered to you for your consideration to sustain his detention.  And *Mercedes* is even better.  What they said in *Mercedes* was -- and *Mercedes* was the lead defendant, but the case really revolved around Roman Rios and Bautista.  But what they said there was, no prior criminal history is a factor weighing in his favor.  Another one, the record weighs in favor of release because of his lack of criminal record; that is Rios and Bautista.  What was unfortunate for them, on the opposite side

USA VS. T. ENIX

of the coin, was the fact they had proffered specific evidence of violence.  They had found them with loaded guns, fake police badges and handcuffs.  They had him brandishing a weapon.  He was convicted twice of brandishing a weapon; that was Bautista.  And Rios was the same thing, driving car with loaded guns and fake police badges.  And even in Bautista, Bautista they probably would have let him out, it's true that he has no record, but he not a U.S. citizen.  So those are the two cases and there is no way in which the government's proof so far comes anywhere close to that.  And I listened, I listened intently to hear what Mr. Tripi had to say at the proffer that he provided to you.  And the gracious assistance of your stenographer, I had a copy of the transcript to take a look at.

THE COURT:  You paid her for it so she is not entirely gracious.

MR. CONNORS:  We still trust her even though she was paid.  And what I would say when, the initial questions were proposed to you by Magistrate Lammens, you did ask them that he never considered the 3142 (g) factors.  There is nothing contained in the report.  I'm not being critical.  He didn't have anywhere near the record that we have and there is a great deal of debate.  That is what brought us here.  We contemplated moving in front of Magistrate Roemer to review the decision of and I did a lot of research on that he felt

USA VS. T. ENIX

uncomfortable being -- he didn't say to overturn, but to review the decision of another magistrate in another jurisdiction and we talked it through.  But when you read those cases that say why do you make it in the district of prosecution, and I argued that there are some cases, Judge, that allow you to do it because you have the most information.  You have the background submitted to you in Florida.  He had a fifteen-minute meeting with his assigned counsel, that is all.  And if there was a two-hour detention hearing, half or more was for Defendant Pirk.  They were brought together there.  And there is little likelihood that he was going to release Defendant Pirk.  And I think that is what happened, despite the favorable report from probation as well.  And I say this respectfully.  Joe says we can infer that from that that he discounted Malinda's testimony.  We can't infer from that.  He doesn't tell us anything about that.  That is the problem with the proffer.  We're being asked to speculate and concur on speculation and we pointed to Officer Palmer.  I'm not being critical, "you never interviewed Tim or his family."  And he said, "I didn't have a chance to talk to anybody," even to this day.  So...

Mr. Tripi says, well, he is the second in command.  At one point, your Honor, he calls him the vice president at one point.  Contradicting himself.  Contradicting himself.  And you ask him, well, what is your basis for that.  He said, well,

USA VS. T. ENIX

he controls Florida and Tennessee.  And you said Tennessee, I thought that was fledgeling.  Six to eight members in Tennessee.

THE COURT:  I thought I read that somewhere.

MR. CONNORS:  It was a start off and he was temporarily put in there until they got Tennessee Jim was going to be the president.  Don't take my word for it, I don't know him personally.  This false claim that he is so high up in the hierarchy really doesn't serve us for anything that would be supportive for detention.

THE COURT:  There certainly seems to be, from the Facebook posts, there seems to be a lot of evidence that he was speaking on behalf of the president, Pirk.

MR. CONNORS:  I don't know if I would agree with that.  I would tell you this, there is five board members, each one gets a vote, that is the ones that unanimously voted down turning down the one percent club.  Five of them, each one gets a vote.  In terms of him speaking for Mr. Pirk, there are some issues that you can see from the record, where he does speak because Pirk is not Facebook literate, doesn't text and doesn't e-mail.  And more importantly where he speaks, and I have some of these from Mr. Pirk and the organization is on matters of financial, real estate, business and background, and we have a, not a large stack, but a small stack of Facebook postings,

123

USA VS. T. ENIX

where he talks about bringing order to the Kingsmen motorcycle club, where he is getting their taxes paid.  And Kingsmen are saying, wow, we feel like a real legitimate organization now and, "thank you, Blaze" -- and he is a fireman, that is why they call him Blaze -- and opens up the books and come and look at them.  Things are changing now in the Kingsmen and this isn't like when John Skeet Spry was in charge.  And they referred to him earlier.  Spry, no doubt, is cooperating with them.  He was thrown out of the Kingsmen for stealing, for a regime of leadership that was terrible, and they voted him out and there is no doubt he wants get back to get back in power. Now that shouldn't happen.  He has no reliability or credibility as well.  Yes, Blaze will speak from time to time about matters on which he is well versed.  He runs a business, the accounting business.

THE COURT:  But if in fact this is him in these Facebook postings, there is no question that he on, what I would characterize, on a fairly consistent basis, among other things, is suggesting that they should avoid law enforcement, don't cooperate with law enforcement, be careful what you say, law enforcement is monitoring this.

MR. CONNORS:  All of which are pretty good instructions.  And probably the same instructions that any biker lawyer would give to them under the circumstances.  I

USA VS. T. ENIX

mean, it's in his fear of the RICO statute is probably well founded. It's not a situation, you know, someone has done something wrong, it's good advice. It's good advice to refrain to speaking to law enforcement unless you are represented by counsel. I bet you gave that advice while in private practice. I know I do. This thing about being joined at the hip, that is how he tries to get you to mete out the same type of disposition that Mr. Pirk has had because they've spoken on the phone. You know, when I thought about this, this pen register, why didn't they get wiretaps, make everybody's job a lot easier and make my job a lot easier as well. They applied for pen registers and they show a number of calls back and forth, they don't show or demonstrate the length of the call, whether it was picked up or answered. They have nothing to show you on that topic other than they talked 600 times.

THE COURT: More than once a day and more significant than any other Kingsmen were talking to Pirk.

MR. CONNORS: We don't know they were talking, we know there was a call made. I don't dispute that. You have a situation where he is now trying to put the Kingsmen on level playing field, trying to do the right thing for filing taxes, trying to do the right thing for so many things on a business standpoint. And of course he would talk to Pirk on a regular basis, they live right next to each other. They're not

USA VS. T. ENIX

neighbors, they live close by.  And I'm sure when Mr. Easton speaks to you on behalf of Mr. Pirk --

THE COURT:  Mr. Easton has not yet filed a motion with me.

MR. CONNORS:  It's coming.  But I'm sure he will be able to show you that there is good reasons for doing that.  But this, you know, this, really, with no support about the two of them running and controlling everything within the organization.  And even if it were true, what the evidence is that we've shown to you is that he ran the organization in an efficient manner and ran it in a legal manner, and he was filing taxes and filing property deeds.  He was doing the kind of things, really, that a COO would do.  And then when he talks about the organization, and you did call him on it one time and you said is, "listen, I'm not so interested on how the organization was run, tell me about Mr. Enix."  And there is a colloquy in which he said, and, yes, you could go to any clubhouse and basically get any drug that you wanted and do it within the confines of the clubhouses.  I challenge them to come forward with information that Tim Enix allowed any drugs in his clubhouse.  I challenge them to say that.

THE COURT:  But a grand jury determined there is probable cause to believe that your client was involved in maintaining the drug house in Buffalo.

USA VS. T. ENIX

MR. CONNORS:  In Buffalo.  And how can you do that when you're living in Florida and you are there in Buffalo three, four times, maybe, and the Special Agent says you have no authority in Buffalo.  They lumped him into that count.  That is what they did.  Everyone is in that count.  You seriously think all 19 of them are guilty of running a drug house on Eagle Street?  It's not logical, it doesn't make sense.

They talk about the June 7th, 2013 Springville Kingsmen clubhouse, and I'm sure, I'm sure, I hope it was -- I'm sure it was a misstatement on his part.  Mr. Tripi said at one point he, meaning Enix, assaulted him.  It's in the transcript, he couldn't possibly mean that.

THE COURT:  What page of the transcript are you referring to, do you know?  If you don't have it right with you, I can ask you about it, because I want to ask you about where that reference in the transcript to Tim not having authority in Buffalo is.

MR. CONNORS:  "Tell me what evidence you have, I don't mean to interrupt you."  Basically he says "I'm getting there."  The truth is, he never gets there.  He never gets there when he is asked to specifically identify evidence of violence on the part of Mr. Enix.  And cites again the *Colombo* case, which is so easily distinguished on the basis of that

USA VS. T. ENIX

quality proffer that was made and sustained by the Circuit. And then he says, well, on page 15, "we do have violence occurring after he" -- meaning Tim -- "becomes the vice president with Pirk." That is not true, it's a flat out false statement. Maybe it's a misstatement and we challenge that we as we challenged --

THE COURT: Which aspect?

MR. CONNORS: Vice president, fifteen, line fifteen, page fifteen. And then he talks about that Florida meeting in the clubhouse. And what he says there on page sixteen is this, breaking into the clubhouse and perhaps tying them up, perhaps tying them up, and if it came to it, they would do this. You know, this is all speculation with nobody giving you a first-hand account of what occurred, supposedly, in Leesburg. I mean, listen, I'm an officer of the court. I proffer to you, but it's only what I know. I'm limited in my ability to say that, but my proffer on that issue is totally non-violent meeting and nothing happened there and that is right now stands on even keel with what they're proffering.

THE COURT: Well, except there are overt acts in the indictment dealing with this that the grand jury has found probable cause. And except for the fact that there is a presumption that is in place because of what a client has been charged with.

128

USA VS. T. ENIX

MR. CONNORS:  There is a meeting and the overt act says there is a meeting at 33, that says --

THE COURT:  I think it is 33, your client's name is only mentioned in 33, but this incident with the Pagans in Florida is covered by 31 through 33.  And clearly, the firearms are referenced in that discussion of this planning with respect to the Pagans in Florida.

MR. CONNORS:  Jenkins and Caruso.

THE COURT:  And Pirk.

MR. CONNORS:  Okay.  Jenkins and Caruso.  If you go through the transcript, there is ten times more references to Pirk than to Enix, but that, again, your Honor, is a claim of something that never came to fruition.  There is no violence, nothing concrete to rely on.  And we say it's absolutely untrue, it's false, false.  We have the ability now to talk to people who were actually there that will come forward and dispute that completely nothing happened.  A sit down that was non violent, and nothing that says there was ever any violence that occurred.  He says they blew him off and we said they met and didn't do anything violent at all.  So it never took place.  And then you ask him a question at 19, "what's the reason why that fact isn't in the indictment," and you never get an answer, which fact --

THE COURT:  Well, I think the answer was, as I

USA VS. T. ENIX

understood it, it's not in the indictment because the information they got specifically about Mr. Enix having this trunk load of firearms was provided after the fact by this co-defendant proffer.

MR. CONNORS:  Well, we have that statement.  There is nothing that we have concrete, and for all we know, it's Caruso, whose credibility and reliability is certainly not something I think you would be comfortable relying on.  What they showed him to be a three-time convicted felon, a drug dealer someone they don't want to use anymore as a witness.  You say, "look, it doesn't say anything about Enix having the handguns."  He said, "no, the second in command have people ready to do this."  I mean, he doesn't answer your question.  First of all, do you have any anything about Enix.  "No."  Second in command, you could say that about any of the 19 people.  It's not something that has some ring of credibility, something that you're going to detain somebody for.  It doesn't pass muster, not clear and convincing.  And you said, "listen, I'm looking for specific stuff, that he was personally involved in violent activity and personally involved in dangerous activity."  And he doesn't say here is what I have.  He says, "I feel like I'm giving very specific facts about what we learned."  But he doesn't, he doesn't.  You know, he mentioned that a proffering co-defendant, and I've got some interesting

USA VS. T. ENIX

case law on that that I'll try to get to as soon as I can.  He said, well, we're executing search warrants.  Well, we had a search warrant for Tim's house in Florida.  It was a consent search.  They showed up and Mindy said, "come on in."  Did they get any contraband or anything illegal?  They took guns that were lawful and licensed and properly in the house.

THE COURT:  And two other cell phones.  Mr. Tripi, were those cell phones, were they burner phones or just regular cell phones?

MR. TRIPI:  They were in a box or closet area with other Kingsmen material, appeared to be turned off.  The make and model I don't have.  The agent over the phone searching characterized them as burner phones.  They may well be smart phones, things of that nature.  I don't know the exact description.

THE COURT:  I guess when I hear burner phone, I think of a phone that isn't registered to a particular individual, it's prepaid, and once you have used --

MR. TRIPI:  May I consult Mr. Cullinane who did the search warrant?

THE COURT:  Sure.

MR. TRIPI:  They are Verizon and LG phones, but we do not know who they are registered to.

THE COURT:  Or if they're registered to anyone.

USA VS. T. ENIX

MR. TRIPI:  The search warrants -- the phones are in transit to FBI Buffalo.  The search warrant was signed two days ago and they'll be searched by the RCFL.  We don't have -- just don't have the information.

THE COURT:  Okay.  Thank you.  I didn't mean to interrupt you, Mr. Connors.

MR. CONNORS:  That is quite all right.  Seems I wouldn't use the term of "burner phone" without having the evidence to back it up, your Honor.

THE COURT:  Well, I think, Mr. Tripi, you were saying the agent referred to it as a burner phone.

MR. TRIPI:  Yes.  When he was conducting the search, he called me from the house and characterized it as such.

THE COURT:  Thank you.

MR. TRIPI:  You're welcome.

MR. CONNORS:  And then you say, "you're not presenting me with any kind of credible evidence that this Facebook report has any personal basis."  The postings that were made supposedly by the retired member of the Kingsmen?

THE COURT:  Right.

MR. CONNORS:  We think we know it's Tim Haley is what we think we know.

THE COURT:  Who is he?

USA VS. T. ENIX

MR. CONNORS:  A retired member of the Kingsmen that lives up in a place called, it is either Dunadind or Dunnellon, Florida.  So we sent an investigator out to talk to him to find out.  And what we found out is, "it would be ludicrous that I would testify for or against the Kingsmen," causing us to conclude that he has nothing but a big mouth on Facebook without personal knowledge of anything.  And you pointed out, what is his personal basis for that, and there is none.  And we talk about the 302.

THE COURT:  This Tim Haley, what was his role, if you know?

MR. CONNORS:  He was a member of the Kingsmen for a while.  He had some issues himself with selling drugs and some problems with his employment.  And then he was kind of on the outs and got a little upset with some of the leadership, thought he should be in a higher position than he was put in and is angry.  Bitter I guess would be a better word right now. No personal knowledge about anything.

And then somehow they say they wouldn't submit to an interview unless it was a joint interview.  Every interview I've been involved in with the FBI, they send two people, nothing suspicious about that.  But the fact is they did submit voluntarily and answered, as far as we can tell, he answered the questions.  Some of them, the information, Pirk decided not

USA VS. T. ENIX

to provide them information, but nevertheless, they participated in that. And to me the reason it's significant is two fold because if there is this unwritten rule that you're going to get expelled or suffer consequences for talking, Tim talked to the FBI guy. He talked to them and they agreed to talk again. And as far as I can tell, the FBI felt they were cooperative. And there is nothing in the report saying they weren't. It says they were comfortable and they agreed to be talked to again. To me, it doesn't sound like that there is evidence that he is anti law enforcement. But the significance of that for your determination, I respectfully submit, is that it's in 2014, December 11th, 2014, and doesn't do anything to display any violence to any of the people afterwards. He didn't run or flee or hide or do anything that might be associated with conscious evidence of guilt. And talks to them about Caruso, who, apparently, his opinion of Caruso as a potential suspect is shared by the government as well. Felon in possession of guns, kind of crazy, sometimes toting and brandishing guns all of the time. So he gave them that information. So there is nothing about that to me --

THE COURT: Well, I mean, but objectively looking at that interview, you have statements on the part of your client purportedly indicating that this Little Bear is kind of a lost soul wandering around without money and a bicycle and

USA VS. T. ENIX

really the evil culprit is the Caruso.  And yet we're now standing here in 2016 and Jenkins has been convicted of these two murders.

MR. CONNORS:  Well, he said -- that is true.  He said they were shocked to hear that about Little Bear.

THE COURT:  And Mr. Tripi's point was how could you be shocked, he was serving an 18-year sentence in North Dakota and was relatively recently released.

MR. CONNORS:  And I don't know anyone that has been able to establish that Tim Enix was aware of that.  But certainly in a proffer, no one has been able to establish that is the case.  The important part of that analogy is that it was Tim Enix who expelled him from the club, who felt as though, wasn't just the fact that he didn't have a motorcycle, which is important, wasn't paying his dues.  Tim was strict with that.  You see from the Facebook posts, he is after everybody to pay their dues.  He basically said, and I'm paraphrasing, I put him out because his feelings about Kingsmen, his attitude and demeanor were not a big deal, and he expelled him.  They make a big deal, they say it's part of the grand scheme, it's part of the plan.  They'll put him out, but not put him out bad.  Well, because if you only put him out and not put him out bad, he'll still have access to the other clubhouses.  If you were going to enter into a scheme to have Jenkins kill somebody up in

135

USA VS. T. ENIX

Buffalo, why would you put him out at all?  He is a co-conspirator.  Why would you put a target on him at all?  Why would you have him being something out of the norm of Kingsmen?  Why would you do that?  You wouldn't put him out and say, hey, head over to Tennessee and get a bike and I want you to get up there and take care of things.  So as far as Tim's relationship with Jenkins, and you pushed on that several times, connect Enix and Jenkins, connect those two, tell me about their phone calls.  Nothing.  Finally, after three pages he said, "no, I have nothing that connects Jenkins.  I have Pirk, nothing that connects Jenkins and Enix."  You think about that.  This interpretation that that is part of a grand scheme, Pirk is the president, and he claims Enix is the second in command.  They don't have to answer to anybody.  You don't put him out.  Go to Tennessee and get a bike and go up and kill these two people.  It doesn't make sense that they would put him out and target him, let everyone know he is put out of the club, we've taken disciplinary action.  To me, that doesn't help their case.  To me, it really undercuts their case.

I told you about this thing about traveling to Western New York on a plane every single time.  They have no contradictory evidence to that, your Honor.  They haven't been able to produce any evidence and said, no, he didn't, he brought it up on the bike.

USA VS. T. ENIX

THE COURT:  It sounds like they have more than one witness that would support the notion that your client was armed here, armed to the hilt when he was here to New York.

MR. CONNORS:  I have no idea how he can possibly get that information.  How is he going to be armed to the hilt when he travels by plane to here?

THE COURT:  Well, he could be provided a gun once he gets here or guns.

MR. CONNORS:  You know what I say to that?  Should do what they did in *Mercedes*, he should do what they did in *Colombo*, they should do what they did in every one of those hearings.  Let's hear those witnesses.  Let's hear what they have to say.  This is not to be a trial, it's not a mini trial, I respect that.  But there has to be something other than someone saying he was armed to the hilt, but I got no proof of it.  No proof of it.  And this confrontation that they have with Caruso, and they talk about Caruso's confrontation, and they have -- frankly, the evidence is Maue and Caruso were violent and it's a confrontation of the national president, that is what he says.  And importantly he says is at page 29, "cooler heads prevailed," they meet and try and work it out.  No violence occurs, no violence occurs at that meeting.  And who is at that meeting?  Tim Enix is there.  Tim Enix is there, who has so far demonstrated a good ability and capacity to

USA VS. T. ENIX

resolve matters without violence.  And in fact, we'll show you one of his posts where he says, "we're strong Kingsmen, we're going to expand, we're going to do it the right way, we're going to do it without physical violence."  They have it, they didn't show it to you.  I got it by pouring through those in the last couple of days.  So you have a dispute about Pirk's leadership and, again, no violence occurs.  That is their own words.  And then there is this statement that we've heard for the first time about some plan that even Jenkins was laughing about and they're going to sit down --

THE COURT:  I'm going to take a break at some point.  You let me know when a good stopping point is.

MR. CONNORS:  Appreciate that, your Honor.

And some plan we hear about the first time that Tim and Jenkins are going to be at a meeting, drop to the floor and people are going to shoot through a fence to get someone else.  I mean, does that make any sense to you?

THE COURT:  There is a lot of this that doesn't make sense to me, Mr. Connors.

MR. CONNORS:  I agree with that, that is why we have trials.

THE COURT:  Right.

MR. CONNORS:  Once again, page 32, "did this ever come to fruition," that is the question from the Court.  "No,

138

USA VS. T. ENIX

they worked it out.  We don't have proof to the effect it didn't result in violence," it didn't result in violence. Every time you press and push, he says, as he has to, "it didn't result in violence, it didn't come to fruition."  So.

I didn't realize we've been going this long.  I'm glad to take a break.

THE COURT:  All I've got on my calendar is a 2 o'clock sentencing, not that I'm encouraging you to use all day.

MR. CONNORS:  I won't.

THE COURT:  I will give you both as much time as you need.  You tell me.

MR. CONNORS:  We can take five.

THE COURT:  We'll take a five-minute break.

(Whereupon, there was a break in the proceeding.)

THE COURT:  All right.  We're back on the record. Are you ready to continue?

MR. CONNORS:  I am, your Honor, thank you.  Over the break, I did find that reference that I mentioned in the transcript of the testimony of Special Agent Brown, it was filed on June 11th, 2016.  The paragraph and the page I'm referring to is on 24 and starts at line 10.  "But he is not a regional president of Buffalo," talking about Enix.  "That's correct."  "That his role does not give him any direct

USA VS. T. ENIX

authority in Buffalo."  Answer:  "That would be correct."  Question:  "You're doing this interview in part because of an investigation into some killings or I guess one killing of two people from Buffalo, correct."  Answer: "Correct."  Question: "There is no suggestion or allegation that Mr. Enix was in Buffalo at that time.  Answer:  I'm not aware.  Question: Nor was there any suggestion that Mr. Enix directed that.  "I'm not aware of that, either."  Line 24.

THE COURT:  Thank you.

MR. CONNORS:  When we broke, your Honor, I was talking about the government's proffer and the quality of their proffer, and when we broke I was at that point where they had proffered that September 1st and September 2nd, they show up in the Western District of New York.  And you say "both Pirk and Jenkins."  And he says, "they both show up, they both show up at the Olean clubhouse."  So what we know from the testimony of Special Agent Brown, what we know from the proffer is that Tim Enix is no where near that particular appearance in Western New York, when, allegedly, a day or two day later, the homicides occur, which cuts against the grain of someone being so high up in the hierarchy of the Kingsmen that they are going to engage in this important conspiracy where someone is going to be killed.  Pirk is present and Jenkins was present, but one can't establish that Enix was present because he wasn't present and

USA VS. T. ENIX

he, in fact, had no authority in the State of New York. He was a regional president in Florida. And you asked them, "do you have any proof of any contact between Enix and Jenkins." And the answer is, of course, "no. We don't have all of the phones. We have Pirk and Enix, but not Enix and Jenkins."

THE COURT: Enix and Jenkins.

MR. CONNORS: Yeah, Enix and Jenkins. And you persisted. Do you have any proof that it was Enix who ordered the bike to be given to Jenkins. All this witness would say is "I followed my chain of command." I mean, the answer to that is, no, I don't have any evidence at all that Enix ordered it. But I understand why they would skip over that particular question and not answer it directly because there is no answer. It is a direct question and the answer, of course, is no because there isn't. And then there is some contact in July, August and they claim there was phone calls made to people who threatened Pirk. And you ask him who is it. Who are the individuals. And he didn't want to tell because "I don't want to -- do I need to name all of my witnesses, I prefer." And then you asked, "well, give me a number." And I would say that it's perfectly within his discretion to decline to give us names and even numbers, if he wants to. No question, it's a proffer. But what the cases tell us is that dilutes the quality of the proffer. If you're not relying on first-hand

USA VS. T. ENIX

information testimony or affidavits and you decide not to disclose your sources, that dilutes the proffer.  And that goes to whether or not he has provided you with clear and convincing evidence that Tim is a danger.

And then he tells the tale of what happened where Pirk allegedly tells Jenkins to take care of it.  Tim, we know, is not even in New York at the time.  And then for about the next three or four pages, they talk about David Pirk, about David Pirk, about David Pirk.  And I was there, and it was towards the end of his proffer, and, you know, it was tough for me to be silent for that long a period of time, but I wanted to say, okay, we understand, but this isn't a detention hearing with respect to Pirk.  I mean, where is the evidence, as you asked him so many times, okay, link Enix to this.  Did he give the order?  Was he present in New York?  Is he participating in the violence?  And they have nothing.  They have nothing.  Jenkins pulls away from the scene of the crime, supposedly, and tells him to call Pirk when he gets to Tennessee.  Call Pirk.  He doesn't say, "call Enix," he says "call Pirk."  And then you say, you know, "I asked you this question before.  But when you say that you don't have any proof of contact around this time between Enix and Jenkins, is that because you don't have records or is there just no evidence."  He says, "correct, that's correct," which means that there is no evidence

USA VS. T. ENIX

contrasting with Pirk.  We have contact with Jenkins and Pirk.
Okay.  Well, that doesn't impact Tim Enix at all because it
doesn't link him in any way to this particular show of violence
that we know occurred, a homicide occurred.

And you asked him about some posting questions.
And he said, "no, these are phone conversations."  And nothing
involves Tim, of course, but I suppose that was a proffer.
We've never been given any phone conversations or any
transcripts of phone conversations.  And I'm sure it doesn't
apply to Tim Enix, but the reality is there is no evidence with
respect to that connection between Jenkins and Enix.  And then
he goes on to talk about posts that are made that talk about
other things.  But you ask him:  "This isn't a post made by
Enix, is it."  And he said, "no, not by him, no."  Okay, why
are we bringing this up?  It really doesn't have anything to
with him.  And again, it's all references to David Pirk and
what the evidence is against David Pirk.

And we talk and get into some of the Facebook
posts.  And, you know, they took some of those Facebook posts
from a collage of Facebook posts.  There are so many of them,
we're finally getting a chance to go through them.  They pulled
a couple of them out and what he says, though, here is a post
that shows his willingness to come to the Western District of
New York.  "Blaze's willingness to come to the Western District

USA VS. T. ENIX

of New York.  And he has come here at various times, but I can't give you a number."  So now it goes from a lot of times to, you pinned him down to two times, now he says "I can't give you a number."  Because he doesn't have any proof of that.  You tried to pin him down on the firearm issue, and that is when he says at page 44, "he came with others.  They were basically -- so this is, and again, forgive me, sometimes the witnesses can't give you a date, I can only relay the best estimates that were given.  But after sort of the internal turmoil back in 2013 where he assaulted the Springville members and kicked them out, the defendant was in town with Pirk and others."  Well, he wasn't even in Springville at the time.  I'm sure it's inadvertent.  I can't not challenge that statement because it's contrary to the indictment and it's contrary to all of the proof.  You know, and then the statements about we hear for the first time on Wednesday that he is always armed to the hilt.  And I proffered to you that he flies here and can't possibly happen.  I wonder, are there photographs, an affidavit from someone?  Is there anything forensic that attaches him to a gun?  Any name of a witness, the date, the place, the time?  The kind of evidence that in *Mercedes* and *Colombo?*  The Second Circuit Court of Appeals says, okay, this is corroborating evidence, this is what we're talking about, this is the evidence that we need to see.  And then he does find a post

USA VS. T. ENIX

that was made by Tim and says, I have no problem -- this is Tim -- this is, according to them, it's Tim.  Obviously there is no foundation yet, I'm not even really disputing it's Tim for now. "I have no problem telling them we'll have our support club and we'll go to any bar or anywhere we choose.  And there is no negotiation and they don't tell us shit, okay?"  And then he goes onto say that goes to the fact that he comes to areas where there is a dispute of a national level.  And after it he says, "I guess," he says, "I guess," and also they're going to push back and I guess and that's I suppose is really a summary of the entire proffer on these issues is a speculation and guess.  But then he says, "they don't tell us shit," excuse me, means he is willing to engage in violence.  I wrote next to that "huh."  "They don't tell us shit" means he is willing to engage in violence.  The leap of logic there is so broad that I -- and then he says it's supported by the demonstrated conduct with the Pagans in Florida, which we know there never came to fruition, no meeting, no violence in Florida.  It undermines the entire theory.  And, you know, they say he is driving the ship, giving the orders.  But they have nothing to back it up and he is not here when the homicides take place.  And then there is a thing about a mission to be sent out, and Pee Wee are going to be heading it up and he is going to send him out on a mission.  Page 46, he offers that for your Honor's

145

USA VS. T. ENIX

consideration that a mission is somehow is in connection with violence, but never backs it up.  So he says that would tell someone that there is a potential for violence.  That is what the proffer says, the fact that Pee Wee is going out on a mission.  And then you ask him who is Pee Wee.  He doesn't know who Pee Wee is.  First of all, he doesn't know who Pee Wee is.  But, secondly, that whatever mission this is, I don't know.  Well, what he doesn't tell you, and I know he knows this, I know they know this, is that a number of missions that the Kingsmen motorcycle club went on were missions where they would do charitable works of endeavors.  Raising, in one instance, $20,000 for St. Jude's children, and doing all sorts of other community and charity works that occurred.  And this mission, quote, is just as likely that it is as anything else.

THE COURT:  These were missions by Nomads?  I think the government's argument here is that the Nomads, by definition, were violent actors in this organization, and if they were involved in a mission, then, by definition, it was a mission of violence.

MR. CONNORS:  We'll talk about that, but I don't think Pee Wee --

THE COURT:  And the Nomads, and I'm looking at the Facebook posting, February 26th, 2016, "I'm sending a crew on a mission tomorrow night.  Pee Wee will be heading it up.  I want

USA VS. T. ENIX

some of Deland and the Nomads with him.  Call him for details."

MR. CONNORS:  It's a pretty terrifying name for a gang member, Pee Wee.  Judge, if they could follow it up by saying, Pee Wee took his group and went on a mission and they hurt somebody, they did something wrong and there was some violence and connect Tim to that, okay, it might be relevant to this determination.  But the reality is that many of these missions were done for charitable endeavors.  I know they found that out and had the information.  We have a lot of it, too, but we're trying to get what they have.  Nomads are utility Kingsmen.  There are good Nomads and there are bad Nomads, just like there are good ones and bad ones in the motorcycle club itself.  Being a Nomad is a somewhat of a distinction, doesn't mean you're violent.  And Tim, you can tell from his vest, was a Nomad at times because he had the ability to go to chapters and do things like, you know, you haven't paid your dues in two months, let's get this straight.  I want to straighten this out with the IRS and get you up to date.  I want to follow your deed so you're protected.  A Nomad has those responsibilities as well.  So the fact they claim a Nomad, it can't blanketly say, just like they say in some of the other charges, that everyone involved in the Nomads is bad and violent.  I don't think they represent that because it's just not true.  It's just not true.  We don't even he know the mission.  We don't

USA VS. T. ENIX

even know who Pee Wee is.  And he says, okay, "be alert, be alert," on the next page.  That just goes to show there could be tension with another club that is entering their territory.  Be alert.  I can't tell you how many times I've said that to my son when he was growing up.  It's the same type of thing they look to spin it in a different direction other than it's a non-violent act, that it's a warning for somebody to do the right thing under the circumstances.  And it never comes up, and I hate to argue against some of his conclusions, if they ever offered a conclusion that resulted in violence that Tim was involved in, and they never do that, never.  It's a hyperbole.  And they say he is violent because he doesn't like Caruso.  Okay.  I'll stipulate he doesn't like Caruso.  He doesn't like him because we know that he put a gun to his head at some point and scared the living daylights out of him, that he is violent, a three-time felon, that he carries a gun and he is a drug user and abuser.  And the only one that doesn't like him more is the government.  They don't like him.  They wanted his bail revoked after they tried to use him as an informant.  So you bet he doesn't like him.  And he thinks at this point that Caruso is involved in killing Maue and Szymanski.  And it will come out at some point that Maue was a friend, a good friend of Tim Enix.  So they come out and say, he says, "you know what, I wish he would get the death penalty."  And I'm

USA VS. T. ENIX

sure he probably does.  There are people that feel strongly about it.  And he wouldn't mind pulling the switch.  That doesn't show that Tim Enix is engaged in violence with other people.  He thinks Caruso is a bad actor and should suffer consequences for that.  And Caruso has proven himself to be exactly that and nothing more.  Then you say, you know, "Mr. Tripi, what about the other postings.  You don't talk about the other postings.  We don't want drug dealers in the club."  Then you say "that cuts against the argument that this was a one percent motorcycle club.  What is the context of that."  You're asking him about the postings about drug dealers.  And he says is, "well, they're thieves.  They obviously throw thieves out.  That is a big deal.  I would say that drug dealing, if you ask most Kingsmen, they would say they don't consider a distribution, like you go to a clubhouse, I have cocaine, I give you some."  Did he ever, ever once link it to Tim's clubhouse?  Of course he didn't.  He couldn't.  The guy is anti drug and he expels people for having that.  But then he says, "I know it's kind of messed up and almost difficult to explain, but the legal definitions of distribution don't exist."  I mean, I'm not sure that answer really is responsive, but he also acknowledges and admits it's difficult to explain and messed up.  And, you know, they talk about this nasty post about doing a drug and having a drink and finding a girl.  And

USA VS. T. ENIX

you ask, "is that Enix's post."  "No, that is someone else's post."  And then you say, "Enix refers to other clubs as one percent clubs as opposed to the Kingsmen."  Yes, he agrees that that is Enix, that is -- that is certainly consistent with him not being interested in becoming a one percent club.  He says, but, "yes, but in one of the posts, he is having a support club for one of the patch over."  And you ask what a patch over meeting is.  There were times when Tim Enix would recruit other members who wanted to get out of one percenters, they didn't want to do it any more for whatever reason, it wasn't for them and it would almost be a coup for a non one percent club to take over and bring a one percent.  That is called a patch over.  That is what they mean by that.  It's not a negative, it's a fact that you would go leave a one percent to go to a Kingsmen, why else would you leave?  Why else would you leave a one percent unless you want to go to a club that is not one percent.  And that is what they mean by a patch over.  And, you know, Joe says so.  That is another indicator they're involved in this type of illegal activity.  And they say the Kingsmen are taking over and they can't let that happen.  And I'm sure there was some one percenters that were concerned about a club like this being managed by Tim, who has no record, has a solid job, a good reputation in the community, and they're recruiting more members than the other one percents.  All of a sudden,

USA VS. T. ENIX

their power is starting to disintegrate and the Kingsmen are getting more powerful and for the reason that they're not a one percent club.

And then the snitch thing.  You asked some questions about that.  And, you know, I was reading this last night.  Supposedly in a meeting with Pirk and a one percenter biker rival, so this is what Joe says, he said one percent biker of rival clubs regarding the information that the Kingsmen had a snitch.  And so the one percent are rivals with people that are not one percenters.  And the Kingsmen had a snitch.  And some word got out and he got beaten.  Okay.  Who got beaten?  Did you bring us a photo to show someone was actually injured?  Can you show some evidence that would be corroborative or support the claim?  Did Tim do it?  Was he there?  Is there any involvement between Tim, other than Pirk and Tim had a conversation?  Now could be, I don't know, days, weeks, earlier, what is the connection?  And you say, "does this involve Enix."  And he says, "well, they were sitting down together to receive information."  You said, "does this involve Enix, he was involved in the beating of a snitch," because you want to know whether witness intimidation is a characteristic of this person, and he doesn't answer the question because there is no answer because they have no evidence that was true. If they had that kind of evidence that he was intimidating

USA VS. T. ENIX

witnesses or that he was inflicting violence or punishment, again, I wouldn't be here asking you to release him. And they talk about where Tim puts out a guy for stealing, he banns him and he doesn't turn in his patches, "I'll hunt him down and take them away from him. If you see him, take his patches." And Mr. Tripi says that is involving violence. Where does he get that from? I don't understand the connection. To get back the patches, no one says he is not going to give them back. And no one says -- no one says this guy was hunted down and hurt. And the demonstration so far that we know, whenever there was patches that had to be discussed, he negotiated a non-violent disposition with respect to those.

And then they make about the Warlocks on April 19th, 2015. He said this is violence. "I want to thank the Warlocks and their support -- "I want to thank all of the brothers that rolled with me yesterday. I think the Warlocks and their support, whatever, shit their pants. They realize the last thing they want to do is piss off Kingsmen. I let them know I'm looking for the big tough guy out of Orlando." So he says that is violence. So on April 15th, 2015, they rolled together to raise $20,000 for St. Jude's. I know they have that clipping. That is what the thing was with the Warlocks. There wasn't any violence involved. It's a motorcycle club and they rolled in to raise money. It was a

152

USA VS. T. ENIX

charity endeavor on their part.  And then there was a statement about him taking this "nice medication," and you asked about that.  And, well, Joe said, "I think he is being sarcastic."  Maybe he was being sarcastic, non violent, but sarcastic.  Then the rest of the posts that they talk about, they reference David Pirk and other people posting.  And you point out on 53, line 23, "this isn't Mr. Enix."  And he said, "no, it's another member on the private page."  Okay.

THE COURT:  What about some of the posts where your client purportedly saying things, "the worst thing someone can do is threaten me or my club," and, you know, you go back to the 302 where Mr. Enix purportedly indicates to the FBI agent that if Caruso were to show up, he would take matters into his own hands and shoot first and ask questions later.

MR. CONNORS:  That is Pirk that says that.

THE COURT:  I thought that was Enix that says that.

MR. CONNORS:  No, it's David.  But here is the point, listen, there is no question, your Honor, some hyperbole that exists on the pages.  There are some rough characters here and Tim does assert himself on the Facebook page.  If there was more than that, I would concede he was a violent person.  If they could say he made the post and then followed it up with a beating or threat or have a direct knowledge of him

USA VS. T. ENIX

participating in that, but there isn't anything.  I concede there is some hyperbole on the pages and some remarks that are off color, but to me, that doesn't say that there is no combination of conditions that would assure he wouldn't be a danger to the community.  And more importantly, he has had these postings out before and they never attributed any violence to him, violent action or activity.  They don't place him at the scene of the homicides.  The Springville violence they talk about in the indictment, he is not there.  And I think it's an honest mistake made by the prosecutor on that. It just doesn't have the connection.  And --

THE COURT:  I'm reading from the 302, page four. It says, "Enix then advised that if Filly was anywhere near his family or brothers, that he would shoot first and ask questions later as he had a right to defend himself and his family."

MR. CONNORS:  I thought that was David Pirk.  It says Enix?

THE COURT:  Yes, it says Enix.

MR. CONNORS:  I'm sorry, I have been reading a lot of documents lately.

THE COURT:  So have I.  I guess the point of my question, there is certainly some language in what is attributed to statements of what your client made to the FBI and some of the Facebook postings where he talks about engaging

154

USA VS. T. ENIX

in violent conduct.  Admittedly, your argument is, well, there is no proof that he actually did anything.  But when you take that, coupled with the presumption, coupled with the allegations in the indictment, it raises some concerns that, in fact, this is an individual who would resort to violence, if necessary, to solve his problems.

MR. CONNORS:  And the answer to that I think, respectfully, your Honor, is this.  It's just what the D.C. Circuit statute said and what Senator Kennedy was afraid of that would or could or perhaps don't qualify to detain him.  It's nothing that has come to fruition without any pattern of violence on his part.  And if any of those statements, hyperbolic as they are, ended up resulting in action or conduct on his behalf, it might be a different story.  But so far, that has never happened and I don't think anything showed about his past that it happened or that would suggest that it was likely to happen.  And you have a situation now where you have to weigh the quality of this evidence to hold him in.  It's a, you know, it's a big step and a big decision and there is just not enough here to hold him in for a lengthy time that he is going to be have to be held in.  And you asked that question towards the end of the hearing.  Tell me, are there any threats to witnesses in the community?  What have you established that shows a threat to a potential witness?  What kind of witness

USA VS. T. ENIX

intimidation have you shown?  Do you have any proof, you know, something that Mr. Enix has intimidated or threatened any witnesses in this case.  And he talks about this one snitch, which to me, I don't see how it relates to the fact as you push a little further, he doesn't even say it was a witness in this case.  He says it happened sometime in 2013, '14 or '15.  They never identify a witness or suggest the witnesses in this case and never suggest that Enix had anything to do with any harm that may have come to some person, and they never document the harm.  There is a lot of talk here, a lot of talk by bikers.  It's a rough crowd.  There is no question about it.  But there is not enough to demonstrate that Tim Enix is involved in violence.  There is nothing that really supports that other than the presumption.  And that is just not enough to hold him. Because, as I tell you, as get near the end of the comments, only just to highlight, again, you say what about the fact he has been in jail, any evidence that you've seen that he administered orders or done any outreach that might affect witnesses?  Nothing, nothing, nothing there.

And then there is some discussion about the law with respect to the Bail Reform Act, and a clarification of that position.  You confirm the fact that Mr. Enix was not involved before 2012.  And even that is sort of reluctantly confirmed by the government.  They say there is an inference

USA VS. T. ENIX

that he was involved before.

THE COURT:  Because he had a meteoric rise to the top.

MR. CONNORS:  That he had a meteoric rise.  He is very talented in terms of his business and he understands Facebook and digital media and does that and wants to turn it into a good organization without any physical violence.  And that was never discussed by the prosecutors.  So what do we have now?  What do we have in terms of the proffer?  When you evaluate the quality of the proffer, what do you use?  What kind of standard do you use?  When I was listening to the proffer, frankly, it was my estimate they would have to rely only upon the allegations contained in the indictment because that is all the papers relied upon.  And I have to come to the conclusion they knew they were on the low end of that particular argument, so they came in with additional facts in a proffer and the prosecutors would say we've had other proffers, we talked to people, someone talked to someone else, we're not going to tell you who it is.  We have others that heard this.  Well, the Courts are a little different about that topic.  I concede to you that these are not supposed to turn into mini trials.  It's not a discovery or fishing expedition for the defense, but all of the decisions that are made to the Bail Reform Act, because it's so drastic to interfere with someone's

USA VS. T. ENIX

liberty when they have never been convicted, and there are a lot of presumptions that attaches of them being innocent. Judge Skretny in 2003 said, "this has to be tempered by the Court's obligation to ensure," to ensure, not to ensure the reliability of proffered information. And they cite the leading case, which is *Martir*, M-a-r-t-i-r. We note that the government, in sharp contrast to what occurred in such cases as *Chimurenga* and *Colombo* referred to no independent evidence, no independent evidence, such as tapes, documents or photographs of the crimes charged. Nor did it furnish testimony or an affidavit to describe or summarize, albeit in hearsay form, in even moderate detail, the forthcoming trial testimony of its witnesses. The government simply stated the most general and conclusory terms what it hoped to prove. And that is *Martir* in 1986, two years after the Bail Reform Act. And they held him in, Martir, but because they said the defense never challenged those proffers. Well, I think you know one thing, we challenge them and challenge them strenuously. But to --

THE COURT: Do you have a case name for the Judge Skretny case?

MR. CONNORS: I do.

THE COURT: You brought an extra copy for Mr. Tripi?

MR. CONNORS: I do. I'll give them to you at the

USA VS. T. ENIX

end.  Is that okay?

THE COURT:  Okay.

MR. CONNORS:  And *Martir* says, the point they make in the third is that, "while the act, hence, gives courts considerable discretion regarding methods of presenting information about the risk of flight, which we don't contest, the exercise of that discretion should reflect an awareness of the high stakes involved with the recognition that a pretrial detention hearing may restrict for a significant time the liberty of a presumably innocent person.  The judge or magistrate, accordingly, retains the responsibility for assessing the reliability and accuracy of the government's information."  The reliability and accuracy of the government's -- and that is really what I've been pounding on for the last two hours is that you cannot stand up in a courtroom and say, "someone told me in a proffer but I'm not going to tell you who it is about something about Tim Enix," and then recite some facts.  We don't know if that person got it from someone else. There is no test of cross examination.  What should have been done for a proper proffer, given the fact the stakes are so high, either bring the person on the witness stand or give the affidavit from that person or a summary of the testimony of the individual, not what has been given to you so far, it just isn't enough.  And in 2003 in the *Goba* case, G-o-b-a, "whether

USA VS. T. ENIX

presented by proffer or direct evidence, courts retain the responsibility for assessing the accuracy of the government's proof.  It's tempered by the Court's obligation to ensure the reliability of proffered information."  And I have copies of all of these.  *LaFontain* as well, citing *Martir*, said, "by selectively insisting upon the production of the underlying evidence or evidentiary sources, whether accuracy is in question," so that says you have the power or authority or discretion to say, bring me something that is more than just you saying somebody else said that.  And in that case, I think the reference was to *Martir*, "we criticize the government's proffer for simply stating in generally conclusory terms what it plans to prove and failing to furnish any testimony or affidavits."  And *Martir* is, of course, the seminal case.  And even Magistrate Scott in 2012 said that "it's permissible" -- "proffer is permissible, I understand the Rules of Evidence don't apply, so long as courts take some measure to assess the reliability and accuracy of prosecutor's information."  You know, reiterating the point that it's important.  And that to me, you know, as a lawyer and advocate, admittedly, in this case, but someone that is concerned about the uses of the Bail Reform Act, the fact that I represent a man that may have to stay in jail a longer period of time is my issue.

We brought to you a number of Facebook posts.  We

USA VS. T. ENIX

have a copy for you and Mr. Tripi, and it talks about Tim giving a full financial report to all of the regional officers at a meeting.  "And I know you'll be shocked, another one, but happy, I've received an e-mail from our CPA, our taxes are done.  We owe zero federal and 90 to the State of New York.  As I told you, I started with nothing two years ago.  And now we have two years of complete records" --

THE COURT:  I feel like I read this.  This may have been attached to the Government's paper.

MR. CONNORS:  Not this one.  Not this one.

MR. TRIPI:  It was.

MR. CONNORS:  "I received the property tax bills, they have all been paid."  And followed up with a number of times where he does the type of things that are very business like and organization.  And then he gets back some of the feedback.  "Blaze got the check, it's so weird to be legit.  All above board, a check from KMC for KMC business.  Brought a tear to my eye.  Finally our money is safe and accounted for like grown ups."  Remind us to get the dues paid.  "There will never be any secrets in our club."  Reminding them of dues regularly.  When they have to pay.  Speaking about the thieves that they took over and threw them out because the claim was Spry was stealing money from the club and using it for his advantage.  Making sure every penny is spent wisely, referring

USA VS. T. ENIX

to the property taxes for the organization. And that is really what, as a Nomad, he did, he went from -- he didn't go physically, but he checked the list from house to house saying, "get your dues paid, your deeds recorded, let's do the things in a right business-like fashion." Now, I know they didn't give you this one. "Brothers, there is power in numbers, that is why we need to keep recruiting and growing our nation." That is what he wanted to do and do it the right way. "Trust me, all of the other clubs see what we're doing and they're concerned and don't understand how we're doing it while watching their chapters and clubs are in a downward spiral. We are beating their ass with mental warfare without ever having to be physical. I love our nation. We're bigger than we were before we threw out all of the trash and the thieves. Here in Florida, I started a patch over for one of the support clubs of a one percent club. One percent clubs would like me to disappear. F them. If I go, some of them will go with me. We're going to keep growing and be the club that honorable men want to join. Thank all of the brothers yesterday for the St. Jude's run. I was told by several people that we rolled and everyone stopped and watched. They couldn't believe the size of our pack. We were a major sponsor and helped raise $20,000 for St. Jude's and the kids. That is the kinds of things the Kingsmen nation does for our communities. Let's see if the

162

USA VS. T. ENIX

press and the Feds put that out in public.  I'm proud of our nation."  And that is exactly what it means when you speak about presence in the community, roots in the community, doing the right things for the community.  And he has those in spades.

I've spent some time in this system, been here for a while, sort of a creature of our criminal justice system.  I trust it and I respect it.  And, you know, it's a great system, not a perfect system, but it means a lot of me.  But when I think about this when I leave him on Sunday evenings, when I leave Niagara County jail, what I think about is he is a 57-year-old man, never been in trouble.  No criminal record.  Has a history of stable presence in a community, a fine family.  He has all of things that qualify for a bail.  No discernable evidence of violence attached to him, not nothing - words, talks, nothing that has been supported.  And I think about this hard-working man and how much his family needs him.  And how much his ailing father needs him and his mother needs him.  And I'm concerned that he might be held in jail for such a long period of time that what would happen, what a hollow victory it would be at the end of this if when we walked out of that courtroom and he had won in the courtroom and lost everything else.

And I'm reminded about the words that I read when

USA VS. T. ENIX

I researched the legislative history of this.  And I knew there were safeguards put into the Bail Reform and the words of Senator Kennedy and Sam Ervin resounded, they warned about this problem, and said there were safeguards and here are the safeguards.  You can fashion a condition or combination of conditions that will satisfy whether or not he will be a danger to the community and rebut that presumption.  We have a combination of factors we're willing to concede.  We'll post all of the property they have.  We'll submit to random drug testing.  Constant supervision by pretrial services, reporting on a weekly basis, home detention, GPS, monitoring, whatever you think is appropriate, but this man deserves to go home.

THE COURT:  There was some reference in your papers to not just, I think it was in Mrs. Enix's affidavit, to cash that was available for bail.

MR. CONNORS:  I will do whatever I can to obtain some cash.  There is some cash available.  I haven't considered returning part of my retainer, which will be gone, if there is a cash component, we'll do everything we can to comply with that and I thank you for the time and patience and I appreciate --

THE COURT:  And you have copies of the cases and the Facebook postings that you're referring to.

MR. CONNORS:  I do.

USA VS. T. ENIX

THE COURT:  Thank you.  Just give us one second, Mr. Tripi.  Why don't we start and see where we go?

MR. TRIPI:  Thank you, your Honor.

Your Honor, I'll start by reading one post that was referenced but kind of glossed over yesterday.

THE COURT:  This is a post attached to your papers?

MR. TRIPI:  Yes, to the Facebook postings. January 12th, 2014, so roughly nine months before the murders that occurred in the North Tonawanda chapter.  Tim Enix posts "brothers, I'm writing this post for the national president Pirk," that is all I read yesterday, but if we go further down --

THE COURT:  Two days ago.  I know everybody --

MR. TRIPI:  It's all blurring together.

THE COURT:  It is.

MR. TRIPI:  Midway through that post, he also said is "our club is to be operated by chain of command.  If you have a concern or a question about anything, it is welcome, but needs to go to your chapter first, then to regional and onto national, if needed.  To stop some of the misinformation, the national will pass information to the regional, the regional will pass it to the chapter presidents and they inform the members of their chapters."  Judge, that is consistent with

USA VS. T. ENIX

everything that has been uncovered in this two-year investigation that led up to the indictment. The searches that occurred in clubhouses where the FBI found meeting minutes had a multitude of references to follow chain of command, and a multitude of references that were similar to the Facebook posts of Mr. Enix insofar as they reference of being law enforcement conscious. So that did trickle down to the rank and file. And it's consistent with the -- what I showed yesterday. In a search warrant in one of the clubhouses, we found out a printed out chain of command. Everything we have points to that is how the organization operated. So for us, that is the starting point and that is reflected in the indictment. And I know Mr. Connors has argued the indictment is not evidence, but in Contrares, the Second Circuit, this is probable cause for everything in it. And this alone, coupled with the presumptions that attach based on these charges, would be enough for this Court, in its discretion, to detain him on both prongs: Flight and danger. But we have corroborated this indictment because we've now given you Facebook postings, those are the defendant's words, not ours, and they are not something that we even had at the time the indictment was returned. In explaining some of the Facebook posts, Mr. Connors, just, maybe like I may have misspoke several times during an hour-and-45-minute proffer, maybe it was a freudian slip, but

USA VS. T. ENIX

when he was explaining away the one percent post that he just read at one point this morning he said, "they are recruiting more members than the other one percent clubs, the Kingsmen are recruiting more members than the other one percent clubs." Could be a just a slip of the tongue or like Volusia County, Florida where there are Kingsmen clubhouses, they have them categorized as a one percent club.

THE COURT:  Say that last part again.

MR. TRIPI:  Volusia County has a local police department, they have Kingsmen in their law enforcement listing, in their listing of one percent, they have them as a one percent there, even though they don't wear the patches.

THE COURT:  But the local police have characterized the Kingsmen in Volusia County as one percenters?

MR. TRIPI:  Yes.  Drifter, who was the third person who came up.

THE COURT:  Who died in the car accident.

MR. TRIPI:  He had gotten in a car accident and died.  In some of the police reporting relating to that, some other Kingsmen were with them, they kind of got in the face of a motorist and things like that, so the police came to the scene of the crash.  The officer noted in there that they have the Kingsmen as a one percent club in his report.

THE COURT:  Is there any allegation that Mr. Enix

USA VS. T. ENIX

was at the scene?

MR. TRIPI:  No, it's just to show you that there are law enforcement agencies in Florida who consider them one percent clubs.  So the fact that Mr. Connors points you to Special Agent Brown and tries to paint him as the case agent, I'll read another quote from Special Agent Brown from the transcript, this is at page 22.

THE COURT:  Hold on a second.  Let me get there.  All right.

MR. TRIPI:  It's page 22, line 13 I'll begin reading from.  One of the first questions asked by the defense lawyer in Florida was:  "And are you aware of the investigation overall in this case."  Agent Brown answers, "peripherally.  I didn't have a hand in the Buffalo investigation, so I can't give specifics."  That sets the table for all of the other questions that follow where he says, "I'm not aware, I'm not aware," the ones that Mr. Connors pointed to, and what I can say, being the AUSA, other than a time that I was engaged in a lengthy trial, so there was a time I wasn't directing things and day to day with law enforcement, Agent Brown, if I'm aware of any other investigative action he took other than interviewing Pirk and Enix, it didn't come until right before the round ups when he did surveillances and things like that.  He wasn't a case agent, he peripherally helped.

USA VS. T. ENIX

THE COURT:  But the fact the only witness that the government has put on the witness stand that I have in front me is Agent Brown.

MR. TRIPI:  Well, actually he was put on the stand in Florida.

THE COURT:  On this record in front of me, the only testimony that I have submitted in any kind of sworn form from the government would be Agent Brown.

MR. TRIPI:  Agreed.  Government, as you know, is allowed to proceed by proffer, just like Mr. Connors was able to.  And so if you want me to speak to the logistics of why that happened, I can.  If you're not interested, I will move on.  But there wasn't an anticipation of a hearing there.

THE COURT:  In Florida.

MR. TRIPI:  In Florida.  It came up quick.  He was there, that is who they used.  It was logistics.  Certainly if it had occurred in front of Judge Roemer, I would have proffered some of the things I proffered to this Court, but I didn't have certain information that I have now, such as the Facebook.  What I will say, looking back to the interview that Mr. Pirk and Mr. Enix gave Agent Brown in December of 2014, I don't think I made a good point of actually demonstrating how important that is.  Within hours of the murders, the Kingsmen knew Andre Jenkins had killed Maue and Szymanski.  He testified

USA VS. T. ENIX

at the state trial, I'm sure the defense have the transcripts, but Paul Gilmore, Rebel, of the north --

THE COURT: Who is he?

MR. TRIPI: A North Tonawanda Kingsmen member, he saw Jenkins, he is the one that saw Jenkins leaving right after the murders that occurred behind the North Tonawanda clubhouse. He had met him before, but maybe he didn't know his name, sometimes that happens.

THE COURT: Had met Jenkins before?

MR. TRIPI: He had seen him, but very shortly after that, someone -- they had a party later that same day. There was a planned party at co-defendant Jack Wood's house. So the murder happens at about 2:50 a.m., later that same day in the evening hours, Jack Wood has a party, he had a lot of land out on California Road, his garage was a de facto clubhouse for a period of time for the Delevan chapter, they had many, many many, many Kingsmen there, and obviously some of the topic of conversation turned to the murders, obviously. And very shortly after getting there, there is a meeting of all of the high-level members, including Pirk, who was still in town, and I'm not suggesting Enix was there, I'm filling in some gaps here. There was a post, a Facebook picture of Jenkins that was shown and, yes, Rebel Gilmore.

THE COURT: Rebel is his name?

USA VS. T. ENIX

MR. TRIPI:  That is his nickname.  He confirmed that Jenkins is the shooter.  So, essentially, the day of, Pirk knew, the club knew that Jenkins was the shooter, they're own.  Yet --

THE COURT:  And this is based on Gilmore's testimony at the state trial?

MR. TRIPI:  This is based on Gilmore testified that essentially he walks out the back door, he sees the same person they had seen come in on video leaving on the bike, that is Jenkins, ultimately identified him in a photo array and Jenkins yells "LKDK"; live a Kingsmen, die a Kingsmen.  That is important because these two killed were suspected of being guys that were going to leave the club, so the killer is yelling "LKDK," live a Kingsmen, die a Kingsmen.

THE COURT:  I guess, Mr. Tripi, I'm trying to figure out the basis for your evidence that other Kingsmen knew that, in fact, Jenkins was the killer.

MR. TRIPI:  Several Kingsmen have talked about -- first Gilmore testifies at the state trial.

THE COURT:  Does he testify to that fact about telling the other Kingsmen?

MR. TRIPI:  He testifies about being at the party and reporting to Pirk what he saw.

USA VS. T. ENIX

THE COURT:  Okay.

MR. TRIPI:  Others have provided information via proffer.

THE COURT:  Through proffer, not grand jury testimony?

MR. TRIPI:  Yep, not grand jury testimony, proffer -- that that day, based upon Gilmore's description and other people who knew Jenkins, sending photos to their phones, that they confirmed Jenkins was the shooter.

THE COURT:  How many others have provided this by proffer?

MR. TRIPI:  By proffer, two.

THE COURT:  Okay.  So you have three witnesses. One of whom has given sworn testimony to the effect to support the conclusion that, in fact, within 24-hours of the two decedents being killed, Pirk and other Kingsmen knew that Jenkins was the shooter; is that fair?

MR. TRIPI:  Yes.

THE COURT:  Okay.

MR. TRIPI:  One even explained, "I was telling Pirk, you got to tell these guys something," meaning the other bosses.

THE COURT:  Say that again.

MR. TRIPI:  One of the people even proffered

USA VS. T. ENIX

telling Pirk, "you got to tell these guys something," in other words, about the murder.  You got to explain to them why we're not going after Jenkins, in other words.

THE COURT:  Okay.

MR. TRIPI:  And he came up with what I'll characterize and what the witness characterizes like a cockamamy story with the benefit of hindsight as their proffering in 2016.

THE COURT:  I'm sorry, I'm not following you.

MR. TRIPI:  The person that provides the information, looking back at the explanation provided with the other information that was publically available after the trial was occurring, looks back on the explanation that Pirk gave for Jenkins doing this murder as like, yeah, that clearly was misdirection.

THE COURT:  Is this the same individual who has those anonymous postings?

MR. TRIPI:  No.

THE COURT:  Different.  There is no -- do you have any evidence, though, that -- and I know the evidence you would argue is through chain of command, the number of phone calls and so forth, but do you have any witness who could corroborate that Enix was informed about Jenkins being the murderer at any point in time after the murder and before the FBI interview?

USA VS. T. ENIX

MR. TRIPI:  Well, yes.  He didn't come right out and say it, but he stated things like, "you'll see why we've put him out, you'll understand later on," things like that, prior to the murders occurring.

THE COURT:  Those are inferences, though.

MR. TRIPI:  Correct.

THE COURT:  Do we have anybody who is a witness, first hand, Enix being informed one way or the other that in fact Jenkins was the murderer?

MR. TRIPI:  I'll put it this way, Enix was at the Tennessee clubhouse with Pirk when Pirk left to meet Jenkins following the murders.

THE COURT:  And explain that to me.  Because I know you said the other day Jenkins came back to the Tennessee clubhouse.

MR. TRIPI:  A period of time passes, at some point they head down there, meaning Pirk and Enix.

THE COURT:  Head to Tennessee?

MR. TRIPI:  Yes.

THE COURT:  This is sometime in 2014?

MR. TRIPI:  Yes.

THE COURT:  Okay.

MR. TRIPI:  Because Jenkins is arrested in November of 2014.

USA VS. T. ENIX

THE COURT:  Okay.

MR. TRIPI:  And in the meantime, Jenkins had dropped his phone or run out of minutes on his phone and was utilizing a girlfriend down there phone to maintain the communication with Pirk, so he was down there for a period of time and it's during that period of time he is running out of money.

THE COURT:  And when you're saying he, you mean Jenkins?

MR. TRIPI:  Correct.  So this is after he had initially gotten there, Tennessee is confused initially and they pull guns on him.  And he explained to the Tennessee chapter, call Pirk, and then nothing happened.  Subsequent to that, Enix is in the clubhouse with Pirk and Drifter, who had previously left to meet Jenkins.  And Enix did not leave the clubhouse to go meet with Jenkins, that was Pirk and Drifter.  But he full well knew Pirk was meeting with Jenkins.

THE COURT:  But that doesn't -- I guess my question is:  Do we have any evidence that Enix had first-hand knowledge with -- anybody with first-hand knowledge that can say Enix knew Jenkins was the killer because I witnessed Joe Schmoe telling him this on such-and-such a date on or something of that nature.

MR. TRIPI:  Pirk comes back with the meeting with

175

USA VS. T. ENIX

Jenkins, walks over with Enix, they walk off and talk.  When Enix comes back, the witness is told "don't worry about it." So they kept it between them.  These are inferences, but there are a number of them.

THE COURT:  And this is a witness that testified before the grand jury?

MR. TRIPI:  No proffering co-defendant.  So with that background, the December 2014 interview is largely a sham. It's Enix and Pirk trying to get information, but they certainly left some gems in there, maybe unwittingly, and we've been through it in detail.  But what I'm saying, the whole club knew Jenkins was the shooter.  And Enix is just as instrumental as Pirk trying to point the FBI in a direction which is Filip Caruso, that is consciousness of guilt.  I'm arguing that that shows you he is complicit in the plan.

THE COURT:  If he knew that Jenkins was the killer.

MR. TRIPI:  Or is an accessory after the fact trying to point the FBI in a different direction.  And, again, Judge, guys leaving the club, the number who had left, which included Caruso and others, 14 members leave, and prior to Paul Maue and Szymanski getting killed, that threatens the very power and nature of the club.  You overlay that concern that is happening in Western New York with some of the Facebook posts

USA VS. T. ENIX

that you just reviewed, he is very interested in growing the numbers of the club, the numbers of the club, the strength of the club, recruiting the patch overs of the one percent.  That is what they're interested in.  What is happening in Western New York, diminishing the club, people leaving to go to other clubs, that sets the tone.  When they first came into Western New York, one of the first people they wanted to kill was Caruso.  Jenkins spent the whole weekend trying to hang out and get him alone.  The targets shifted or was longer than just Caruso, and Maue and Szymanski, after some investigation, end up getting killed in the hit.

So now let's go to one more thing that Enix says in the 302, when the FBI, who isn't sure who Drifter is at the time.  See, we know now it is David Palmer, but at the time, they thought it was somebody else.  When the FBI asked, "who is Drifter."  Enix says, "I'll put you in touch with him."  If he is so cooperative, why not say, "it's David Palmer," he lives at such-and-such.  They didn't figure out who he was until after he gets in the car accident, local police respond and they put two and two together that he is Drifter and he is in a coma and then he dies.

There was a search warrant that occurred at Enix's house.  It wasn't a consent search.  His wife consented to other searches at that time.  But we had a search warrant

USA VS. T. ENIX

signed by a judge in Florida to search for firearms.  And we found two handguns.  And what type of ammunition, Judge?  Hollow point bullets.

THE COURT:  Those aren't illegal, though?

MR. TRIPI:  Obviously you noted he is charged with 924(c), my guess is in and of themselves you can purchase that type of ammunition, but I did ask an ATF agent, what is a hollow point round for.  And he explained, not connected with the case, I asked him:  What is the purpose of a hollow point round.  I had a phone call with him yesterday, Tom Galluch of the ATF.  He said, "it's a type of round that makes a small entrance and a large exit for maximum damage."  I asked him:  "Would you use that for hunting or target practice."  He laughed and said "no."  Those are the types of rounds that Enix had.

THE COURT:  But there is no allegation that the possession of hollow point bullets in the state of Florida is illegal, correct?

MR. TRIPI:  Not in and of itself.

THE COURT:  In other words, the law, the legislature said it's okay to sell hollow point rounds?

MR. TRIPI:  If it's illegal in Florida, I'm unaware of it.  But the point is, a legal gun is still a dangerous gun, a hollow point round is a dangerous round.  He

USA VS. T. ENIX

is charged with 924(c) in this case. It's not like we alleged it. People just said he had guns and we didn't find guns and ammo, we found them. It's also significant that during the consent search, when she did consent to other things, Malinda asked for one thing, don't take his patches. And they didn't. They took photographs. Even she recognizes how important that is to a biker. So when you have the references in his Facebook posting to take their patches, I can't stress it enough in this sub culture, it's silly to me and to you and probably silly to Mr. Connors, but to them, it's a big, big deal. One of the victims in -- multiple victims in this particular indictment, whether it be the Springville incident or I think victim D, who is assaulted in 2013, those were attempts to take patches. Guys got pistol whipped. Victim D got knocked over the head with a mag light, so you're calling for violence. There is no other way to phrase it. When he is directing Pee Wee or others or whoever he was on the Facebook post that is saying, "do what you got to do," that is a violent act, giving an order. I'm going to hand up those photographs, your Honor. One other thing about them, the Facebook posting of the person who I redacted, Mr. Connors referred to as Timothy Haley referenced "now Pirk has made Enix a Nomad," in those posts and some other, those are the photos I got from the FBI, big Nomad patch right on the back.

USA VS. T. ENIX

THE COURT:  And I mean, I heard Mr. Connors acknowledging that at least for some portion of the time, Mr. Enix was a Nomad, but not all Nomads are bad.

MR. TRIPI:  Judge, I'll jump to that.  I was going to get to that.  Tom Scanlon testified in the grand jury in part -- he is a co-defendant.

THE COURT:  He has been released.  He was like the president of Olean.

MR. TRIPI:  Olean, and at times a regional president.  Regional presidents change in New York.  Tom Scanlon is charged with obstruction based in part upon his explanation of the Nomads.  It was a very similar explanation that Mr. Connors gave.  So I don't doubt that that is what he is being told, but the grand jury did not find that.  What the grand jury found about the Nomads is set forth on page 3, moving onto the later page 3, paragraph 7, "a KMC Nomad was a member who was not required" -- excuse me -- "to regularly attend all of the enterprise's meetings and other events, but was expected to serve the interest of the KMC enterprise, including fighting other clubs and committing violent crimes on behalf of the KMC.  The KMC Nomads answer only to the national president or regional presidents passing down orders to the Nomad president from the national president."  Now, the post of the person who I redacted, who they say is Haley, said he

USA VS. T. ENIX

became a Nomad, I think sometime in August of 2015.

THE COURT:  Enix became, when you say he?

MR. TRIPI:  Yes.  So not only has he been a regional president in two states, he is a Nomad.

THE COURT:  What are these?  They look like index cards.

MR. TRIPI:  They're his business cards.  A little more corroboration that he is a regional president of Florida and the whole southeast regional president.  And he didn't put his name, Timothy Enix, he puts "Blaze."  That goes to show you how they operate.  That in and of itself serves an anti law enforcement function.  That is how they couldn't figure out necessarily who Drifter was before -- to interview him before the man was in a coma and died.

And, Judge, you did ask me the other day to come up with the specific instances of witness intimidation and maybe the question caught me off guard.  I've had a little time to reflect, if you don't mind.  This is in Florida, I'm going to read a police report, and I'll give it to Mr. Connors in redacted format.  I'm going to edit it as I read it.  This is of the mother of the female witness, she is younger, she is with Jenkins and Pirk leading up to the murders.

THE COURT:  Okay.  Wait a minute.  This is a statement of the mother of the female who was posing as

USA VS. T. ENIX

somebody from Tennessee?

MR. TRIPI:  Yes, she was from Olean, but she acted as Jenkin's girlfriend from Tennessee.

THE COURT:  Got you.

MR. TRIPI:  On November 11th, 2014, which is the same month that Jenkins was arrested.  I believe he was arrested November 18th in Georgia, and about a month before Enix and Pirk sit down with the FBI, Kingsmen show up at this girl's mother's house in Florida.

THE COURT:  Kingsmen did.

MR. TRIPI:  Yes.  And she calls the Buffalo case agent first, and he says, you got to call -- "you got to tell your mom to call the Florida police, I'm in Buffalo."  So the female witness --

THE COURT:  The female who was posing as Jenkins' girlfriend.

MR. TRIPI:  Yes, gets information from her mom that Kingsmen are at my house.

THE COURT:  But she is not there.

MR. TRIPI:  Correct.

THE COURT:  Her mother is there.

MR. TRIPI:  She lives in Bradenton, Florida, which is three or four hours from Daytona.

THE COURT:  The FBI had already made contact with

USA VS. T. ENIX

this woman before this incident in November of 2014?

MR. TRIPI:  I'm confused by the question.

THE COURT:  I thought you said that the -- call her the girlfriend -- called the case agent in Buffalo, who said, "you have to call the Florida police."

MR. TRIPI:  The way it worked out, they had been in touch with her, you know, obviously very scared.

THE COURT:  So the FBI is in touch with the girlfriend?

MR. TRIPI:  Yes.  Very scared, things she witnessed, the throwing of the gun, blood on the clothes, the whole nine.  Agent --

THE COURT:  She left the North Tonawanda clubhouse with Jenkins?

MR. TRIPI:  Yes, she rode on the motorcycle with him back.  She rode with him, and was with him for the weekend.  After the murder, he picks her up from a nearby bar, she jumps on the motorcycle and they're on video going through various toll booths.  And essentially her explanations of what happened lead to the recovery of the firearm.

THE COURT:  Okay.

MR. TRIPI:  So her mother lived in Florida.  So about two months after the murder, several days before Jenkins is arrested, and about a month before Enix and Pirk give their

USA VS. T. ENIX

interview to the FBI, Kingsmen visit the mom's house.  The mom, instead of calling the police, calls her daughter, who then calls the agent in Buffalo, who then says "you need to tell your mom to call the police."  In that delay, the police respond to the mom's house.  And now I'll read the report.  Sorry for the long wind up.

THE COURT:  No, that is okay.  I wanted to make sure I was following you.

MR. TRIPI:  So this report is taken November 11th, 2014.  The writer is a Casey M. Harnas, police officer.  H-a-r-n-a-s, Casey with a C.  Bradenton Police Department, so three or four hours from Daytona, Deland where Enix and Pirk are headquartered, where their residents are near:  On the above date and time I made contact with -- redacting name, redacting the address -- who advised me that there were two subjects that came to her door asking for her daughter, insert name of homicide witness.  Mother then advised me that her daughter resides in New York, in upstate New York, and she was a primary witness to a double homicide involving the Kingsmen motorcycle club.  Mother -- I'm inserting the word "mother" -- stated that for some reason her daughter decided to put on Facebook she was down in Bradenton and moving back here.  She is young, she is on Facebook.  Mother stated that her daughter has not been in this area in several years.  I asked, insert

USA VS. T. ENIX

mother, about the two men that came to the house and asked for, inserting daughter.  She advised me that both are white males, one had red hair and she described him to look like the comedian Carrot Top.  He is about 5'8" to 5'10", slender built, about 160 pounds.  Mother advised that he was probably in his early to mid 40s and had no facial hair.  Mother stated that he had tribal-like tattoos on right forearm.  Mother advised that he wore a gray shirt with jeans (could not recall color) and a black vest that said "Kingsmen," and had what she called a mid evil helmet under that as well.  Mother advised also that it was a patch that had "one percent" on it and another saying "Daytona."

I will step back from the report for a moment. There was a period of time where meetings were had where Pirk wanted people to have one percent patches.

I asked -- this is the Officer -- I asked mother about the other male subject and she advised me that he had the same black vest on, but he had on a black shirt and black jeans, his hair was brown and a type of mullet style, and he had a piercing on the right side of his nose.  The mother stated that he did not have any facial hair, either, and was possibly in his late 30s to early 40s, about 5'8" to 5'10", and weighing about 160 to 180.  Mother advised me this subject had tribal tattoos and sleeves on both of his arms.  I asked mother

USA VS. T. ENIX

to walk me through what happened.  She advised me that around 1400 hours -- I believe that would be around 2 in the afternoon or so -- (unsure of exact times) that these two subjects came her to house -- I believe it should read "to her house" -- and asked for her daughter by name.  She asked them she advised them they -- should be "that" -- she was not here, and did not reside there.  Mother then advised that she saw them walk around her house and they ended up in her backyard (which is not fenced.)  And they sat in the grass watching the house. Mother stated that they sat there for about an hour and they got in a burnt orange unknown make and model four-door vehicle that looked rough and left.  Mother then stated that she called her daughter to make sure she was all right and to find out what was going on and explained everything to her daughter. Mother stated that her daughter told her she would call her back, that she was going to call the detective and let him know.  The detective of the case in New York is a Detective Gregory Mango.

He is actually an FBI Safe Streets Task Force officer, he is an HSI investigator.

He confirmed that the daughter did in fact call him about the situation and he advised her to tell the mother to call the police right away.  I asked mother why she waited so long to call us and she advised she was scared, and in the

USA VS. T. ENIX

same way she didn't want to waste our time.  The report concludes:  Detective Piper was made aware of the situation and has the case number and Detective Mango's phone number to make contact with him.

Then follows up another supplement on November 25th, 2014, same Officer, I believe.  No, this is Investigator Benjamin Piper, another investigator, went to show mother several pictures of individuals that have been identified as member of the Kingsmen outlaw motorcycle gang.  That is the word they use here "outlaw" is synonymous with one percent.

THE COURT:  As opposed to the Outlaw motorcycle.

MR. TRIPI:  If you're an outlaw motorcycle gang, you're a one percent.

I received the pictures from Investigator K. Powell from the Volusia County Sheriff's Office Intelligence Unit -- and I referenced an earlier report where Volusia County had them listed as a one percent -- mother looked through all 31 pictures and identified a Mr. Joseph Long as possibly being one of the two subjects who arrived at her residence looking for her daughter.  She was not positive, but stated he looked familiar.  Photos were signed and dated and will be placed into evidence.  It should be noted that prior to showing the pictures, he advised her, you know, he gave her a disclaimer about may or may not contain the person.  Copy of that was then

USA VS. T. ENIX

sent to Mango.

Obviously we had an equivocal identification there, your Honor, to a degree, but scary situation mother of our witness.

THE COURT:  But, I mean, what evidence do you have that Mr. Enix was involved in that?

MR. TRIPI:  Judge, again, you're going to ask me for direct and I'm telling you, I'm arguing to you, I apologize for that, the chain of command.  These are bikers of the Kingsmen in Florida taking a drastic measure.  We go back, Mr. Enix's own words nine months earlier, a year earlier, "follow chain of command."

THE COURT:  Mr. Tripi, I understand your argument, but do you have any evidence, any direction, any instruction from Mr. Enix, even to a general instruction to the Kingsmen to go and talk to this mother or is your argument --

MR. TRIPI:  My argument --

THE COURT:  That basically a Kingsmen acts, that means Mr. Enix acts because of the leadership role he had in the organization.

MR. TRIPI:  That is my exact argument.  We're never going to be able to, unless we're on a wiretap, which, as you know, we need a dirty call.  They're law enforcement conscience, most of them are very loyal.  We didn't have

188

USA VS. T. ENIX

someone to make the dirty phone call to allow me to go to OEO to get a wire tap.  It's a closed group, people that are reported or kicked out or beat up, they didn't have that.

THE COURT:  But you have pen registers on some of the phones?

MR. TRIPI:  Yes.

THE COURT:  Did you know who this Joseph Long is? That, I think, that is the name that you said.

MR. TRIPI:  Yeah, Joseph Long is the name that I used.

THE COURT:  Long or Wong?

MR. TRIPI:  L-o-n-g.

THE COURT:  Proof of any contact between Mr. Enix and Mr. Long?

MR. TRIPI:  I don't know that we have a phone number, an active phone number for this Mr. Long.  Certainly, Judge, all aspects of this case remain under investigation.  To say that, you know, I don't.

THE COURT:  But you're asking me to detain a defendant right now.

MR. TRIPI:  But my argument is, as it stands, Judge, you asked me for a specific example.  The grand jury --

THE COURT:  Well, let's be clear, what I asked you for, I asked you for a specific example, and I remember the

USA VS. T. ENIX

question very clearly, we can go back to it if you want, I asked you for a specific example of any intimidation, threat, retaliation directly made by Mr. Enix to any witness. And that, at that time, what you proffered to me was this meeting between Pirk and Enix with another member of a club and that ended up resulting in somebody getting kicked out of the clubhouse and beaten up here in New York.

MR. TRIPI: That is one example I gave the other day, this is another example of witness tampering or witness intimidation, the grand jury findings, so loop it back as to the purposes of the enterprise on page 9, subparagraph C, 27 C, grand jury finding: Placing victims, potential victims, potential witnesses and others in fear of the enterprise, its members and associates through violence and threats of violence.

THE COURT: But you would agree with me, Mr. Tripi, any of these cases that you look at where a defendant has been detained, even in the context of having a leadership role, in some kind of criminal enterprise, there is some kind of evidence that that defendant was personally involved in either directing violent activity or engaging personally in the violent activity.

MR. TRIPI: See, I don't know that that is accurate to say in all cases that deal with RICO or that deal

190

USA VS. T. ENIX

with gangs or drugs that there is direct evidence of the threat from the person detained.

THE COURT:  Or at least an instruction, an order that comes from the person in the leadership role to somebody else to engage in the act of violence.

MR. TRIPI:  We've been through the Facebook countless times, you've seen the orders.  His words, "our club is to be operated by chain of command."  That is in the minutes that we seized from all of the clubhouses, that is in the form that we seized that I put up the first exhibit I showed you the other day.  So, I'll quote *Colombo*, since everyone is quoting *Colombo*, this is the actual quote from the case at page 97, the Second Circuit said in that case where they upheld detention that there is "virtually no evidence of Colombo's direct participation in the crimes charged is not surprising if one accepts the determination made for purposes of bail hearings that Colombo played a leadership role in the organization."  That is at page 99.  That is what the Second Circuit said.  That is what I'm arguing.

Moving onto this Tennessee Moonshine chapter.  Mr. Connors' word was "fledgeling."  They have a Facebook page.  Judge, you can look it up, moonshine chapter, I believe, unless they privatized it.  You can see what is public on that page.  I haven't looked in a couple of months, so maybe they changed

191

USA VS. T. ENIX

the settings.  Jack Wood, a co-defendant in this case, after the FBI was looking into him here, he transfers down there, sells his house, moves to Tennessee.  When the FBI started arresting people March 22nd, someone posted "the FBI just came to the Wood's house in Tennessee" to the private page that Enix was the administrator.  Nothing fledgeling about that chapter.  Another thing, the person that came up and gave the motorcycle to Jenkins was subpoenaed to grand jury, referenced a minute ago as Tennessee Jim.  They know who he is.  He probably speaks to them more than the government.

THE COURT:  But he is not a defendant in this case?

MR. TRIPI:  He is not a defendant, he is a subject, potential target, but he was subpoenaed to grand jury.  His bike was the one Jenkins was driving.

THE COURT:  Okay.

MR. TRIPI:  We made arrangements for him at the hotel down the street.  He was met by Kingsmen.  Never stayed in the hotel.  Was brought to the Arcade/Delevan chapter where he met with Pirk.  We knew that from the video surveillance and from the agents who dropped him off.  They picked him up at the airport and dropped him off, and he was met by Kingsmen in the lobby.  He leaves.  They double checked.  He never came back.  He never used the room that was booked for him when we

USA VS. T. ENIX

subpoenaed him.

THE COURT:  When was the time frame?

MR. TRIPI:  I can get you the exact date because he testified in grand jury.

THE COURT:  Even general time frame, we're in 2015?

MR. TRIPI:  2015, your Honor.

And when being asked a multitude of questions about who knew who was here, who did he meet with. Misdirection, I think I'm in a position to characterize his testimony at this point, I hope that would be fair, mischaracterization, misdirections, vagaries.  Certainly didn't tell us that he met with Pirk.  Other people reported that is who he met with.  And when I tried to nail him down to say, who did you report.  All he would say is "I followed my chain of command."  Well, at that time, his chain of command, and I believe if my recollection of the transcript is clear, I established his chain of command was Mike Long, his chapter president, and Tim Enix.  I'll give you the transcript.  I'll give a copy of the transcript to Mr. Connors subject to the protective order that is in front of Judge Roemer.  We'll hash that out, but there is some litigation on the protective order.

On the issues of flight, Judge, you asked me and I don't have copies, but I have citations for you, so I

USA VS. T. ENIX

apologize.

THE COURT:  That's fine.  About the community ties issues?

MR. TRIPI:  Regarding community ties.  Judge Skretny has issued a number of decisions in the *Drake* case, *U.S. vs. Drake,* this is 2005 Westlaw 602381.

THE COURT:  Give me the last number.

MR. TRIPI:  60238.  This is *U.S. vs. Drake*.  Judge Skretny said:  "Nothing in the record suggests the defendant has any ties to this district" -- was his wording -- "that would compel him to remain here if released pretrial."  In the *United States vs. Berrios-Berrios*, Second Circuit case, 791 F. 2d page 246, pin cite 250, Second Circuit, 1986.  The quote I direct the Court to is "the Court is obliged to determine whether the defendant is likely to flee the jurisdiction if released."  That is the word they used, "the jurisdiction." Here the jurisdiction is the Western District of New York. That was a robbery case, essentially a robbery charges emanating out of Connecticut, I believe the Hartford area, the defendant was someone who lived in Puerto Rico, was part of a group, the Machete group, a violent crimes/terrorist group in Puerto Rico.  Prior to being charged, seems like shortly before being charged, she moved to Mexico.  She gets charged in Connecticut, ultimately waives extradition and comes back and

USA VS. T. ENIX

in Connecticut, that defendant even offered to move her kids to Connecticut, and that wasn't good enough in that particular case.  In *U.S. vs. Jackson*, this is 823 F. 2d page four, pin cite page 7, Second Circuit 1987.

THE COURT:  823 F. 2d 4.

MR. TRIPI:  Yes, four.  They are recounting some of the factors, and I'm not saying the charges are the exact same, some of them are drug cases and some gun charges.  "The defendant's mother in that case stated that the defendant had not lived with her, none of his clothes were in her home, which revealed state of mind of rootlessness," was the quote.  And that was a case where the crimes were charged and the person was from the district, so we didn't have this issue of being from a separate district, but the Court, in reciting the factors, cited lack of community ties.  And their quote was "a general lack of ties to the community."  They were talking about a person who was even from that area but who didn't have a stable residence in that area and they focused on his community ties.  And so even though he was from there, that was what they looked at in that particular case.  *U.S. vs. Gonzalez Claudio*, this is at 806 F. 2d 334 and 343.  This will double as one of the due process cases that you can look at as well, your Honor.

THE COURT:  806 F. 2d 344?

USA VS. T. ENIX

MR. TRIPI:  334.

THE COURT:  334, okay.

MR. TRIPI:  And they stated in that particular case, "the defendant's ties to the community" -- this is certainly not the holding, but the Second Circuit stating "the defendant's ties to the community are the starting point for assessing risk of flight," that quote at 343 is in the Second Circuit direction, that is also a due process case.  I think when you read *Gonzalez Claudio* case, that will undercut some of the argument from Mr. Connors.  I believe that is one of the indications where they explicitly state that the hypothetical length of the detention is not a factor.

THE COURT:  There is a Second Circuit case.

MR. TRIPI:  There is another one, but *Gonzalez Claudio* is another one.

THE COURT:  The Second Circuit reversed the district judge because the district judge had relied on the potential length of incarceration in ordering the defendant.

MR. TRIPI:  In the other case that we can't think of the name.

THE COURT:  Right.

MR. TRIPI:  The defendant's medical condition, the notes that I wrote and you focused in on it is that he hasn't

USA VS. T. ENIX

had treatment with Dr. Boggus since November of 2015. The larger point I made in my brief, and Mr. Connors explained some of that, the larger point is it didn't stop him -- none of these conditions stopped him from doing what appears to be a full-time job for the Kingsmen. He clearly positions himself as the big tough guy for the club. In the one post that has been read, he says he is looking for the big tough guy out of the Warlocks Orlando. The clear inference here is we're going to beat that guy up. I'm the big tough guy here, I'm going to beat that guy up. We don't need to do too much extrapolating to know what he means there.

It's interesting that Mr. Connors brings up the board. The by-laws were revised 2015, shortly after the public trial where Jenkins is convicted. It might be in the process of being talked about at that point in time, but Enix is the one who revises the 2015, the by-laws. The only other by-laws we found were 2009. There was no board or anything like that. So now all this heat has come down. Someone is convicted of a double murder. Pirk's name was in the Buffalo news multitude of times. They revise the by-laws and they come up with this board. But it's interesting, there is five board members, as Mr. Connors explains. One of them is Pirk, the national president; two others are from the New York area; Blaze gets two spots because he has two states. So all you needed to do

USA VS. T. ENIX

still was have Pirk and Blaze agree, you controlled the board.

THE COURT:  Do you disagree with Mr. Connors' argument that there was a meeting where they voted down unanimously to become a one percent club?

MR. TRIPI:  I do dispute it because I believe it was a game of semantics.  All it related to was putting on the patch.  The actual conduct from the inception of the club to the time we charged was one percenter.  This was a -- this was just are we going to proclaim it to the world.  We're arguing they've always been involved in drugs, sexual assault, prostitution.  Not every member, but enough people doing it that it's sanctioned activity in these clubhouses.  Drug use, guns in every clubhouse.  Before our search warrants of all seven clubhouses, there was an order to remove all of the guns from the clubhouses.  We found ammo and we found pictures of guns in Western New York.  We didn't find any guns.  We expected to find guns.  We now know there was an order two days before given in New York.

THE COURT:  Was there a search warrant of the clubhouses in Florida?

MR. TRIPI:  No, there weren't.  There were not.

THE COURT:  Okay.

MR. TRIPI:  None were applied for even.  It's not like they were applied for and rejected.

198

USA VS. T. ENIX

THE COURT:  Okay.

MR. TRIPI:  Moving to Mr. Connors argued, well, why are there no wiretaps.  I believe I touched on, Judge. It's very -- as you well know, it's very hard to get a wiretap.

THE COURT:  I've not had an application for one since I came on the bench.

MR. TRIPI:  That's probably a good thing, they can be a headache.

THE COURT:  I've heard.

MR. TRIPI:  But from an AUSA standpoint, it's like probable cause plus you need a dirty call.  So if you don't have an active member of a club, not someone that has been kicked out or beat up, not someone that is in jail and gives a proffer, not someone who jumped to a rival club, not a civilian witness who doesn't know who David Pirk or Tim Enix is, you need someone -- you would need someone in the inner circle to have the phone number and be willing to betray them in making a dirty call.

THE COURT:  You're talking about for a state court application as well?

MR. TRIPI:  We don't -- we frown upon that.  Since I was running it, we're either going to do a federal wiretap or we're not doing one.

THE COURT:  My understanding, for a lot of the

199

USA VS. T. ENIX

Government's cases here, oftentimes the wiretap information, at least the information I've seen, comes from state court.

MR. TRIPI:  I can't speak to necessarily the Rochester modus operandi, I will say as a general rule, we are trying to get away from ever doing state taps.  I'm the deputy chief in Buffalo, I would not go in a case -- now, if certain circumstances came up where you had, there was an exception to every rule, safety issue, you had to move quicker because of the glacial pace, I'm not saying we would never use a state wiretap, but, by and large, we're utilizing federal wiretaps.  And that is how we want to operate.  That is, ultimately, we'll have federal judges reviewing our wiretaps under federal standards.  It just makes good sense.  Just to point out why we don't have one is, yeah, we had a pen register, we have what I believe to be good information.  Pirk and Enix spoke more times in that stretch than I speak to my wife on the phone.  And maybe that is a bad thing, but if we looked at the actual records, which I brought up here, somewhere, here they are, Judge, you know, we certainly have 30-minute phone calls, nine-minute phone calls, fifteen-minute phone calls, 57-second phone calls.

THE COURT:  What is that you're looking at?

MR. TRIPI:  And Mr. Connors has this.  This is Enix and Pirk's phone contact either from subpoenaed phone

USA VS. T. ENIX

records or from the pen register, so total 630:  470 contexts came off the pen register; 160 were from subpoenaed toll records.

THE COURT:  Can I see that?

MR. TRIPI:  Yes.  The Post-it is mine because it is listed by phone numbers.

THE COURT:  Okay.  Mr. Connors has a copy of this?

MR. TRIPI:  The raw pen data and I'm going to give him the broke-down data that I have.

THE COURT:  So walk me through this.  For instance this says --

MR. TRIPI:  Those two numbers reflect the known numbers we had for Pirk and Enix during the relevant time period.  And the contracts are either from the pen register we had on Pirk's phone or subpoenaed phone records during that time period.  It's a combination, FBI intel analyst put the pools.

THE COURT:  The tolls are what you got from subpoenaed records?

MR. TRIPI:  Correct.  So the intel analyst put the two pools of information together and generated all of their contacts between one another.  And what is interesting is once you get to November 1st, 2014, the same month that Jenkins is arrested, the same month that two people show up at the

201

USA VS. T. ENIX

witness' mother's house in Florida, it appears that between November 2014 and July of 2015, Mr. Enix stops using that phone, so we don't have any records.  So that 630 does not include a phone from November of 2014, he doesn't start using that phone again until July 2015.  We just seized two other phones, so who knows what those are going to show when we execute the warrants.

THE COURT:  The date of the murder was.

MR. TRIPI:  September 6th, 2014.  Around the time of the murder, they have phone contact on September 1st before that, which would be the day after Enix made that post that Jenkins is out of the club.  And then they have about a six or seven-minute conversation on the day of the murder.  But we know for a fact during, through witnesses, that Pirk also had a burner phone.  We know that many higher ups --

THE COURT:  Do you have witnesses who would put a burner phone in Enix's hands?

MR. TRIPI:  Yes, we believe we recovered what were called burner phones, a secondary phone.

THE COURT:  Do you have witnesses that would support the notion that Enix had used burner phones?

MR. TRIPI:  The way I asked the question so far is did people in the club use burner phones, and, yes, at one point, all of the higher ups used burner phones.  We're pretty

USA VS. T. ENIX

fresh into some of the proffers, I didn't focus on Mr. Enix for six hours.

THE COURT: Like we have now?

MR. TRIPI: Agreed. So there will be more proffering to come, but I didn't focus in on did he have one, did he have one. Were burner phones used, it was more general answer. And yes, and we've recovered two other phones. I don't think that Pirk and Enix -- I think it would be fair facts to infer from the lack of records that they didn't just stop talking between November and July.

And I don't want to be overly dramatic here, your Honor, he is charged with 924(c). We've had people tell us he is always armed. He has been in New York armed. I proffered the guns in the trunk. We recovered two guns plus hollow point ammo.

THE COURT: I don't mean to interrupt you, but I want to ask you more questions about that proffer. But if you're in a middle of a thought, go ahead.

MR. TRIPI: The last thing I was going to say is, yes, he has no criminal record. But I can point to many people who have committed gun violence who had no criminal record. The most recent one is Orlando. A person lawfully purchased firearms in Florida, massacred people, not saying that is what this defendant did, but the point remains, the presumption

USA VS. T. ENIX

applies to the charge.  We found guns, we have that supported by testimony or witnesses who we expect to testify, and guns are throughout this whole club.  It's like standard operating procedure.  And we believe that that is wholly supported by the Facebook postings and the inferences drawn from what he says.  Why the Warlocks would shit their pants because they're on a run for St. Jude's Hospital is beyond my mind.  I think they would, pardon my French, I think they would do that because someone is intimidating and has a lot of numbers and they are a rough, tough biker gang as charged.  That is just one example.  So, Judge, I'm ready for any questions you have.

THE COURT:  Let's talk about this Pagans overt acts which are 31 through 33 of the indictment.  And I know I asked you questions about this the other day.  And I just want to make sure I'm clear on the evidence that you have specifically, because I went back and looked at the paragraphs in the indictment, 31 through 33, and there is discussion in 31 about Filip Caruso and another KMC member traveling from New York to Florida on orders of Pirk to assist in recovering the KMC colors from this Hernando Valley chapter that had been taken over by the Pagans.  And there is discussion in 32 about having a rental vehicle that is loaded with shotguns and rifles, but that is that Caruso, Jenkins and others did this, I guess.  But what you're telling me the other day is there is an

204

USA VS. T. ENIX

eye witness who saw Enix open a trunk of a car that he was driving that was loaded with firearms?  Am I understanding that correctly?

MR. TRIPI:  That's correct.  Just to speak to the incident, I will say that Filip Carlo, that was the guess, is not the grand jury witness, did not testify in the grand jury, okay?  So that comes from another participant at the time of the grand jury return.

THE COURT:  And this is another participant who testified before the grand jury who was an eye witness to this?

MR. TRIPI:  Yes, in the meeting.

THE COURT:  In the meeting with Enix.

MR. TRIPI:  Yes.  And that is why when I'm sitting here hearing the argument that it's not dangerous, these overt acts, essentially you have Enix, Pirk, Jenkins, Caruso and others, while armed with firearms, travel to a clubhouse in Leesburg, Florida and met with Pirk and Enix, essentially they're in a room with guns at one point discussing murder and kidnapping, that is a violent act.  That is the indictment.

THE COURT:  And the witness that you had testify before the grand jury under oath was at that meeting and essentially inculpated or indicated he was a participant in this as well?

MR. TRIPI:  Yes.

USA VS. T. ENIX

THE COURT:  And then this is another witness, as I understand it, who is a proffering co-defendant who identified Enix as well.  You tell me.

MR. TRIPI:  Provided that additional piece of all of the guns being in the trunk.

THE COURT:  In a trunk of a car that Enix had custody of.

MR. TRIPI:  He was showing off and they came over and looked at the trunk and held a few.  So the information was supported but the grand jury finding in and of itself.  If I can make the point a little clearer than I didn't other day, the grand jury finding in and of itself has the national president, this defendant and the hit man, and this demon, who is brought from New York for the purpose of going to war with the Pagans, as bad as Caruso is, he is called up and in a room with this defendant and Pirk.  He is called there because of who he is, because he is just like, yes, Jenkins, yes, they brought in the guys who were willing to go to war and that is who is in the room.

THE COURT:  So, the co-defendant was obviously also a participant to this, is that fair to state?

MR. TRIPI:  Co-defendant.

THE COURT:  The co-defendant who proffered about the guns, he was an eye witness.

USA VS. T. ENIX

MR. TRIPI:  Yes.

THE COURT:  And he was participating in this planning to go to war against the Pagans?

MR. TRIPI:  Correct.

THE COURT:  Do you have any other evidence other than those two eye witnesses?

MR. TRIPI:  Well, I have the co-conspirator statement from Jenkins when he comes back up and he tells about what happens the third time, I would argue is a co-conspirator statement if the Rules of Evidence apply.

THE COURT:  Say that again.

MR. CONNORS:  Jenkins, fast forward to the national party that summer, one of the participants has a conversation with Jenkins.  We all know the meeting with the Pagans didn't happen, no shoot out occurred.

THE COURT:  Jenkins telling them about the other plan to shoot them and they were going to duck and so forth.

MR. TRIPI:  Judge, if at a trial if you find that is it a co-conspirator statement, I understand the Rules of Evidence don't apply here, we have corroboration from the participants as well as Jenkins, essentially.

THE COURT:  Okay.  And that evidence about Jenkins co-conspirator statement, let's call it for right now, that comes from how many individuals?

USA VS. T. ENIX

MR. TRIPI:  Right now one of the two other people.

THE COURT:  And is it a different person than the grand jury witness and the co-defendant who proffered about?

MR. TRIPI:  No, it's one of those two.

THE COURT:  It's one of those two.

MR. TRIPI:  Yes.  But my point being, that is not in the indictment.  They couldn't have read that and then said, I'm going to tell you what you already have.  It's not in the indictment.

THE COURT:  The person that gives you the evidence of this statement of Jenkins, is that the grand jury witness or the proffering co-defendant?

MR. TRIPI:  The proffer.

THE COURT:  Okay.  The guns, the witnesses, the eye witnesses -- you have is eye witnesses who have seen Mr. Enix with firearms here in New York?

MR. TRIPI:  Yes.

THE COURT:  How many eye witnesses do you have?

MR. TRIPI:  Three, so far.

THE COURT:  And three.

MR. TRIPI:  Three that I can think of.  There might be more, Judge.  Forgive me, there has been hundreds and hundreds of interviews.

THE COURT:  I appreciate that, Mr. Tripi.  And

USA VS. T. ENIX

appreciate the fact I'm asking you these questions and asking you to respond right away.  And if you don't know, that's fine or if you need to look at something to respond, that's fine.  I want to make sure I understand the evidence you're proffering. You have at least three eye witnesses.

MR. TRIPI:  I can think of three off the top of my head.

THE COURT:  Any of them testify before the grand jury.

MR. TRIPI:  No, no.

THE COURT:  So are these eye witnesses who are co-defendants or witnesses.

MR. TRIPI:  Co-defendants, yes.  We've had a number of people come in.

THE COURT:  You had three proffering co-defendants.

MR. TRIPI:  And obviously, Judge, there was evidence put forth in the grand jury, he is indicted for a 924 and fire possessions, but again --

THE COURT:  Right.  And can you give me any more information about what that evidence is.

MR. TRIPI:  Guns in every clubhouse, guns in individual personal possessions, sharing firearms, there is a section (2) section component to it.

USA VS. T. ENIX

THE COURT:  And I'm just trying to make sure I understand, is there grand jury testimony that puts Enix with a gun here in New York?

MR. TRIPI:  I don't recall.

THE COURT:  But you definitely have at least three co-defendants who have proffered to that effect?

MR. TRIPI:  Yes.

THE COURT:  And you may know better than I. Obviously he was licensed to carry firearms in Florida, correct.

MR. TRIPI:  That is what -- I haven't seen a license, but that is what they're putting forth.  I have no reason to doubt Mr. Connors is being accurate.

THE COURT:  But that wouldn't allow him to necessarily be possessing a firearm here in New York, right?

MR. TRIPI:  Correct.  Nor would it allow him to possess those firearms in Florida in furtherance of a RICO enterprise.

THE COURT:  Right.  The defendant, obviously, has made an application for disclosure of Brady material in connection with this motion and there hasn't been a response from the government.  Do you have exculpatory evidence with respect -- - and I'll focus right now with respect to this Pagan dispute involving?

210

USA VS. T. ENIX

MR. TRIPI:  No.  And that is why I didn't respond, Judge, because I don't know what planet we're on where you get together and you contemplate murder and you bring killers into town or someone you think will do a killing and you talk about killing people, but because it doesn't work out to the fact where you have to commit the ultimate act, somehow that is Brady?  No, that is conspiracy to commit murder, that is not Brady.

THE COURT:  So, do you have exculpatory or evidence that is favorable to Mr. Enix, vis-a-vis, this Pagan situation.

MR. TRIPI:  No.  Unless you view the fact that they didn't actually kill anybody as Brady, no, which I don't view it as Brady.

THE COURT:  What about with respect to the murder that Jenkins has been convicted of and Enix's alleged role or lack of role in that, do you have exculpatory evidence that would be favorable to Mr. Enix in that?

MR. TRIPI:  No.  I believe that the people that are now coming in and providing more context to this type of post are inculpatory.

THE COURT:  What is this?

MR. TRIPI:  This is the Facebook post where he says he is out of club.  So this post gave him plausibility

USA VS. T. ENIX

they were building in their defense.  Gives him plausible deniability to, A, law enforcement, but B, to his club.  See because, to bring it back to this for a moment, Jenkins is coming to kill Caruso by that point in time and others who have left, the target at had some point switches to guys that might be leaving and providing information, Maue and Szymanski.  In order for Jenkins to infiltrate the Nickel City Nomads, he cannot be a Kingsmen, so they have to put him out so that the Kingsmen who are the leaks -- I'm giving the whole case away, but that's fine -- so that the Kingsmen that are the leaks, can corroborate if they checked on is this guy out of your club, Enix put him out, it's on Facebook.  Now he gets to hang out with the Nomads, at the same time being the double agent, figuring out who they are getting their intel from the Kingsmen.  And then Maue and Szymanski end up dead after he meets with Pirk and gets the okay to kill their own guys.  This gave them the deniability.  And they knew the same day that Jenkins was the killer.  Not only did they not do anything to him when they said that is what they would do when the FBI interviewed him, Pirk protected him in Tennessee.  And then they were in Tennessee at the same time later, and then they meet with the FBI in December and try and point him back to Caruso and tried to kill him.  That is the case.  That is what I'll be arguing to a jury.  Can't wait to do it.  I don't have

212

USA VS. T. ENIX

anything further.

THE COURT:  Let me make sure I don't have further questions.

MR. TRIPI:  Okay, I apologize.

THE COURT:  Does the government have any other response for the defendant's request for Brady material.

MR. TRIPI:  Judge, the defense thinks everything that is -- you could use to impeach something, that is Brady. They're going to get, if we have criminal records on people, if we have deals we've cut, they're going to get that.  That is Giglio.  That is separate and apart.  We're talking about Brady, exculpatory information, now, if they point to has anyone been kicked out of the club for dealing drugs.  How is that Brady?  If you know that you've kicked people out for dealing drugs, that is not in my control.  Go interview them.

THE COURT:  I guess --

MR. TRIPI:  None of my witnesses said I got kicked out because I did drugs or sold drugs.

THE COURT:  The point of me asking these questions is this is an issue I'm going to need to address, particularly if I deny the defendant's motion is the point they're asking for Brady material.

MR. TRIPI:  I can provide a written response.  I'm -- Judge, this is all I do.  I know you've never dealt with me

213

USA VS. T. ENIX

before.  There was a shot kind of across the bow.  All I've done for the last eight years are RICO cases.  And Mr. Connors made the point, well, the government is not really successful.  In every RICO case I've brought, every single person has been convicted whether at trial or a plea.  And I've made disclosures.  I've testified at hearings against dirty cops.  I'll comply with my obligations.  I have no exculpatory information.  If we have -- if we get to -- we're trudging toward a trial and I have a second thought, I'm going to give it to you and let you make the call.  As I stand here now, there is nothing I believe to be Brady.

THE COURT:  That is all I need.

MR. TRIPI:  If Mr. Connors can point to something and I take a look at it, if I have questions about it, I'll go to you and let you make the call.

THE COURT:  Okay.  Anything else, Mr. Tripi?  I don't think I have any other questions.

MR. TRIPI:  No, your Honor, I have nothing further.  Thank you.

THE COURT:  Mr. Connors.

MR. CONNORS:  I'd like to take Mr. Tripi up on his offer to show it to you.  He has, so he claims, some evidence we've never seen about this issue about guns in the trunk.  You have, of course, the authority to take a look at that evidence.

214

USA VS. T. ENIX

THE COURT:  I do if I -- I'm well aware of the case law.  I can accept the government's proffer.  If I feel as though it lacks credibility or lacks sufficient basis for me to make a detention determination based on that, I can indicate to the government that I'm not just accepting the proffer and I'm going to require some kind of additional testimony, I'm not doing that here, though.

MR. CONNORS:  The point I think is important is that on the issue of the disputed issue of whether there was any violence with this meeting with the Pagans, hotly disputed contested issue, and someone he claims says they saw some guns in a trunk for a meeting that never took place and no violence ever occurred, nothing ever came to fruition, that is a statement we should read to see exactly what they do say about that.

THE COURT:  Well, I don't think you would be entitled to that.  That is discovery or you wouldn't be entitled to that for purposes of a detention hearing.  The case law that you cite deals with, in some limited instances, Brady material has been ordered to be disclosed.  And I have Mr. Tripi's representation that he doesn't have any exculpatory information, at least at this point, that he can cite to that should be produced in response to that request.

MR. CONNORS:  But I think it is true that if they

USA VS. T. ENIX

claim that something occurred at a meeting and nothing actually occurred, I think we should see what the claim is that actually occurred.  In other words, if someone says --

THE COURT:  That is in the indictment, I mean, that is 31 through 33 of the overt acts in the indictment as to what, you know, there is at least probable cause to believe it occurred.

MR. CONNORS:  It says two other people, Jenkins and Caruso were harmed.

THE COURT:  When you're saying, Mr. Connors, that you're asking for information as to what occurred at the meeting, that is more than just Brady.

MR. CONNORS:  Not if nothing occurred or if in fact, Judge, there is no evidence that supports this claim that we're hearing on a proffer.  And that is something that ought to be examined because it sounds like it's important to you and it's important to me, also.

THE COURT:  It's important to me.  I find this incident involving the Pagans and Mr. Enix's involvement in it, let's face it, it's one of the two overt acts in the indictment and I do think it's important information.

MR. CONNORS:  And so far we have a statement that there was some discussion about something happened that never happened.

USA VS. T. ENIX

THE COURT:  We have more than that, Mr. Connors. We have overt acts that the grand jury has found probable cause for that your client was involved in a meeting where they brought in Caruso and Jenkins from New York and they talked about getting their colors back from the Pagans, including murdering Pagans and kidnapping Pagan "old ladies."

MR. CONNORS:  And then we do have in their response that nothing ever came to fruition or there was no meeting whatsoever.

THE COURT:  And I have your proffer that in fact your client was really the one who was able to intercede and let cooler minds prevail, so to speak.

MR. CONNORS:  Right.  I believe the statement I made was in terms of the recruiting was that not that they're one percent from other clubs, other one percent clubs, but just from other clubs.

THE COURT:  And that is what I heard you to say as well.  I mean, you may have used the word "other," but I didn't view that as somehow you conceding that the KMC were one percenters.

MR. CONNORS:  And the issue with respect to Special Agent Brown, that really is the only sworn testimony that we have in this particular proffer.  And that testimony, we submit, supports the fact there was a vote and it was

USA VS. T. ENIX

rejected to turn into a one percent club, and that Tim has no authority in the State of New York.  And that I think is relevant to with respect to your determination.

Then there was a lot of talk about the issue of whether or not Enix was ever informed about Jenkins.  And the answer was from the witness that apparently offered a proffer, he didn't come right out and say, so that link was never connected to the question that you asked that someone said or connected Enix to knowing that that occurred.  All right.

And the one, he claimed there was a conversation between Pirk and Jenkins, they walked over and there was a statement that said, "don't worry about it."  Well, who said "don't worry about it"?  Pirk or Jenkins?  And who was there that received that type of information?  It just leaves a huge factual gap that, to me, makes it a meaningless statement and doesn't support really anything with respect to violence, knowledge of violence or any facts on their part.  It never was completed.  They said Pirk and Jenkins, after meeting, walked over after they talked and someone said "don't worry about it."  And that was the extent of the proffer on that issue.

On the issue about the witness intimidation.  I mean, I expected that they were going to say --

THE COURT:  Probably what I was expecting, too, I though your client was going to be the one who was identified.

218

USA VS. T. ENIX

MR. CONNORS:  I waited after they took a break after the red haired person and came back with the next one, and, obviously, that has no connection at all to Tim Enix.  And I think it prompted you to as is there any evidence, any direction or instruction any general information, and they said only the chain of command, which, of course, you can't rely upon to detain him without any connection at all and that really brings us to *Colombo*.

THE COURT:  I can assure both of you I'm going to go back through and read *Colombo* very closely as well as all these other cases, but go ahead.

MR. CONNORS:  I won't belabor the point.  Since he did cite to *Colombo* that the head of a crime family can be held, but what he didn't say to you, *Colombo* is really unavailing to support his proposition because there the Court held that the government proffered clear and convincing evidence that the defendant had, in fact, been involved in the violence attributed the conspiracy.  They had a sworn witness from a government informant, personal knowledge and presence at meetings, they had corroboration of that evidence with tapes of telephone calls in which the defendant participated.  Exactly the type of evidence that I asked you -- take a look at that, we don't have that at all here.  And that is, to me, makes this proffer insufficient to detain a person.  They say he is acting

USA VS. T. ENIX

like a tough guy.  Okay.  Well, bring some evidence that he ever hit anybody, struck anybody, was engaged in any violence at all other than saying, you know, something on the Internet.  That just is not enough.

When you're asking the question about wiretaps and state taps, whether they utilize those or not.  It was a very interesting comment by Joe.  He said, well, unless there was some safety issues involved, we wouldn't try to get a quick wiretap or a state wiretap unless there was some safety issues involved.  That is what this is all about.  Whether or not there was any violence that would precipitate taking dramatic action to move the prosecution investigation forward and now to detain him.  And basically those safety issues have disappeared and certainly weren't important enough to them.

MR. TRIPI:  Since we're quoting me a lot.

MR. CONNORS:  Not much.

MR. TRIPI:  We're quoting me, I've never obtained a state wiretap, so that record is clear.

THE COURT:  I must imagine that practice is very different in Buffalo than Rochester.  I've seen quite a few evidence of wiretaps in cases that I have here in Rochester that are obtained through state court.

MR. TRIPI:  Might be.  Never done so, don't plan to do it.  I'm a federal prosecutor, I go to federal court.

220

USA VS. T. ENIX

MR. CONNORS:  The point he made was safety issues, safety issue were involved.  And one of the cases we cited in the brief, the name escapes me, you probably remember it, talks about the delay from the investigation to the indictment and that speaks volumes about whether or not there is imperiled danger to a community that would require detention.  And I think that is an important issue in this case.  Thank you.

MR. TRIPI:  Nothing further, Judge.

THE COURT:  Anything else?

MR. TRIPI:  Thank you for the time and patience.

THE COURT:  Thank you to you both.  I obviously have a lot to digest.  I realize how important it is for me to not only to get this right, but to do it promptly.  And I can assure you that I will do that.  I'll reserve decision, but I'll issue a decision as quickly as possible.

MR. TRIPI:  Before we break, may I have a brief word with Mr. Connors?

THE COURT:  Yes.

MR. TRIPI:  Your Honor, you might be able to tell from how hotly contested this hearing has been, and obviously Mr. Connors did a nice job, our position is he should remain detained.  Mr. Connor's position he should be released, I think in either event, we might be going up to the Second Circuit.

THE COURT:  I'm assuming that.

221

USA VS. T. ENIX

MR. TRIPI:  If you order release, I'm asking for a stay to be built into whatever written decision if you go that way.

MR. CONNORS:  And as I said to Joe, if that happens, we should be heard on that.

THE COURT:  Yes.  Let me put it this way, if I were to -- if I do -- if my written decision is that Mr. Enix needs to be released, I will have a short period of time where we can discuss the issue as to whether or not there should be a stay in that decision pending the appeal.

MR. TRIPI:  Thank you, your Honor.

MR. CONNORS:  Thank you, appreciate it.

THE COURT:  You're welcome.  Thank you both and I mean that.  I know you both put a lot of time in this and it's been very helpful to me in getting my arms around everything and thank you again for coming to Rochester today.  I appreciate it.

MR. TRIPI:  Thank you, your Honor.

THE COURT:  You all have a good July 4th weekend and we are adjourned.

MR. TRIPI:  You do the same.

* * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

S/ Karen J. Bush,   RPR

Official Court Reporter