UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

TIMOTHY ENIX a/k/a Blaze,

Defendant.

**DECISION AND ORDER**

1:15-CR-00142 EAW

## BACKGROUND

Defendant Timothy Enix a/k/a Blaze (hereinafter "Defendant" or "Mr. Enix") seeks revocation of the magistrate judge's detention order pursuant to 18 U.S.C. § 3145(b). (Dkt. 177). Defendant is one of 16 defendants named in a 46-count Second Superseding Indictment (Dkt. 33) returned on March 16, 2016, that alleges various crimes, including a RICO conspiracy in violation of 18 U.S.C. § 1962(d) and firearm offenses in violation of 18 U.S.C. § 924(c), pertaining to the operation of the Kingsmen Motorcycle Club ("KMC"). Defendant served as Regional President of KMC operations in Florida and Tennessee, and is named in the following four counts: (1) Count 1 (RICO conspiracy); (2) Count 2 (possession of firearms in furtherance of crime of violence); (3) Count 45 (using and maintaining the KMC South Buffalo Chapter's clubhouse for drug dealing); and (4) Count 46 (possession of firearms in furtherance of drug trafficking).

Defendant was arrested and subsequently arraigned on March 22, 2016, in the United States District Court for the Middle District of Florida, where he was temporarily

detained by United States Magistrate Judge Philip R. Lammens pending a detention hearing scheduled for the following day. (Dkt. 192-1 at 4-5). The United States Probation Office for the Middle District of Florida prepared a Pretrial Services Report, recommending that Mr. Enix be released on conditions. (Dkt. 177-1) (filed under seal).

On March 23, 2016, a detention hearing was held before Magistrate Judge Lammens, who considered Defendant's detention at the same time he considered the detention of a co-defendant, David Pirk (hereinafter "Pirk"). The hearing before Magistrate Judge Lammens lasted approximately two hours. (Dkt. 192 at 2 n.1). The Government proceeded by proffer and also presented the testimony of FBI Special Agent David Brown. (Dkt. 177-2) (transcript of detention hearing before Magistrate Judge Lammens). Defendant's wife, Melinda Enix, testified on his behalf at the hearing. (*Id.*). At the conclusion of the hearing, Defendant was ordered detained, as was Pirk, who at the time was facing a potential death penalty.[1] (*Id.* at 52-55).

On May 4, 2016, Defendant filed a motion for release from custody before the magistrate judge assigned to the case in this District, the Honorable Michael J. Roemer. (Dkt. 131). The Government filed its response on May 18, 2016. (Dkt. 147). On May 23, 2016, Magistrate Judge Roemer determined that he did not have authority to review the decision of Magistrate Judge Lammens (Dkt. 153), and Defendant subsequently filed his motion before this Court for a *de novo* review (Dkt. 177). The United States Probation Office in this District prepared a memorandum recommending that Mr. Enix be

---

[1]    The Government subsequently communicated by letter dated April 27, 2016, that the U.S. Attorney General directed not to seek the death penalty against Pirk in this case. (*See* Dkt. 163-1 at ¶ 11).

detained with no bail conditions, based upon his alleged risk of danger and flight. (Dkt. 177-4) (filed under seal). Mr. Enix was not interviewed by this District's Probation Office in connection with the preparation of that memorandum.

The Government filed its response in opposition to Defendant's motion on June 23, 2016 (Dkt. 192), and Defendant filed his reply memorandum on June 26, 2016 (Dkt. 193). The hearing before this Court commenced on June 29, 2016, at the courthouse in Buffalo, New York, and lasted approximately two hours. (Dkt. 199). The Government presented its proof by way of proffer in support of its position that Defendant should be detained.[2] (Dkt. 202). The hearing continued at the courthouse in Rochester, New York, on July 1, 2016, at which time Defendant proceeded by proffer, and both counsel for the Government and for Defendant continued with their arguments in support of their respective positions. (Dkt. 204). The appearance on July 1, 2016, lasted over four hours, and when it concluded, the Court reserved decision and indicated that it would issue a decision promptly. At the hearing on July 1, 2016, the Government provided the Court with photographs taken during a search warrant executed at Defendant's home on or about May 12, 2016, and also showed to the Court (although the Court did not retain) an analysis of the alleged telephone communications between Defendant and Pirk based

---

[2] The Government has sought detention of all 16 defendants in this case. Magistrate Judge Roemer has ordered the release on conditions of four of the defendants, but the remaining defendants have all been detained. At the present time, two other defendants (Ryan Myrtle and Robert Osborne, Jr.) have filed motions before this Court to revoke the magistrate judge's detention orders. (*See* Dkt. 195, 217).

upon pen registers and toll records. In addition, at the July 1 appearance, Defendant submitted copies of certain postings on the KMC Facebook account.

On July 5, 2016, while the matter was still under advisement by the Court, Defendant filed a motion to reopen the hearing so that he could testify on his own behalf.[3] (Dkt. 205). With no opposition from the Government, the Court granted Defendant's motion to reopen the hearing (Dkt. 206), and further proceedings were held at the Buffalo courthouse on July 18, 2016, at which time Defendant testified (Dkt. 233).[4] The Government utilized exhibits at the hearing on July 18, marked as Government Exhibits 1 through 33. The hearing on July 18 lasted over four hours, and at its conclusion, the Court reserved decision.

---

[3] After the hearing was scheduled to continue on July 1, 2016, in Rochester, Defendant requested that he be permitted to waive his personal appearance, purportedly due to concerns over his safety if placed at the Monroe County Jail in Rochester, New York.

[4] Prior to Defendant's testimony, the Court resolved issues concerning the Government's ability to use Defendant's testimony at subsequent stages of this proceeding. The Court indicated that it would memorialize those oral findings as part of this Decision and Order. However, in the interests of issuing this decision concerning Defendant's custody status in an expeditious fashion, the Court will issue a separate Decision and Order with respect to the Court's determination regarding the use of Defendant's testimony.

## LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, authorizes and sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal. The procedures and standards for release or detention of a person such as Defendant pending trial are set forth at 18 U.S.C. § 3142. A defendant awaiting trial must be released unless the release will present a risk of flight or danger, or both, and no set of conditions can reasonably protect against those risks. *See United States v. Berrios-Berrios*, 791 F.2d 246, 249 (2d Cir. 1986) (Bail Reform Act codified "traditional presumption favoring pretrial release for the majority of Federal defendants") (quotation omitted).

Under the statutory scheme set forth in the Bail Reform Act, "it is only a limited group of offenders who should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citations and quotations omitted). Yet, the law reflects "the deep public concern . . . about the growing problem of crimes committed by persons on release and the recognition that there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) (quotations omitted). "Congress has determined that [w]hen there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate." *Id.* (quotations omitted) (alteration in original).

In this case, there is a rebuttable presumption pursuant to 18 U.S.C. § 3142(e)(3) that no condition or combination of conditions will reasonably assure the appearance of Defendant and the safety of the community if Defendant is released. This rebuttable presumption arises because a grand jury has returned an indictment against Defendant that charges him with a drug crime for which the maximum term of imprisonment is ten years or more, and with offenses in violation of 18 U.S.C. § 924.[5]  18 U.S.C. § 3142(e)(3); *see also, United States v. Contreras*, 776 F.2d 51, 54-55 (2d Cir. 1985) (a grand jury indictment establishes probable cause for purposes of the rebuttable presumption under the Bail Reform Act, and when faced with an indictment, the Court does not need to make an independent finding of probable cause). The presumption shifts to Defendant "a limited burden of production – not a burden of persuasion – to rebut the presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "[A] defendant must introduce some evidence contrary to the presumed fact[s] in

---

[5]     The Court does not reach a determination as to whether the RICO conspiracy charged against Mr. Enix creates a rebuttable presumption. The Government has expressed its view that the RICO conspiracy charge creates such a presumption because it involves alleged crimes of violence. However, the issue was not briefed by the parties and it is not dispositive to the Court's determination, since a rebuttable presumption is created by the other counts charged against Mr. Enix. *See United States v. Marino*, 396 F. App'x 728, 729 (2d Cir. 2010) (leaving unresolved the issue as to whether predicate acts attributed to alleged racketeering co-conspirators could support application of rebuttable presumption in favor of detention as against defendant). *Cf. United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002) ("The flaw in Gotti's first argument is that, in determining whether he has been charged with a crime of violence, we should consider only the predicate acts ascribed to him in the indictment (i.e., money laundering) and not the objectives and means of the RICO enterprise as a whole, as alleged through the predicate acts ascribed to all enterprise participants.").

order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). If a defendant satisfies this burden of production and rebuts the presumption, it does not disappear, but rather "remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.

Even in a presumption case, however, at all times the government retains the ultimate burden of persuasion. The government must demonstrate by clear and convincing evidence that a defendant should not be released due to his risk of danger. *Chimurenga*, 760 F.2d at 405. Clear and convincing evidence means something more than preponderance and something less than beyond a reasonable doubt. *Id.* In other words, the evidence must support a conclusion of danger to the community "with a high degree of certainty." *Id.*

With respect to risk of flight, it is a two-step inquiry. "First, the court must make a finding as to whether the defendant presents a risk of flight if not detained. Second, if the court finds that a defendant is likely to flee, then the court must proceed to the second step of the inquiry, namely, whether there are conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released." *United States v. Shakur*, 817 F.2d 189, 194-95 (2d Cir. 1987) (citations omitted). The burden of proof is preponderance of the evidence. *Id.* at 195.

The factors that a court must consider in deciding whether a defendant has rebutted the presumptions of flight and danger, and whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety

of any other person and the community, are set forth at 18 U.S.C. § 3142(g), as follows:

(1)    the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2)    the weight of the evidence against the person;

(3)    the history and characteristics of the person, including—

    (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also Mercedes*, 254 F.3d at 436 ("To determine whether the presumptions of dangerousness and flight are rebutted, the district court considers . . . [the factors set forth at] 18 U.S.C. § 3142(g).").

In reviewing a detention order of a magistrate judge, a district judge should not simply defer to the judgment of the magistrate judge, but rather must reach her own independent conclusions. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). "When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence." *United States v. Marra*, 165 F. Supp. 2d 478, 481 (W.D.N.Y. 2001).

## ANALYSIS

The Court has carefully reviewed the parties' submissions and presided over approximately 10 hours of testimony and argument. Based upon its review of the record and the factors set forth at 18 U.S.C. § 3142(g), including consideration of the rebuttable presumptions, the Court concludes as follows: Defendant has met his burden of production with respect to the rebuttable presumptions; the Government has established by a preponderance of the evidence that Defendant presents a risk of flight, but there are a combination of conditions that reasonably will assure the presence of Defendant at trial if he is released; and the Government has <u>not</u> established by clear and convincing evidence that Defendant presents a risk of danger for which there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community. As a result, Defendant's motion to be released pending trial (Dkt. 177) is granted subject to Defendant satisfying the reasonable bail conditions set forth below.

## A.    NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED

Defendant is charged with some very serious crimes, including a RICO conspiracy that involved a pattern of racketeering activity involving murder, robbery, kidnapping, drug trafficking, and obstruction of justice as part of its predicate acts. Defendant is charged in two separate firearms offenses in violation of 18 U.S.C. § 924(c), one count in furtherance of crimes of violence, and another count in furtherance of drug trafficking. Defendant faces potential penalties of life in prison, with a potential mandatory minimum term of imprisonment if convicted on the § 924(c) counts of 30 years in prison.

According to the Government, if convicted on all four counts, the sentencing guideline imprisonment range would be 50 years.

Defendant argues in support of his release that he is charged with the fewest counts of all 16 defendants, and the fewest overt acts in support of the RICO conspiracy. (Dkt. 177-8 at 18-21). Specifically, Defendant is only referenced in two of the 87 paragraphs that detail the overt acts supporting the RICO conspiracy charged in Count 1. (*Id.*).

Paragraph 33 of the overt acts references Mr. Enix in connection with a dispute that the Government proffered occurred between KMC and a rival motorcycle club, the Pagans, in January 2014, where Defendant and co-defendants Filip Caruso, Andre Jenkins (hereinafter "Jenkins"), and Pirk met at the KMC Clubhouse in Leesburg, Florida, while armed with firearms, and "agreed that they would get their KMC colors back from the Pagans by any means necessary, including murdering Pagans and kidnapping Pagan Old Ladies." (Dkt. 33 at 20, Overt Act 33).

Paragraph 87 of the overt acts references Mr. Enix along with the remaining 15 co-defendants, and alleges that for at least a ten year time period, beginning no later than 2006, and continuing until March 2016, they all maintained the South Buffalo Chapter KMC clubhouse located at 846/850 East Eagle Street, in Buffalo, New York, as a drug house, including for the distribution and use of cocaine and marijuana. (Dkt. 33 at 29, Overt Act 87).

Further information concerning the evidence that the Government relies upon to support these allegations is discussed below, but for purposes of considering the first

- 10 -

factor under § 3142(g), the Court finds that the nature and circumstances of the offenses charged support a decision to detain Defendant without bail. While Mr. Enix may be charged in the least number of counts, and mentioned in the least number of overt acts, these are serious charges with significant potential penalties. Indeed, it is apparent that the magistrate judge based his detention determination on the nature and circumstances of the offenses charged, along with the rebuttable presumptions,[6] and this Court agrees that consideration of this first factor under § 3142(g) weighs in favor of a finding that Defendant has not rebutted the presumptions of flight and danger, and he should be detained.

However, this is simply the first of the § 3142(g) factors. It is one factor in the analysis. As discussed below, consideration of the remaining factors weighs in favor of releasing Defendant with reasonable bail conditions.

## B.   <u>WEIGHT OF THE EVIDENCE</u>

The Court will first discuss the evidence presented by both the Government and Mr. Enix, it will then discuss the applicable case law, and then it will discuss its analysis of the second § 3142(g) factor.

### <u>The Evidence</u>

While much of the evidence between the parties appears to be disputed, certain points are not disputed, at least based upon the evidence presented to the Court at this

---

[6]   Based upon this Court's review of the transcript before the magistrate judge (Dkt. 177-2), it appears that the magistrate judge based his detention determination on only the first factor under § 3142(g) and the rebuttable presumptions of flight and danger. Although the magistrate judge may have considered the other § 3142(g) factors, there is nothing in the transcript to support that conclusion.

stage of the proceedings.  First, it appears undisputed that Defendant was not part of KMC until 2012.  Defendant testified that he did not join KMC until the summer of 2012, and the Government has presented no evidence to dispute that claim.  Therefore, many of the acts that are the focus of the Second Superseding Indictment, from the kidnapping and sexual assault of Victim A in September 2009 (Dkt. 33, Overt Acts 1-8), to the maintenance of the South Buffalo Chapter clubhouse as a drug house since 2006 (*id.*, Overt Act 87), pre-dated Defendant's involvement in KMC.

Second, it appears undisputed that Defendant served in a leadership role within KMC, as the Regional President of both Tennessee and Florida, although the degree of his authority (and Defendant's involvement in Tennessee) is contested.  Along the same lines, it is apparent that KMC operated through a chain of command, with the National President (Pirk) serving at the top of that command, and Regional Presidents, such as Defendant, serving directly below the National President.

Third, it appears undisputed that Defendant was the administrator of the KMC Facebook account and private group pages, and in that capacity, he authored hundreds of communications to KMC members, including a number of communications on behalf of KMC President Pirk.  Both the Government and Defendant have submitted to the Court examples of these postings, and as even Defendant conceded, the postings used rough language and regularly included vulgarity.  Violence is referenced in many of the submissions presented to the Court, although other submissions appear to relate solely to legitimate business operations of KMC.

Fourth, it appears undisputed that there was a great deal of communication between Defendant and KMC President Pirk on a regular basis. The Government has submitted evidence that Defendant had 630 phone contacts, of varying duration, with Pirk between September 1, 2014, through March 22, 2016, averaging over one call per day, and in fact, that does not include any communication over a several month time period between 2014 and 2015. Two additional cellular telephones were seized during the search warrant executed at Defendant's residence on May 12, 2016, although an analysis of those phones is not yet completed. According to the Government, Defendant had more contact with Pirk than any other KMC member or Regional President for whom the Government has records. Defendant disputes that this pen register and toll record data shows that there was actual communication between Defendant and Pirk (as opposed to just attempted contact), but Defendant does not contest that he was in frequent contact with Pirk. Indeed, Defendant conceded during his testimony that he talked to Pirk "quite a bit." In other words, the evidence plainly demonstrates that the contact between Defendant and Pirk was significant.

Fifth, there does not appear to be any dispute that Defendant at some point became a Nomad. Although there is a dispute as to whether, by definition, the Nomads were charged with engaging in acts of violence, the grand jury found that a "KMC Nomad was a KMC member who . . . was expected to serve the interests of the KMC enterprise, including fighting other clubs and committing violent crimes on behalf of the KMC." (Dkt. 33 at ¶ 7).

Sixth, the *volume* of evidence possessed by the Government in this case is substantial. The Government submits that the evidence in this case "consists of hundreds of witness interviews, dozens of Grand Jury witnesses and exhibits, a pen register on David Pirk's cell phone, subpoenaed phone records, FBI toll analysis of phone record and pen register data, historical cell site analysis, search warrants executed at numerous locations, including seven (7) KMC clubhouses and several residences including Timothy Enix's residence, search warrants for cell phones and other electronic devices, Facebook records produced pursuant to search warrants, consensual recordings of some KMC defendants, firearm seizures, video evidence, physical surveillance, and voluminous records seized." (Dkt. 192 at 14-15).

However, there is a dispute as to the quality of that evidence, specifically as it relates to whether Mr. Enix engaged in violent acts or directed violent acts. There is no question that many of the Facebook postings use rough language and appear to encourage acts of violence. Just by way of example, in a post from earlier this year, Mr. Enix stated:

> I got word that 2 of the 1% clubs in Florida had a meeting about us because they said the Kingsmen are taking over and they can't let that happen. All I can say is go fuck yourself we have only just started the two together don't have the numbers we do here. . . . The worst thing someone can do is threaten me or my club.

(Dkt. 192-1 at 32) (posting dated 1/31/2016). Similarly, in a post from January 10, 2014, Mr. Enix stated:

> I have had a few do things to hurt our club and I have sent them away bruised and beaten no longer wearing our patches it is time for some old school discipline!

(Gov. Ex. 1 at 321).

- 14 -

Yet, there was no direct evidence presented, whether through eyewitness testimony or otherwise, of any acts of violence directly attributable or linked to any of these postings. In fact, the evidence before the Court, in the form of Mr. Enix's testimony, indicated just the opposite – that these postings reflected tough talk, but nothing more.

### *The Murders*

There is no dispute that on September 6, 2014, two KMC members, Paul Maue and Daniel "DJ" Szymanski, were murdered execution-style outside a KMC clubhouse in North Tonawanda, and Jenkins has been convicted of the murders in New York State court. The role, if any, that Defendant played in those murders is disputed, and unlike some other defendants, Defendant is not charged with any substantive count in the Second Superseding Indictment involving the murders. Defendant is charged with the RICO conspiracy, and the overt acts alleged as part of that RICO conspiracy include the murder (although the co-defendants alleged to have participated in those overt acts do not include Defendant). (Dkt. 33 at ¶¶ 41-59).

The Government proffered that Defendant participated in the conspiracy to commit the murders and in the efforts to cover up Jenkins' role in the murders. Specifically, on August 31, 2014, Defendant posted a message to the KMC Facebook private group page that stated "Little Bear" (*i.e.,* Jenkins) was out of the club for owing dues and not having a working motorcycle, but he was "not out bad." According to the Government, this was part of the plot, with Pirk, to lay the ground work to allow Jenkins to travel to the Western District of New York with Pirk (and another KMC member,

"Drifter," who is deceased) in order to infiltrate the Nickel City Nomads (a rival motorcycle club) to investigate KMC members who were "jumping patch" (*i.e.,* disloyal KMC members who were looking to join the Nickel City Nomads). The Government submits that by being out of KMC, Jenkins was given cover to infiltrate the Nickel City Nomads, but by not being "out bad," he would retain, and in fact did retain, access to KMC clubhouses. The Government contends that witnesses have explained that many members owe dues or have non-working motorcycles, but they are not kicked out of KMC.

The day after this message was posted, Pirk and Jenkins allegedly began communicating via cell phone and coordinated their travels to the Buffalo area. That same day, September 1, 2014, Defendant and Pirk had phone contact, according to the Government. The overt acts in the Second Superseding Indictment allege that sometime between September 4 and 6, 2014, Pirk told Jenkins "to 'take care of it' in reference to killing Paul Maue and Daniel 'DJ' Symanski," and at 2:42 AM on September 6, 2014, Pirk called Paul Maue by cellular telephone and almost immediately thereafter, Jenkins executed Maue and Symanski. (*See* Dkt. 33 at ¶¶ 57-59). The Government proffered that on the day of the murders, Defendant and Pirk had phone contact.

According to the Government's proffer, approximately one month prior to the murders, Paul Maue confronted Pirk and Defendant at the South Buffalo KMC clubhouse, as did defendant Filip Caruso (hereinafter "Caruso"), who purportedly pulled a gun on Defendant and held it to his head. However, no violence resulted from this encounter, and Pirk purportedly told Maue "don't ever act like that again."

The Government also proffered evidence concerning Jenkins' contact with KMC members both before and after the murders, including contact with KMC members in Tennessee, and argued that this implicates Defendant because of his role as Regional President of Tennessee.

Defendant and Pirk were interviewed by the FBI in December 2014, and according to the 302 report created by Agent Brown, Defendant attempted to identify Caruso as the likely culprit in the murders. (Dkt. 192-1 at 3). The Government argues that this was a calculated effort by Defendant to misdirect law enforcement's investigation and Defendant was fully aware that Jenkins committed the murders. However, there is no evidence of any direct contact between Jenkins and Defendant at or around the time of the murders, nor was the Government able to identify any witness who had direct, personal knowledge that Defendant was aware that Jenkins was involved in the murders.

The Government submitted the Facebook private message page of an unidentified individual, represented to be a high ranking retired KMC Nomad member from Florida, that discusses the murders of Maue and Szymanski and stated that Defendant was involved in the murders. (Dkt. 192-1 at 11-13). One of the posts from this unidentified individual, from October 12, 2015 (more than a year after the murders) states: "Pirk, Blaze (Defendant) and Emmett were 100% behind the murders of two Kingsmen and everyone looks the other way." (*Id.* at 12). The Government proffered that the individual was interviewed and stands by his postings, but the defense claimed otherwise. In any case, there was no allegation that this unidentified individual had direct, personal

knowledge about Mr. Enix's alleged involvement, but rather his purported beliefs were apparently based upon piecing together information after-the-fact.

Neither the defense nor the Government sought to elicit testimony from Defendant on the subject of the murders when he testified before the Court on July 18, 2016.

### The Dispute with the Pagans

The Government proffered, and in fact the grand jury charged, that Defendant was at a meeting in January 2014, with Pirk, Caruso, and Jenkins, at a KMC Clubhouse in Leesburg, Florida, where they "agreed that they would get their KMC colors back from the Pagans by any means necessary, including murdering Pagans and kidnapping Pagan Old Ladies." (Dkt. 33 at ¶ 33).

In addition, the Government represented that a proffering co-defendant has relayed that Defendant arrived with a trunk full of approximately 30 firearms the day following that meeting in anticipation of a meeting with the Pagans, but the meeting did not go forward because the Pagans "blew them off that day."

The defense argued that Caruso is the likely proffering co-defendant, and citing to the Government's motion to revoke Caruso's bail in another case pending in this District (*see* Case No. 1:14-CR-203-A, Dkt. 25), contended that even according to the Government, Caruso is not a credible witness.

In addition, Mr. Enix testified about this dispute with the Pagans. Mr. Enix explained that there was a dispute with the Pagans when KMC members left to join the Pagans, and a KMC clubhouse in Florida had been owned, at least in part, by at least one of those KMC members who joined the Pagans. As a result, the Pagans apparently

gained access to KMC property, and more specifically KMC badges or patches. According to Mr. Enix, he met with the Pagan leadership and retrieved the patches, without any resort to or threats of violence. Mr. Enix adamantly denied the Government's allegations, including the allegations concerning the trunk of firearms. There is no dispute that this issue with the Pagans was resolved without violence.

*"Armed to the Hilt"*

The Government proffered that Defendant has traveled to this District to conduct KMC business and he has been "armed to the hilt" with firearms.

Defendant testified that this was false, explaining: "I would never carry a firearm in the State of New York or any type of gun a knife or anything else. Because of their laws, absolutely not. I abide by the laws. I know the laws and I make sure that I follow the laws." Defendant acknowledged that he did travel to this District approximately four or five times, and he typically came by airline. On one occasion he travelled by vehicle, but did not transport any guns or weapons. Indeed, during Defendant's testimony, he appeared to be very familiar with the laws of various states and any corresponding reciprocity with his ability to lawfully possess a gun in Florida.

During execution of the search warrant on May 12, 2016, at Defendant's residence in Florida, the Government seized: a Kel-Tec .38 auto semi-automatic firearm; a Smith and Weston firearm; two inside-the-pant holsters; one ankle holster; eleven rounds of .38 caliber ammunition, ten of which were hollow point; and a stock. The Government proffered that hollow point bullets are intended to cause significant injuries to the victim, making a small entrance but large exit for maximum damage. In contrast, Defendant

explained how he enjoys using hollow point bullets during target practice, although they are more expensive than regular bullets so he does not use them as frequently.

There is no contention that Defendant was not licensed to possess the firearms and ammunition in the state of Florida, or that his procurement of these firearms and ammunition, in and of themselves, somehow violated the law.

### *Trip to Tennessee*

The Government also introduced through Defendant's testimony evidence about a trip to Tennessee involving KMC members from various parts of the country. Mr. Enix admitted that he was armed at that meeting, and refused to remove his firearm before attending the meeting. However, the evidence elicited through Mr. Enix's testimony was that there was no violence or altercation of any kind at this meeting, and in fact, the two groups socialized together following the meeting.

### **The Case Law**

The Court has reviewed decisions from the Second Circuit Court of Appeals addressing detention decisions in the context of defendants charged with racketeering conspiracies, where, as here, the underlying enterprise and predicate acts involve alleged violent conduct. Based upon a review of that case law, discussed in further detail below, it is apparent that a court may determine that the government has established danger by clear and convincing evidence even when a defendant has not personally participated in any violent acts, but where that defendant plays a leadership role in a criminal enterprise engaged in violent acts at the direction of the defendant. However, it is also apparent to the Court, based upon a review of that case law, that more evidence supported a finding

that the defendant was directing the violent acts of the conspiracy in those cases where the Second Circuit found in favor of detention, than the evidence that has been presented to this Court concerning Mr. Enix.

Of course, there is no *per se* rule requiring the detention of a defendant pending trial who is charged in a racketeering conspiracy, and, according to the government, played a leadership role in the criminal enterprise. Rather, as with all detention decisions, a court's decision must be based upon "a fact-intensive analysis of the quality and quantity of the evidence produced at the bail hearing in determining the defendant's role in the violent RICO enterprise alleged, and whether the acts committed by the enterprise, combined with his leadership role within the enterprise, justified pretrial detention." *United States v. Ciccone*, 312 F.3d 535, 543 (2d Cir. 2002).

Moreover, the Government need not "present a record of violence or dangerous conduct in order to justify detaining a defendant on grounds of dangerousness. This is not necessary. Although a prior record of violence eases the government's burden of showing dangerousness, it is not essential. The government's burden is only to prove dangerousness by clear and convincing evidence." *Rodriguez*, 950 F.2d at 89.

In *United States v. Colombo*, 777 F.2d 96 (2d Cir. 1985), cited extensively at oral argument by both parties, the defendant (Colombo) and 24 other persons were named in a 71-count indictment charging that for ten years, the defendant operated a criminal enterprise known as the "Anthony Colombo crew" which committed state and federal crimes, including murder and other violent acts. *Id.* at 97. In support of its request for detention, the government proffered that it would present at trial the testimony of

Anthony Ferrara, who would testify that the defendant stated that he was head of the "crew" and that he approved all criminal activity by its members; that the defendant profited from their criminal activities; that Ferrara had personally attended meetings at which the defendant directed "crew" members to rob persons; that at least two of the robberies resulted in the victims being assaulted; and that the defendant approved the abduction, assault, extortion and attempted murder of various individuals, including a government informant. *Id.* The government also presented the proffered testimony of the alleged victims. *Id.* In addition, Ferrara's proffered testimony was corroborated by tapes of telephone calls involving the defendant. *Id.*

In reversing the district court's order of release, the Second Circuit Court of Appeals determined that the evidence proffered by the government established clearly and convincingly that the defendant presented a danger to the community. *Id.* at 99. While not showing that the defendant directly participated in any of the crimes alleged, the Second Circuit concluded that the Government's proffer demonstrated that he was the "leader of an enterprise that carried out its criminal activities at his direction." *Id.*

In *United States v. Ciccone*, 312 F.3d 535 (2d Cir. 2002), the defendant was arrested along with 16 other alleged members and associates of the Gambino Organized Crime Family named in a 68-count RICO indictment. *Id.* at 537. The RICO enterprise was alleged to be the Gambino Crime Family, of which the defendant was alleged to be the *de facto* leader. *Id.* In support of its request to detain the defendant, the government presented the expert testimony of an FBI agent about the defendant's role within the Gambino Crime Family and made a proffer, corroborated with surveillance photographs

and tape recordings, to demonstrate the strength of its criminal case against the defendant. *Id.* at 538. The government presented its case as follows:

> Gotti became the leader of the Gambino Crime family following the criminal convictions of his brother, John Gotti, and of his nephew (the latter's son), John Gotti, Jr. In that capacity, Gotti represented the family at meetings attended by the leaders of other organized crime families and at weddings and funerals of various organized crime figures. Under Gotti's leadership, members of the Gambino Crime Family used threats of force and violence to place a Gambino associate on the ILA Executive Council and to ensure that a lucrative ILA contract was awarded to a company partly owned by a Gambino associate. Secret payments of the proceeds from the extortionate activities charged in the indictment were said to have been made to Gotti.

*Id.* The government contended that Gotti directed the violent crimes of his co-defendants as leader of the Gambino Crime Family, and the Court noted that it was "'clear from the indictment that [defendant] [was] charged with being the Acting Boss of the Gambino [C]rime [F]amily, responsible for controlling the activities of the racketeering enterprise, and conspiring with the members of the organization to engage in the various acts charged in the indictment.'" *Id.* The evidence the government offered in support of its argument that the defendant was in charge of the Gambino Crime Family included statements of cooperating witnesses that defendant held a leadership position; evidence that the defendant met with members and associates of the Gambino family in a manner consistent with organized crime leadership; proof of a link between the defendant and the receipt of monies obtained through the collection of extortion payments; evidence that the defendant engaged in surreptitious attempts to contact the Gambino Crime Family's former boss (his incarcerated brother John Gotti); and proof that the defendant

participated in meetings with, and served as arbiter of disputes between, other organized crime families. *Id.* at 539.

In *United States v. Orena*, 986 F.2d 628 (2d Cir. 1993), Defendants were indicted as playing leadership roles in the Colombo Family of La Cosa Nostra, and the predicate acts included conspiring to commit murder, murder, and illegal possession of weapons. *Id.* at 628. In addition to the indictment, the government submitted evidence from five confidential sources and two witnesses who had already testified publicly in another trial, demonstrating that the defendants were the acting boss of the Colombo Family and his right-hand man, and that together they directed individuals to engage in violent crimes, including murder, and that their efforts were responsible for the "bloody, franticidal war" resulting in over 20 shootings and the injury and deaths of innocent bystanders. *Id.* at 631. With respect to the right-hand man, the Court of Appeals concluded that the record showed that he was "an important member of the [criminal enterprise] . . . and one who readily furthers its criminal objectives through violence." *Id.* at 632.

In *United States v. Persico*, 376 F. App'x 155 (2d Cir. 2010), the district court improperly applied the rebuttable presumption to support the defendant's detention, causing the Second Circuit to reverse and remand. *Id.* at 157. The government sought detention of a defendant charged in a racketeering conspiracy "because he had the 'ability to order others to use violence,' and . . . he 'controls violence' and 'is in a position to turn it off and turn it on.'" *Id.* at 156. The government proffered evidence showing that the defendant met with high ranking members of the Colombo crime family, and recorded conversations including one where a co-defendant indicated he would check with the

defendant before using violence. *Id.* at 157. However, the Second Circuit recognized that on remand, the issue of whether the defendant should be detained was a close case "given that [defendant] has no criminal record, that the government offers no direct evidence of [defendant] either using violence or directing others to use violence, and that the evidence suggests that [defendant] used any influence he had in order to discourage violence. . . ." *Id.*

This Court has reviewed a number of other decisions similarly addressing detention under these types of scenarios. *See, e.g., United States v. Marino*, 396 F. App'x 728, 730 (2d Cir. 2010) (detention of defendant charged in 23-count indictment with murder, witness tampering, extortion, racketeering conspiracy and other crimes, supported by "considerable evidence of [defendant's] prior conduct [that] reveals disturbing propensity for violence, often in the context of obstruction of justice" which included four prior felony convictions and evidence of defendant's continued membership and leadership role in the Gambino Crime Family); *United States v. Dono*, 275 F. App'x 35, 37 (2d Cir. 2008) (reversing district court's order setting bail conditions, where defendants, who were a captain and an associate in the Colombo organized crime family, were charged with assaulting two individuals and government proffered that defendants assaulted and threatened to kill victims in retaliation for perceived participation in a robbery of a Colombo family "social club" and played excerpts of an audio recording of the assault that was captured by a cooperating witness and another audio recording of defendants discussing the incident). *See generally United States v. Salerno*, 481 U.S. 739 (1987) (approving detention of defendants charged in 29-

count RICO indictment where defendants were "boss" and "captain" in the Genovese crime family of La Cosa Nostra who had participated in wide-ranging conspiracies to aid their illegitimate enterprises through violent means, where government proffered evidenced based in large part on conversations intercepted by court-ordered wiretaps and presented the testimony of two trial witnesses who would assert that at least one of the defendants personally participated in two murder conspiracies).

## Analysis

In the Court's view, the evidence supporting detention in the above-referenced cases was stronger than the proof presented concerning Mr. Enix. Here, while a fair argument can be made that based upon KMC's operation through a chain of command and based upon the Facebook postings, Mr. Enix directed and controlled the activities of KMC, there is no direct evidence that Mr. Enix either personally participated in acts of violence or that he directed any specific acts of violence. Although there are volumes of Facebook postings by Mr. Enix containing language that regularly appears to be encouraging violence, there was no evidence linking any acts of violence to those Facebook postings. As a result, it is difficult for the Court to conclude by clear and convincing evidence that those Facebook postings were direct orders to engage in violence as opposed to juvenile boastings about the alleged toughness of KMC.

In addition, there is no wiretap or surveillance evidence in this case, or any other type of corroborating evidence presented to the Court. The bulk of the Government's proffer involving alleged specific acts by Mr. Enix (whether it be that he was armed in this District or that he had a trunk load of firearms for the dispute with the Pagans)

consisted of unsworn statements from unidentified proffering co-defendants. Moreover, the Second Superseding Indictment does not contain any allegation about Mr. Enix controlling the operations of the KMC, let alone the operations conducted in New York where the murders and other violent acts allegedly occurred. Indeed, as defense counsel pointed out, the only live testimony presented by the Government consisted of the testimony of Agent Brown during the detention hearing held before the magistrate judge in Florida, and Agent Brown testified that Mr. Enix had no authority in New York. (Dkt. 177-2 at 25).

Furthermore, while the most significant and dangerous conduct at issue in the Second Superseding Indictment involves the murders in September 2014, Mr. Enix is not charged with any substantive count involving the murders, and the evidence concerning his alleged involvement is highly circumstantial. There is no evidence before the Court of any direct contact between Mr. Enix and Jenkins at the time of the murders, and there is no proof of the substance of the alleged communications between Mr. Enix and Pirk.

Certainly, there is nothing preventing the Government from electing to proceed by proffer or relying upon unidentified sources, as it primarily did in this case. *Marino*, 396 F. App'x at 730 (distinguishing between unidentified sources whose identity is known to the government and who are anticipated trial witnesses, as opposed to "anonymous tipsters"); *United States v. LaFontaine*, 210 F.3d 125, 131-32 (2d Cir. 2000) ("question for the district court is whether the government has produced sufficient evidentiary support" for its request for detention without bail, which is permissible in the form of a proffer); *United States v. Matir*, 782 F.2d 1141, 1147 (2d Cir. 1986) ("In the informal

evidentiary framework of a detention hearing, the methods used to scrutinize government proffers for reliability must lie within the discretion of the presiding judicial officer, informed by an awareness of the high stakes involved.").   Likewise, circumstantial evidence can be just as persuasive as direct evidence.   However, "[w]hether presented by proffer or direct evidence, courts retain the responsibility for assessing the accuracy of the Government's proof." *United States v. Goba*, 240 F. Supp. 2d 242, 247 (W.D.N.Y. 2003).

The Government's proffer in this case consists largely of circumstantial evidence in the form of potential witness testimony from alleged co-conspirators, who at this stage are primarily unidentified and in many respects have not given sworn testimony before the grand jury.   In contrast, Mr. Enix elected to testify and the Court was able to assess Mr. Enix's credibility firsthand.   Mr. Enix presented himself on the witness stand in striking contrast to the individual depicted in the Facebook postings.   The Court recognizes that the true nature of Mr. Enix is probably a mix between the person who testified and the individual who generated the Facebook postings.   However, Mr. Enix was able to consistently explain the context of the Facebook postings, and again, there was no evidence presented linking a specified act of violence to the postings.   Moreover, based on Mr. Enix's demeanor on the witness stand and the substance of his testimony, both on direct and cross examination, Mr. Enix generally appeared to testify credibly. The Government argued that Mr. Enix's testimony was rehearsed and evasive, but the Court did not assess his testimony in that manner.   While it remains to be seen whether Mr. Enix will ultimately be convicted at trial of the charges in the Second Superseding

Indictment, it is not the Court's role at this stage of the proceedings to assess Mr. Enix's guilt or innocence. *See United States v. Jones*, 566 F. Supp. 2d 288, 292 (S.D.N.Y. 2008) ("the Court's function in examining the weight of the evidence is not to determine guilt or innocence.").

Rather, the Court's role is to assess whether Defendant is a flight risk or danger for which reasonable bail conditions cannot protect against. Based upon the entire record before this Court, consisting of over ten hours of argument and testimony, including Mr. Enix's testimony, the Court concludes that consideration of this second § 3142(g) factor weighs in favor of a finding that Defendant has rebutted the presumptions of flight and danger, and that reasonable bail conditions should be set.

**C.    HISTORY AND CHARACTERISTICS**

Consideration of this third factor under § 3142(g) weighs strongly in favor of granting Defendant's motion for release. He is 57 years old, and as emphasized by his counsel, up until his detention in the present case, Mr. Enix had never seen the inside of a jail. Mr. Enix has never been convicted of a crime. He has a history of stable employment from the time he was 18 years old. After graduating from high school, Mr. Enix worked at Chrysler in Toledo, Ohio, where he worked for 30 years, starting on the assembly line and working his way up to a position in management before retiring in 2007 and moving to Florida. In addition, while in Ohio, Mr. Enix served as both a volunteer firefighter and medic.

In 2007, Mr. Enix, the father of three sons and two step sons, moved to Florida with his second wife, not too far from where his parents had moved. Mr. Enix almost

immediately began working for real estate firms in the Florida area, and obtained his Florida real estate license. Mr. Enix renewed his active participation in the Masons and started a chapter in Florida.

Mr. Enix has been diagnosed with Type II Diabetes Mellitus, and by 2008, was taking daily insulin injections and developed neuropathy. Mr. Enix's wife has been diagnosed with systemic Lupus and has developed fibromyalgia.

With the development of these and other health issues, and with the Florida real estate market not doing well, Mr. Enix joined his brother's successful accounting firm, Enix & Associates, working flexible hours. He has the title of Chief Operating Officer of this firm employing approximately 10 employees. He lives close to his 81-year-old father, whom he cares for on a regular basis, and his brother.

Mr. Enix denies using illegal drugs or alcohol. The Government cross-examined Mr. Enix about reliance that he developed on prescription pain medications when recovering from a severe motorcycle accident in September 2012, but there is no credible evidence before the Court suggesting that Mr. Enix is a risk for drug or alcohol use, let alone abuse.

The Government has argued that while Mr. Enix may have ties in Florida, he has no ties to this District and therefore he is a flight risk. The case law on this point – whether ties to the community must be to the community in which the defendant is charged as opposed to the community in which the defendant resides – is varied. *Compare United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("we hold that 'community' in this section of the statute embraces both the community in which the

charges are brought and also a community in the United States to which the defendant has ties.") and *United States v. Garcia*, 801 F. Supp. 258, 263 (S.D. Iowa 1992) ("While the Defendant has no ties to any community within the Southern District of Iowa, he clearly has substantial ties to Tucson, Arizona.") *with United States v. Alverez-Lopez*, No. 2:14-cr-45-FtM-38CM, 2014 WL 2882906, at *3 (M.D. Fla. June 25, 2014) (rejecting notion that ties to any community in the United States are sufficient, as opposed to community of prosecuting district).

This Court has not found any case in this Circuit specifically addressing the issue, although as noted by the Government, several decisions from this Circuit reference the requirement of ties to "this" community, referring to the prosecuting district. *See, e.g., United States v. Drake*, No. 04-CR-253S, 2005 WL 602381, at *3 (W.D.N.Y. March 15, 2005) (noting the defendant's limited ties to "this district").

Nonetheless, even if the strength of Defendant's community ties in Florida is not as compelling as similar ties in this District, consideration of all the factors under this third prong of the § 3142(g) analysis, including Mr. Enix's character, employment, past conduct, history relating to drug or alcohol abuse, and criminal history, supports a conclusion that Defendant has rebutted the presumptions of flight and danger, and he should be released on reasonable conditions.

**D.    NATURE OF DANGER**

The Government contends that if Defendant is released "it is much easier for him to carry on the purposes of the enterprise, and to place actual or perceived witnesses in danger or in fear." (Dkt. 192 at 26).

When questioned as to whether there was any proof that Defendant had attempted to intimidate witnesses, the Government initially cited to a meeting between Pirk and Defendant and a member of another motorcycle club, who revealed that a "snitch" existed in a club in Buffalo and that person was beaten up and kicked out of the club. The Government was not sure if the incident occurred in 2013, 2014, or 2015, and apparently the information was not presented to the grand jury but rather came from an unidentified proffering co-defendant. During his testimony, Mr. Enix denied any such incident or involvement.

In addition, on the second day of the hearing before this Court, the Government cited to an incident involving the mother of a female witness who was with Jenkins leading up to the murders, where KMC members showed up at the mother's house in Florida as some type of intimidation tactic. However, there was no direct evidence of Mr. Enix's involvement with this incident. Rather, the Government relied upon the "chain of command" to support the conclusion that Mr. Enix must have been involved in ordering this intimidation.

By contrast, Mr. Enix testified that he would not jeopardize being able to be with his family if allowed to be released on conditions; that he would agree not to have any contact or involvement with KMC if released; and that he would agree to abide by all conditions set by the Court.

Based on the entire record, including Mr. Enix's testimony, the Court determines that Defendant has met his burden of production when considering this factor, and the

Government has not met its burden of persuasion to support Defendant's detention without conditions.

## CONCLUSION

Based upon a review of the record in this case and consideration of the factors set forth at 18 U.S.C. § 3142(g), including consideration of the rebuttable presumptions, the Court concludes that Defendant's motion to be released pending trial conditioned upon the setting of reasonable bail conditions should be granted.  Our system of justice requires more than presented here before an individual's liberty is taken away while under a presumption of innocence.  In this case, with this defendant, based upon the record before this Court, detention without bail would not be a just result.

Accordingly, the Court grants Defendant's motion to be released from custody pursuant to 18 U.S.C. § 3145(b) (Dkt. 177), subject to Defendant satisfying the following conditions which the Court finds are reasonable and necessary to ensure Defendant's appearance in this case and to protect against any risk of danger to other persons or the community:

1.      Defendant shall not commit any offense in violation of federal, state or local law while on release in this case.

2.      Defendant must cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. § 14135a.

3.      Defendant must remain at a verifiable address as approved by the United States Probation Office (hereinafter "USPO"), and shall immediately advise the Court,

defense counsel, the U.S. Attorney and the USPO in writing before any change in address and telephone number.

4.    Defendant must post with the Court a secured bond in a form approved by the Court, of $500,000 secured by the agreement of Defendant and each surety to forfeit the property owned by Defendant and his wife, the property owned by Defendant's brother, and the property owned by Defendant's father, as detailed in defense counsel's Affirmation dated June 11, 2016, at paragraph 43 (*see* Dkt. 177), based upon the Court's understanding based upon defense counsel's representations that Defendant and the sureties hold a total equity value in the properties of $642,000.  The agreement and bond shall be posted to secure Defendant's appearance at all proceedings as required, and to secure Defendant's compliance with all the conditions set forth herein.[7]  The failure to appear as required or otherwise comply with the conditions set forth herein shall result in forfeiture of the properties utilized to secure the $500,000 bond.

5.    Defendant shall be placed in the custody of his brother, David Enix, who must execute an agreement promising to (a) supervise Defendant in accordance with all

---

[7]    Although typically a bail bond and its collateral is provided to secure a defendant's appearance, 18 U.S.C. § 3142(c)(1)(B)(xiv) provides that a court can impose a condition on a person to "satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community."  The Court finds that the secured bond of $500,000 is necessary to ensure Defendant's appearance and his compliance with the other conditions set forth herein, including conditions imposed to protect against danger.  Defendant has indicated he has no objection to such a requirement, and in fact, a requirement such as this is supported by the case law.  *See United States v. Gigante,* 85 F.3d 83, 85 (2d Cir. 1996) ("bail bond and its collateral may be forfeited not only for the defendant's failure to appear, but also for other violations of bond conditions, including the defendant's commission of a crime.").

conditions of release; (b) use every effort to assure the appearance of Defendant at all scheduled court proceedings; and (c) notify the Court immediately in the event Defendant violates any conditions of release or is no longer in the custodian's custody.

6.      Defendant must report to the USPO within 24 hours of release, and thereafter on a weekly basis.  As part of his supervision by the USPO, Defendant must agree to the ability of the USPO to make random, unannounced visits to Defendant's residence, to ensure Defendant's compliance with the conditions set forth herein.

7.      Defendant must maintain or actively seek employment.

8.      Based upon the representation that Defendant does not possess a passport, Defendant must not obtain a passport or other international travel document (*i.e.*, Enhanced Driver's License or NEXUS card).

9.      Defendant's travel is restricted to the Middle District of Florida and the Western District of New York, unless permission is granted by the Court to travel elsewhere.

10.      Defendant must avoid all contact in any manner, directly or indirectly (including by electronic means) with any co-defendants or defendants in any related cases, as well as with any persons who are or who may become victim(s) or potential witness(es) in the subject investigation or prosecution, unless approved by the USPO.

11.      Defendant must refrain from possessing a firearm, ammunition, destructive device, or other dangerous weapon, and no such items may be present in Defendant's residence.

12.      Defendant must refrain from any use of alcohol.

- 35 -

13.    Defendant must refrain from any use or unlawful possession of a narcotic drug and other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner, and/or any other mind altering substances.

14.    Defendant must submit to any method of testing required by the USPO for determining whether he is using a prohibited substance.  Such methods may be used with random frequency and include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing, including co-payment.

15.    Defendant must refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or electronic monitoring which are required as conditions of release.

16.    Defendant must participate in the "Home Detention" location restriction program and abide by all the requirements of the program which will include electronic monitoring or other location verification system, as recommended by the USPO and approved by the Court.[8]  Defendant shall pay all or part of the costs of the program based upon his ability to pay as determined by the USPO.  "Home Detention" means that Defendant is restricted to his residence at all times except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits,

---

[8]    Defendant had proposed that he be subjected to "GPS monitoring."  The Court has not received a recommendation from the USPO as to the particular electronic monitoring that would be most appropriate for Mr. Enix, and in part, any such recommendation will depend upon a site inspection of Mr. Enix's residence by the USPO in the Middle District of Florida.  As part of this Decision and Order, the Court directs the inspection of Mr. Enix's residence, and requests that a recommendation be submitted to the Court, which will be incorporated herein and adopted by the Court, prior to Mr. Enix's release.

court appearances, court-ordered obligations, or other activities as pre-approved by the USPO.

17.    Defendant must report within 72 hours to the USPO any contact with any law enforcement personnel, including but not limited to any arrest, questioning, or traffic stop.

18.    Defendant must submit to a mental health evaluation and/or treatment as approved by the USPO.  Defendant shall contribute to the cost of services rendered in an amount to be determined by the USPO based on ability to pay or availability of third party payments.

19.    Defendant is restricted from any association or membership with any motorcycle club/gang, including but not limited to KMC.  This means that Defendant shall not pay dues, attend meetings, participate in mandatory runs, or wear the clothing, colors, patch, or insignia of any such club.  Further, Defendant shall not attend social functions sponsored by such clubs even if the function is open to "citizens" (the public). Defendant must remove all insignias or emblems associating him with KMC from his home, motorcycle, vehicles or other property.

20.    Defendant must execute an acknowledgement of an Order Setting Conditions of Release, that will incorporate the conditions set forth herein and provide advice of penalties and sanctions, which must then be signed and approved by the Court prior to Defendant's release.

At the conclusion of the appearance on July 1, 2016, the Government indicated the possibility of pursuing an appeal to the Second Circuit Court of Appeals, in the event that

Defendant's application to be released was granted, and also requested that the Court afford the Government an opportunity to seek a stay of any release order issued by this Court. As set forth above, because compliance with certain of the Court's conditions of release needs to be confirmed before Defendant can be released from custody, the Court will be scheduling an appearance for purposes of confirming compliance with these conditions. This will afford the Government an opportunity to seek, if it so chooses, a stay of this Decision and Order from the Second Circuit Court of Appeals. In support of any such stay application, the Government may represent that this Court has declined to stay its Decision and Order pending any appeal.

Finally, because the Government has represented that there is no information responsive to Defendant's request for exculpatory information pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and because Defendant's application to be released from custody pursuant to conditions has been granted, that portion of Defendant's application seeking the production of *Brady* material (Dkt. 177) is denied as moot, and without prejudice to Defendant continuing to pursue similar relief as part of pretrial motions before Magistrate Judge Roemer.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:    July 21, 2016
          Rochester, New York

- 38 -