IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.   15-CR-142-W

GREGORY WILLSON a/k/a Flip,

Defendant.

---

# PLEA AGREEMENT

The defendant, GREGORY WILLSON, and the United States Attorney for the Western District of New York (hereinafter "the government") hereby enter into a plea agreement with the terms and conditions as set out below.

## I.   THE PLEA AND POSSIBLE SENTENCE

1.  The defendant agrees to plead guilty to Counts 1, 8, and 9 of the Second Superseding Indictment, which charge:

   a.   In Count 1, a violation of Title 18, United States Code, Section 1962(d) (RICO Conspiracy), for which the maximum possible sentence is a term of imprisonment of 20 years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of 3 years.

   b.   In Count 8, a violation of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm), for which the maximum possible sentence is a term of imprisonment of 10 years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of 3 years.

  c. In Count 9, a violation of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm), for which the maximum possible sentence is a term of imprisonment of 10 years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of 3 years.

  d. The defendant understands that the penalties set forth in this paragraph are the minimum and maximum penalties that can be imposed by the Court at sentencing.

  2. The defendant understands that, if it is determined that the defendant has violated any of the terms or conditions of supervised release, the defendant may be required to serve in prison all or part of the term of supervised release, up to six (6) years, without credit for time previously served on supervised release. As a consequence, in the event the defendant is sentenced to the maximum term of incarceration, a prison term imposed for a violation of supervised release may result in the defendant serving a sentence of imprisonment longer than the statutory maximums set forth in ¶ 1 of this agreement.

  3. The defendant understands that the Court must require restitution to be paid to victims of the offense as part of the sentence pursuant to Sentencing Guidelines § 5E1.1 and Title 18, United States Code, Section 3663A.

## II. ELEMENTS AND FACTUAL BASIS

  4. The defendant understands the nature of the offenses set forth in ¶ 1 of this agreement and understands that if this case proceeded to trial, the government would be required to prove beyond a reasonable doubt the following elements of the crimes:

2

### Count 1

a. that there was an enterprise, as describe in the Second Superseding Indictment, consisting of a group of persons associated together for a common purpose of engaging in a course of conduct;

b. that the enterprise engaged in, or its activities in some way affected, interstate or foreign commerce;

c. that the defendant was employed by or associated with the enterprise; and

d. that the defendant knowingly and intentionally entered into an agreement that a conspirator would conduct, or participate in the conduct of, the affairs of the enterprise through a pattern of racketeering activity.

### Counts 8 and 9

a. that the defendant knowingly possessed a firearm;

b. that the defendant had previously been convicted by a crime punishable by a term of imprisonment exceeding one year; and

c. that the firearm traveled in or affected interstate or foreign commerce.

### FACTUAL BASIS

5. The defendant and the government agree to the following facts, which form the basis for the entry of the pleas of guilty including relevant conduct:

a. The Kingsmen Motorcycle Club ("KMC") was founded in Lockport, New York in or about 1959 and continues to operate today. As set forth in the Second Superseding Indictment, the KMC is a criminal organization whose leadership, members, and associates constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, the activities of which affected interstate and foreign commerce.

b. The purposes of the KMC included, among other things, the following: promoting and enhancing the enterprise and its members and associates activities, including, but not limited to, distribution of controlled substances, maintaining premises for use and distribution of controlled substances, possession, use, and sale of firearms, sale of untaxed

      cigarettes, and other criminal activities including promoting prostitution; preserving and protecting the power, territory, and reputation of the enterprise and its members through intimidation, violence, threats of violence, assaults, murder, and attempted murder; placing victims, potential victims, potential witnesses, and others in fear of the enterprise, its members, and associates, through violence and threats of violence; and generating and maximizing the profits, reputation, and membership of the enterprise from a variety of illegal activity including but not limited to drug trafficking, firearm sales, sale of untaxed cigarettes, sale of alcohol, gambling, robbery, and prostitution.

c.   The KMC operated in New York, Pennsylvania, Tennessee, and Florida. Each KMC member and chapter paid dues to the KMC National, which was located in the State of Florida. KMC Chapters routinely sold alcohol, and untaxed cigarettes for profits, which they attempted to mask by calling them "donations." The KMC also permitted gambling inside KMC Chapter clubhouses, and promoted unlawful "stripper parties" and sexual activities inside KMC Chapter clubhouses.

d.   The defendant, GREGORY WILLSON, was at various times a KMC Springville Chapter member and a KMC Nomad. The KMC Nomads did not belong to a particular chapter and were the enforcement and security arm of the KMC. The defendant admits that, at various times during the RICO Conspiracy alleged in Count 1, KMC members and associates of the KMC used marijuana, cocaine, and other controlled substances in and around KMC Chapter clubhouses, and that the defendant personally sold controlled substances, including cocaine and marijuana, to KMC members and associates at KMC events and inside various KMC Chapter clubhouses. The defendant also acknowledges that sometimes the KMC and its members and associates made efforts to ensure that KMC members, or civilians did not do drugs in open and notorious manner inside the clubhouse out of fear that such activity would cause law enforcement to investigate the KMC. However, the defendant acknowledges that, even with brief periods of diminished drug use, drug use and distribution continued to occur inside and around KMC clubhouses, including the KMC South Buffalo Chapter, KMC Olean Chapter, KMC North Tonawanda Chapter, KMC Arcade Chapter, Jamestown Chapter, KMC Niagara Falls Chapter, KMC Lockport Chapter, KMC Springville Chapter (before it was shut down and its members forced out of the KMC), and inside and around various other KMC Chapters in Pennsylvania, Tennessee, and in Florida. The defendant further acknowledges that he knew that KMC members were involved in the use and distribution of cocaine, marijuana, and other controlled substances. The defendant further admits that he possessed

4

firearms, and that KMC members maintained access to firearms, and KMC members possessed and maintained firearms on their person and inside KMC Chapter Clubhouses, including the KMC South Buffalo Chapter, KMC Olean Chapter, KMC North Tonawanda Chapter, KMC Arcade Chapter, Jamestown Chapter, KMC Niagara Falls Chapter, KMC Lockport Chapter, KMC Springville Chapter (before it was shut down and its members forced out of the KMC), and inside and around various other KMC Chapters in Pennsylvania, Tennessee, and in Florida. KMC members were also involved in firearm sales at various times. The defendant admits that the interstate activities of the KMC, including sale of alcohol, cocaine and other controlled substances, firearms sale and possession, payment of dues, use of cellular phones, possession of firearms and ammunition that had been shipped in interstate commerce, and nationwide coordination by the KMC affected interstate commerce.

e.  The defendant further admits that, in September 2009, he took a female, Victim A, from the state of New York to KMC clubhouses in the state of Pennsylvania. While visiting a KMC clubhouse in Meadville, Pennsylvania, the defendant and Victim A got into a verbal altercation when Victim A tried to leave the KMC clubhouse without permission. In response, the defendant punched Victim A in the face repeatedly, bloodying her face to the point where her eyes were swollen shut. Despite the fact that the female needed medical attention, neither the defendant nor any other KMC members or associates inside the KMC Meadville Chapter called for medical attention. Instead, the defendant, with assistance from other KMC members and associates, put sunglasses on Victim A to conceal her injuries. The defendant then transported Victim A back across state lines, from Pennsylvania to New York, and brought victim A to 2936 Five Mile Road, Allegany, New York. There, the defendant met with his mother and they decided to clean the female up and keep her secluded against her will inside the residence, for several days, in order to conceal her injuries. While keeping the victim against her will, the defendant permitted Victim A to call her mother but, in doing so, forced Victim A to lie and tell her mother that she was okay when, in truth and in fact, Victim A had been physically assaulted by the defendant and was being kept inside 2936 Five Mile Road against her will to conceal her injuries so that the defendant would not "get in trouble" and go back to prison. On the third day of captivity, Victim A was able to sneak a phone call out from the landline at the residence to a friend of her family. That distressed phone call prompted the victim's mother and her friends to conduct a "reverse lookup" to see from where Victim A's phone call originated. From there, the victim's mother and her friends were able to locate the victim and rescue her from the defendant. Neither the victim nor the victim's mother immediately reported the incident to the authorities due

to the defendant's membership in the KMC, and Victim A lied to medical professionals at Bertrand-Chaffee Hospital about the source of her injuries. Eventually, the authorities were contacted and Victim A reported to law enforcement that the defendant was in fact the cause of her injuries, and that she had been transported over state lines and held against her will for days. The defendant admits to this conduct, which applies to Count 1, Overt Acts 1 through 10.

f. The defendant also admits that he stored cocaine for sale at his then-girlfriend's house at 57 Humphrey Road, Buffalo, New York, and on August 9, 2013, a firearm belonging to the defendant, ammunition, and 7.90 grams of cocaine were recovered from 57 Humphrey Road when the Erie County Sheriff's Office executed a search warrant at the location. The defendant has also been made aware of consensually recorded phone calls made by his then-girlfriend, on behalf of the Erie County Sheriff's Office, to the defendant on August 9, 2013. In those consensually recorded phone calls, the defendant, in sum and substance, acknowledged the cocaine and the firearm inside the location belonged to him. Additionally, subsequent DNA analysis confirmed there is strong scientific support to conclude the defendant's DNA is in the DNA mixture on the firearm. The firearm possessed by the defendant, as stored by him inside 57 Humphrey Road, Buffalo, New York, on August 9, 2013, was a Taurus, Model 80, .38 caliber Special revolver, bearing serial number 708150, which had traveled into New York State in interstate commerce prior to its recovery by law enforcement on August 9, 2013. The defendant has prior felony convictions on or about May 8, 2002, in the United States District Court for the Western District of New York, and on or about October 12, 1993; on or about January 11, 1994; and on or about February 3, 1999, in County Court, Cattaraugus County, New York, of crimes punishable by imprisonment for a term exceeding one year. The defendant admits these prior convictions, and this relevant conduct applies to Count 1, Overt Acts 26-27, and Count 8.

g. On July 31, 2015, members of the FBI executed a search warrant at the defendant's residence located at 2936 Five Mile Road, Allegany, New York. During the execution of the search warrant, the FBI located KMC paraphernalia, a quantity of marijuana (a controlled substance the defendant is known to distribute), and a quantity of psilocybin ("mushrooms"). The FBI also recovered a firearm and ammunition possessed by the defendant, namely, a Hi Point, Model JHP, .45 caliber semi-automatic handgun, bearing serial number X491425, and ammunition, namely, sixteen (16) rounds of Federal .45 caliber ammunition; two (2) rounds of CCI .45 caliber ammunition; one (1) round of REM-UMC .45 caliber ammunition; one (1) round of R-P .45 caliber ammunition; one (1) round of R-P .22 caliber ammunition; one

6

round of R-P .38 caliber ammunition; one (1) round of PS over 1950 .303 caliber ammunition; and ten (10) rounds of 3 over 96 7.62 mm ammunition. The firearm and all ammunition traveled in interstate commerce prior to the FBI's recovery of said items inside the defendant's residence on July 31, 2015, and subsequent DNA analysis confirmed there is strong scientific support to conclude the defendant's DNA is in the DNA mixture on the firearm. Additionally, in subsequently recorded jail conversations between the defendant and his mother, who was the only other person present when the search warrant was executed inside the residence, the defendant acknowledged that the firearm found inside his bedroom belonged to him. The defendant further acknowledges that, while possessing the firearm and ammunition described above, he was prohibited from doing so by virtue of his felony convictions, as detailed in paragraph 5(f), above. The defendant admits that this relevant conduct applies to Count 1, Overt Act 69 and Count 9.

h.  The parties agree that after converting the amount of cocaine, marijuana psilocybin, and other controlled substances involved in the offense, at least 60 kilograms but less than 80 kilograms of marijuana is the amount involved in the defendant's relevant conduct encompassed in Count 1 of the Second Superseding Indictment which could be readily proven by the government against the defendant.

i.  The defendant further admits that the KMC follows a strict chain of command. David Pirk was the National KMC President, and Timothy Enix was the KMC Regional President of Florida and the Southeast from in or about 2012 through the return date of the Second Superseding Indictment. The KMC chain of command involved the National President passing down orders to the Regional Presidents; Regional Presidents passed down orders to the Chapter Presidents; and Chapter Presidents passing down orders to Chapter Officers and members. KMC Nomads served at the discretion of the National President and/or Regional Presidents passing down orders from the National President. Furthermore, interstate coordination was maintained through cellular telephones, and also by a private KMC Facebook Group page administered and maintained by Timothy Enix.

j.  The defendant also admits that, on or about June 7, 2013, he and other KMC members were instructed by KMC Nomad President Edgar DeKay II to "shutdown" the Springville KMC Chapter because members of that chapter were loyal to the former KMC National President, who was forced out of the KMC and replaced as National President by David Pirk. The defendant, while armed with a handgun, and other KMC members including Thomas Koszuta, Ryan Myrtle, Tom Scanlon, Stanley Olejniczak, and many others, went to the

Springville KMC Chapter. Once the defendant entered the clubhouse, the defendant, and several others told the Springville Chapter President, Victim B, that they were being "shutdown" and to turn in their patches. After defendant WILLSON, Thomas Koszuta, Ryan Myrtle, and a few other KMC members went inside the KMC Springville Chapter meeting room with Victim B, Thomas Koszuta struck Victim B forcefully in the head with a mag light, that is, a heavy duty flashlight. Victim B was knocked out, and was bleeding from his head. Thomas Koszuta told Ryan Myrtle to make sure Victim B didn't move while other KMC members, including the defendant, removed all of the property from the KMC Springville Chapter. Property removed from the clubhouse included U.S. currency, firearms, untaxed cigarettes, bottles of liquor and beer, t-shirts, a television, and other KMC memorabilia. Victim B's cell phone, KMC ring, and KMC patches were taken outside to a burn barrel and burned, while others bleached the areas where Victim B bled on the floor, and cut out sections of the rug to ensure they destroyed all evidence. Other members of the KMC Springville Chapter were lined up against the interior wall of the clubhouse and had their KMC patches/vests removed under implicit and explicit threat of bodily injury. The defendant admits this conduct, which applies to Count 1, Overt Acts 13 through 19.

k. On August 3, 2013, while at a KMC party at Jack Wood a/k/a Snake's residence, members of the KMC received word that the former KMC Springville members, whose colors were forcibly removed by the KMC on June 7, 2013, were still wearing KMC patches and were taunting the KMC. After learning that the former Springville KMC members were taking pictures wearing KMC patches and taunting the KMC, the defendant, GREGORY WILLSON, and other KMC Nomads including Thomas Koszuta, Sean McIndoo a/k/a Professor, Edgar DeKay II a/k/a Special Ed, and another KMC Nomad decided to conduct a drive-by shooting. The defendant and his cohorts knew that the former Springville KMC members were having a cookout/party at the former Springville KMC Chapter clubhouse. The defendant, along with Thomas Koszuta, Sean McIndoo a/k/a Professor, Edgar DeKay II a/k/a Special Ed, and another KMC Nomad removed the seats from Jack Wood's van, acquired shotguns, and drove to the former Springville KMC clubhouse where they located the former members. At that point, they opened the sliding door on the side of the van and one of the defendant's accomplices fired twice with a shotgun towards the group of former Springville KMC members who were outside. One of the shots from the shotgun struck a vehicle which was parked near where one of the targeted former KMC members was standing.

l. In the fall of 2013, the defendant had a telephone conversation with Victim C, a former KMC member loyal to the former KMC National

8

    President, wherein the defendant threatened Victim C by stating over the telephone Victim C would be beaten or found in a creek.

m. The defendant admits to the above-described criminal conduct.

### III. SENTENCING GUIDELINES

6. The defendant understands that the Court must consider but is not bound by the Sentencing Guidelines (Sentencing Reform Act of 1984).

### BASE OFFENSE LEVEL

7. The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2D1.8(a)(1), 2D1.1(a)(5), 2D1.1(b)(1), 2D1.1(b)(12) and 2D1.1(c)(10) apply to ¶¶5(d), 5(f), 5(g), and 5(h), above, and provide for a base offense level of 24.

8. The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2A4.1(a), 2A4.1(b)(2)(B) apply to ¶5(e), above, and provide for a base offense level 34.

9. The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2B3.1(a), 2B3.1(b)(2)(C), 2B3.1(b)(3)(A), and 2B3.1(b)(7)(A) apply to ¶5(j), above, and provide for a base offense level of 27.

10. The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2A2.2(a), 2A2.2(b)(1), and 2A2.2(b)(2)(A) apply to ¶5(k), above, and provide for a base offense level of 21.

11. The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2A6.1(a), and 2A6.1(b)(1) apply to ¶5(l), above, and provide for a base offense level of 18.

12. The government and the defendant agree that Guidelines §§ 2K2.1(a)(4)(A), and 2K2.1(b)(6)(B) apply to Count 8 (see ¶5(f), above), and provide for a base offense level of 24.

13. The government and the defendant agree that Guidelines §§ 2K2.1(a)(4)(A), and 2K2.1(b)(6)(B) apply to Count 9 (see ¶5(g), above), and provide for a base offense level of 24.

## ADJUSTED OFFENSE LEVEL

14. Based on ¶¶ 7 through 13 of this agreement and Guidelines § 3D1.4, it is the understanding of the government and the defendant that the defendant's combined adjusted offense level is 35.

## ACCEPTANCE OF RESPONSIBILITY

15. At sentencing, the government agrees not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines § 3E1.1(a) (acceptance of responsibility), and further agrees to move the Court to apply the additional one (1) level downward adjustment of Guidelines § 3E.1.(b), which would result in a total offense level of 32.

## CRIMINAL HISTORY CATEGORY

16. It is the understanding of the government and the defendant that the defendant's criminal history category is V. The defendant understands that if the defendant is sentenced for, or convicted of, any other charges prior to sentencing in this action the defendant's criminal history category may increase. The defendant understands that the defendant has no right to withdraw the pleas of guilty based on the Court's determination of the defendant's criminal history category.

## GUIDELINES' APPLICATION, CALCULATIONS AND IMPACT

17. It is the understanding of the government and the defendant that, with a total offense level of 32 and criminal history category of V, the defendant's sentencing range would be a term of imprisonment of 188 to 235 months, a fine of $35,000 to $350,000, and a period of supervised release of 1 to 3 years. Notwithstanding this, the defendant understands that at sentencing the defendant is subject to the minimum and maximum penalties set forth in ¶ 1 of this agreement.

18. Notwithstanding the above calculations, it is the agreement of the parties pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure that the Court at the time of sentence impose a 180 month term of imprisonment as part of the appropriate sentence in this case. If, after reviewing the presentence report, the Court rejects this agreement, the parties will be relieved of their other obligations under this agreement and the defendant shall then be afforded the opportunity to withdraw the pleas of guilty. This agreement does not

affect the amount of a fine, the amount of restitution or the length and conditions of a term of supervised release that may be imposed by the Court at sentencing.

19. The defendant understands that except as set forth in ¶ 18, above, the Court is not bound to accept any Sentencing Guidelines calculations set forth in this agreement and the defendant will not be entitled to withdraw the plea of guilty based on the sentence imposed by the Court.

### IV. STATUTE OF LIMITATIONS

20. In the event the defendant's pleas of guilty are withdrawn, or convictions vacated, either pre- or post-sentence, by way of appeal, motion, post-conviction proceeding, collateral attack or otherwise, the defendant agrees that any charges dismissed pursuant to this agreement shall be automatically reinstated upon motion of the government and further agrees not to assert the statute of limitations as a defense to any other federal criminal offense which is not time barred as of the date of this agreement. This waiver shall be effective for a period of six months following the date upon which the withdrawal of the guilty pleas or vacating of the convictions becomes final.

### V. GOVERNMENT RIGHTS AND RESERVATIONS

21. The defendant understands that the government has reserved the right to:

a. provide to the Probation Office and the Court all the information and evidence in its possession that the government deems relevant concerning the defendant's background, character and involvement in the offense charged, the circumstances surrounding the charge and the defendant's criminal history;

b. respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government; and

c. modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines including criminal history category, in the event that subsequent to this agreement the government receives previously unknown information, including conduct and statements by the defendant subsequent to this agreement, regarding the recommendation or factor.

22. At sentencing, the government will move to dismiss the open counts of the Second Superseding Indictment as against the defendant.

23. The defendant agrees that any financial records and information provided by the defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

## VI.   APPEAL RIGHTS

24. The defendant understands that Title 18, United States Code, Section 3742 affords a defendant a limited right to appeal the sentence imposed. The defendant, however, knowingly waives the right to appeal and collaterally attack any component of a sentence imposed by the Court which falls within or is less than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 17, above, notwithstanding the manner in which the Court determines the sentence. In the event of an appeal of the defendant's sentence by the government, the defendant reserves the right to argue the correctness of the defendant's sentence.

25. The defendant understands that by agreeing not to collaterally attack the sentence, the defendant is waiving the right to challenge the sentence in the event that in the future the defendant becomes aware of previously unknown facts or a change in the law which the defendant believes would justify a decrease in the defendant's sentence.

26. The government waives its right to appeal any component of a sentence imposed by the Court which falls within or is greater than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 17, above, notwithstanding the manner in which the Court determines the sentence. However, in the event of an appeal from the defendant's sentence by the defendant, the government reserves its right to argue the correctness of the defendant's sentence.

## VII.   FORFEITURE PROVISION

27. Upon the defendant's conviction under Counts 1, 8, and 9, the defendant agrees to the forfeiture of all of his right, title, and interest in the following property pursuant to Title 18, United States Code, Sections 1963(a)(1) and 3665 against the following property:

  a) One Taurus, Model 80, 38 special revolver, caliber: .38, SN: 708150, with six (6) rounds .38 caliber ammunition recovered from 57 Humphrey Road, Upper Apartment, Buffalo, New York on or about August 9, 2013, and previously in the custody of Erie County Sheriff's Office; and

  b) One (1) AK-47 type magazines containing ten (10) 7.62X39 caliber cartridges and one (1) empty AK-47 type magazine, three (3) rounds of ammunition (.22/.38/.308), one rifle scope, twenty (20) rounds 45 caliber ammunition, two (2) magazines, one Hi Point pistol, Model JHP, 45 ACP caliber, SN: X491425, and one (1) shell casing; recovered on or about July 31, 2015 from 2936 Five Mile Road, Lot No. 4, Allegany, New York.

28. The defendant hereby waives any right to notice of a <u>Preliminary Order of Forfeiture</u> and consents and agrees that it shall become final as to the defendant prior to sentencing and agrees that the Order shall be made part of the defendant's sentence and included in the Judgment pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure.

29. The defendant further agrees to the entry of orders of forfeiture for the aforementioned property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of property is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted.

30. The defendant agrees that the above-described property is also subject to forfeiture and waives any and all statutory and constitutional rights, including but not limited to time restrictions and notice provisions with respect to the final disposition or forfeiture of the above property. The defendant further agrees to the destruction of the firearm and ammunition described above.

### VIII. TOTAL AGREEMENT AND AFFIRMATIONS

31. This plea agreement represents the total agreement between the defendant, GREGORY WILLSON, and the government. There are no promises made by anyone other

than those contained in this agreement. This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

JAMES P. KENNEDY, JR.
United States Attorney
Western District of New York

BY: *signature*
JOSEPH M. TRIPI
Assistant United States Attorney

Dated: November 30, 2017

I have read this agreement, which consists of 16 pages. I have had a full opportunity to discuss this agreement with my attorney, Thomas J. Eoannou, Esq. I agree that it represents the total agreement reached between myself and the government. No promises or representations have been made to me other than what is contained in this agreement. I understand all of the consequences of my pleas of guilty. I fully agree with the contents of this agreement. I am signing this agreement voluntarily and of my own free will.

*signature*
GREGORY WILLSON
Defendant
Dated: November 30, 2017

*signature*
THOMAS J. EOANNOU, ESQ.
Attorney for the Defendant
Dated: November 30, 2017